IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| OMZZ TRADING CO., LIMITED and NINGBO UNIONMAX TECHNOLOGY CO., LTD., | ) | |
| Plaintiffs, | ) | Case No. 1:26-CV-09480 |
| v. | ) | |
| EVERPLAY LABS LIMITED, | ) | |
| Defendant. | ) | |

**EVERPLAY LABS LIMITED'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ITS MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to the Court's October 27, 2026 Order (Dkt. 46), Defendant and Counterclaim-Plaintiff Everplay Labs Limited ("Everplay") submits these proposed findings of fact and conclusions of law on its Motion for Preliminary Injunction (Dkt. 12) against Plaintiffs and Counterclaim-Defendants OMZZ Trading Co., Limited and Ningbo UnionMax Technology Co., Ltd. (collectively, "OMZZ").

The District Judge referred the motion, together with OMZZ's motion to stay, to this Court for a report and recommendation. Dkt. 15, 16, 21. The Court held an evidentiary hearing on October 30, 2026. Dkt. 30, 49. Everplay presented the live testimony of Anthony Erwin, a co-founder and director of Everplay and a named inventor of U.S. Patent No. 12,551,811 (the "'811 patent"), and of Timothy P. Fletcher, an industrial designer whom Everplay tendered as an expert. Hr'g Tr.[1] 6:17–7:8, 55:7–15, 59:3–7. OMZZ cross-examined both witnesses. It called no witnesses

[1] "Hr'g Tr." refers to the transcript of the October 30, 2026 hearing (Dkt. 50), cited by page and line, and "Hr'g Ex." to an exhibit received at that hearing. Docket citations are to ECF page numbers.

of its own, *id.* at 4:24–5:1, and it confirmed that it had no further evidence to offer on the motion. *Id.* at 101:14–18, 102:7–21.

Having considered the testimony, the exhibits received at the hearing, the declarations and exhibits of record, and the parties' briefs, the Court makes the following findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(2) and recommends that the motion be granted. Any finding of fact that is more properly a conclusion of law is adopted as a conclusion of law, and any conclusion of law that is more properly a finding of fact is adopted as a finding of fact.

## I. PROCEDURAL HISTORY

1. OMZZ filed this action on August 7, 2026, seeking a declaratory judgment that the claims of the '811 patent are invalid. Dkt. 1. OMZZ did not seek a declaration of non-infringement. *Id.*

2. Everplay answered and counterclaimed for infringement of the '811 patent on August 31, 2026. Dkt. 9. OMZZ answered the counterclaims on September 21, 2026. Dkt. 18.

3. On September 17, 2026, Everplay moved for a preliminary injunction based on claim 1 of the '811 patent. Dkt. 12, 13. The motion was supported by Exhibit 1, the declaration of Anthony Erwin (Dkt. 13-1), Exhibits 1-A through 1-E (Dkt. 13-2 through Dkt. 13-6), Exhibit 2, the declaration of Timothy P. Fletcher (Dkt. 13-7), Exhibits 2-A through 2-H (Dkt. 13-8 through Dkt. 13-15), and Exhibits 3 through 9 (Dkt. 13-16 through Dk. 13-22). The District Judge referred the motion to this Court. Dkt. 15, 16.

4. In the parties' September 25, 2026 joint status report, OMZZ stated that it did not intend to retain an expert for its response, and that it would rely on declarations from its own personnel concerning, among other things, its sales and inventory and the harm an injunction

would cause. Dkt. 26 at 1–2.

5. On September 29, 2026, the Court set an in-person evidentiary hearing for October 30, 2026. Everplay represented that it would present two witnesses, and OMZZ represented that it did not intend to present any witnesses. Dkt. 30.

6. OMZZ filed its opposition on October 14, 2026. Dkt. 39. It attached two patent references, U.S. Patent No. 10,217,388 ("Alkas") (Dkt. 39-1) and Korean Utility Model Registration No. 20-0442713 ("Kim '713"), with an English translation (Dkt. 39-2). It submitted no declaration, expert or lay.

7. Everplay replied on October 21, 2026 (Dkt. 42), with Exhibit 10, a supplemental declaration from Mr. Fletcher (Dkt. 42-6), and Exhibits 11 through 15. (Dkt. 42-1 through Dkt. 42-5).

8. At the hearing, Everplay stated that it would rely on the declarations and exhibits already filed without formally re-offering them, and the Court confirmed that those materials were before it. Hr'g Tr. 5:4–22. OMZZ did not object. *Id.*

9. The Court received two physical exhibits: Hearing Exhibit A, two SUPERSPACE panels, and Hearing Exhibit B, two panels of the Accused Products (defined below). Hr'g Tr. 20:6–22:14, 27:20–28:6, 33:3–6. Mr. Fletcher also displayed the disassembled panels, dowels, connectors and magnets he examined, and he used demonstrative slides previously provided to the Court and to OMZZ's counsel. *Id.* at 56:22–57:1, 59:12–62:18.

10. At the close of the evidence, the Court permitted OMZZ to file, by November 3, 2026, a sworn declaration limited to its sales of the Accused Products through all channels, for the sole purpose of setting security, and permitted Everplay to respond within two days. The Court ruled that any such declaration may not address OMZZ's claimed harms or any other subject. Hr'g

Tr. 107:13–18, 110:14–111:2, 111:22–112:14.

11. The Court also granted in part Everplay's motion to expedite the objection period (Dkt. 32). Any objection to the Report and Recommendation is due within five calendar days after its issuance, and any response within five calendar days after the objection is filed. Dkt. 49; Hr'g Tr. 130:23–131:19.

## II. FINDINGS OF FACT

### A. The Parties

12. Everplay Labs Limited is a company registered in the United Kingdom. It was formed on November 2, 2020. Dkt. 13-1 ¶ 3; Hr'g Tr. 8:11–16 (correcting the formation date stated in Dkt. 13-1 ¶ 3). It designs and sells SUPERSPACE, a line of life-size magnetic play panels that children use to build forts, houses, and other structures. Dkt. 13-1 ¶ 6; Hr'g Tr. 9:10–16.

13. SUPERSPACE sets, add-on packs and accessories are Everplay's only products. Dkt. 13-1 ¶ 29; Hr'g Tr. 9:10–13, 40:23–41:3. Everplay sells SUPERSPACE in the United States primarily through its own website, and since 2026 also on Amazon.com, along with a small business-to-business channel serving schools, libraries and children's museums. Hr'g Tr. 21:2–8; Dkt. 13-1 ¶ 14. Everplay is a small company: three founders and four full-time employees, three of whom are in the United States. Hr'g Tr. 7:4–8, 40:18–22.

14. Anthony Erwin is a co-founder and director of Everplay and has been with the company since its formation. Hr'g Tr. 6:22, 7:2–11. He runs Everplay's marketing and product development and works across all of its departments. *Id.* at 7:4–8; Dkt. 13-1 ¶ 4. He is a named inventor of the '811 patent. Dkt. 13-8 at 2; Hr'g Tr. 8:17–9:3.

15. OMZZ Trading Co., Limited is based in Hong Kong, and Ningbo UnionMax Technology Co., Ltd. is based in Ningbo, China. Dkt. 26 at 2. Each sells through its own Amazon

seller account: OMZZ Trading as "OMZZ-US," and UnionMax as "U-MOVING." Dkt. 42-3 at 2–11.

16. OMZZ sells "Umoving" magnetic fort-building panel sets on Amazon.com under two listings: ASIN B0F1F8XFQ6, a 24-piece "Deluxe" set, and ASIN B0F1FC6SHD, a 20-piece set (together, the "Accused Products"). Dkt. 13-1 ¶ 14; Dkt. 13-3 at 9, 16; Hr'g Tr. 26:19–27:5. OMZZ's Amazon page links the two sets as options of the same product. Dkt. 13-7 ¶ 48. OMZZ admits that it lists the Accused Products for sale, sets their pricing, describes them, and controls the content of its listings. Dkt. 18 ¶ 44.

17. OMZZ admits that Everplay and OMZZ "sell competing children's magnetic play-panel products." Dkt. 18 ¶ 19. The Accused Products are sold on Amazon.com in the same product subcategory as SUPERSPACE and appear alongside it in search results. Dkt. 13-1 ¶ 14; Hr'g Tr. 26:5–18.

**B. The '811 Patent and Claim 1**

18. The '811 patent, titled "System, Panel and Method," issued on February 17, 2026. Dkt. 13-8 at 2; Hr'g Tr. 34:4–6. It names Anthony Erwin and Craig Spencer as inventors and Everplay as assignee. Dkt. 13-8 at 2. It claims priority to a foreign application that Mr. Erwin and Mr. Spencer filed on August 25, 2020, before Everplay was formed, and that they later assigned to Everplay. Dkt. 13-1 ¶ 9; Hr'g Tr. 8:17–9:3 (correcting Dkt. 13-1 ¶ 9); Dkt. 42-6 ¶ 27.

19. Everplay asserts only claim 1 for purposes of this motion. Claim 1 recites:

> 1. A system for building a play area comprising:
>
> two or more panels, each of the two or more panels comprising:
>
> a plurality of connectors, each connector of the plurality of connectors defining a first recess at a first end of the connector and a second recess at a second end of the connector;
>
> a plurality of magnets, each magnet of the plurality of magnets positioned in a connector of the plurality of connectors such that the magnet is able to rotate, the plurality of magnets comprising:

a first magnet housed in the first recess of a first connector of the plurality of connectors; and

a second magnet housed in the second recess of the first connector; and

a plurality of dowels comprising:

a first dowel, a first end of which is received within the first recess of the first connector and a second end of which is received within the first recess of a second connector of the plurality of connectors; and

a second dowel, a first end of which is received within the second recess of the first connector and a second end of which is received within the first recess of a third connector of the plurality of connectors, wherein the first connector is coupled to the first dowel and the second dowel, the second dowel angled with respect to the first dowel;

wherein, for each of the two or more panels, when an edge of a first panel of the two or more panels is brought towards an edge of a second panel of the two or more panels from any direction, at least one magnet of the plurality of magnets in each of the first panel and the second panel orientates such that a magnetic connection is formed between the first panel and the second panel.

Dkt. 13-8, claim 1.

20. The parties have not asked the Court to construe any term of claim 1. OMZZ proposed no construction in its opposition or at the hearing. *See* Dkt. 39. The Court therefore applies the plain and ordinary meaning of the claim terms.

**C. Prosecution of Claim 1**

21. During prosecution, the examiner rejected the pending claims as obvious over U.S. Patent Publication No. 2016/0184727 ("Ornstein") in a non-final rejection dated March 18, 2025, and again in a final rejection dated August 5, 2025. Dkt. 13-18; Dkt. 13-19; Hr'g Tr. 71:24–72:7.

22. After an interview, the applicant amended claim 1 on August 28, 2025, to recite the connector structure now in the claim: connectors that each define a recess at each end, a magnet housed in each recess, and dowels whose ends are received within those recesses, with the second dowel angled with respect to the first. Dkt. 13-20; Dkt. 13-21; Dkt. 42-6 ¶ 33; Hr'g Tr. 72:8–14.

23. On November 12, 2025, the examiner allowed claim 1, explaining that "[t]he

closest prior art of record fails to make obvious a magnetized panel system comprising dowels and connectors having the structure as claimed, the connectors housing a magnet in each of two end recesses and the recesses each receiving a dowel in the manner claimed." Dkt. 13-22 at 8; *see* Hr'g Tr. 72:15–73:2.

24. Alkas was also before the examiner. It appears on the Notice of References Cited issued with the Notice of Allowance and in the examiner's search notes, and it is listed on the face of the '811 patent, with an asterisk denoting a reference cited by the examiner. Dkt. 42-1 at 4; Dkt. 13-8 at 2–3; Dkt. 42-6 ¶ 36; Hr'g Tr. 77:1–4, 93:14–95:6. The examiner allowed claim 1 over it. Hr'g Tr. 95:4–6.

**D. Development of SUPERSPACE**

25. Mr. Erwin and his co-inventor set out to build a life-size, modular play system that young children could build, take apart, and rebuild themselves, as an alternative to blanket forts and to existing rod-and-connector fort kits that children found "fiddly" and frustrating. Dkt. 13-1 ¶ 7; Hr'g Tr. 9:19–11:8.

26. They concluded that the panels had to meet three requirements at once: light enough not to hurt a child if a structure fell and for the connection to hold; stiff enough not to bend when stacked several panels high; and inexpensive enough to be sold in sets of many panels. Hr'g Tr. 11:19–12:16.

27. Meeting those requirements took many failed iterations. They tested foam, cardboard, and plastic panels and Velcro, interlocking, and magnetic connections. Hr'g Tr. 12:17–13:8. Magnets worked best with children, but fixed magnets attracted in one orientation and repelled in the other. *Id.* at 13:9–14:9. Rotating ball magnets connected from any direction but were too weak. *Id.* at 14:10–15:6. Diametrically magnetized cylindrical magnets, made to order

because they were not then available off the shelf, rotated and were strong enough. *Id.* at 15:7–16:21. But no panel material was at once light, stiff, and affordable; injection-molded foam came closest but cost too much. *Id.* at 16:22–17:16; Dkt. 13-1 ¶ 8.

28. The solution was to move the magnets into connectors at the corners of each panel. Each connector houses two rotating magnets and has an opening at each end that receives a dowel, so that the dowels and connectors form a light, rigid frame and the panel infill need not be stiff. Hr'g Tr. 17:17–18:18; Dkt. 13-1 ¶ 8. The corner placement also produced a stronger connection between panels. Hr'g Tr. 18:12–20. The development took more than a year. *Id.* at 18:21–19:14; Dkt. 13-1 ¶ 8.

29. SUPERSPACE today uses essentially the same connector, recessed-magnet and dowel configuration, in every panel shape. Hr'g Tr. 19:23–20:5, 20:21–23, 21:22–22:3. SUPERSPACE panels join when brought together in any orientation because of the rotating magnets inside. *Id.* at 21:9–20; Hr'g Ex. A.

30. Everplay launched the product, then called "Everplay," through a Kickstarter campaign in March and April 2021, and renamed it SUPERSPACE at the end of 2021. Hr'g Tr. 22:18–23:5; Dkt. 13-1 ¶ 9. About 3,200 backers pledged roughly £736,000, just over US $1 million, in the United States and the United Kingdom, before a single unit shipped. Hr'g Tr. 23:6–11, 44:4–23; Dkt. 13-2 at 2, 18.

31. SUPERSPACE received design awards in 2022, including a Core77 Design Award in the Sports & Recreation category and recognition in the Industrial Designers Society of America's IDEA program, and it was one of four finalists for the U.S. Toy of the Year award that year. Dkt. 13-2 at 19–29, 34–43; Dkt. 13-1 ¶ 10; Hr'g Tr. 23:12–24:25.

32. Everplay spent more than $5 million on advertising and marketing from 2021

through 2025. Dkt. 13-1 ¶ 13; Hr'g Tr. 43:25–44:3.

33. Customers buy SUPERSPACE for how it works. Asked on cross-examination whether awards and reviews are why customers choose SUPERSPACE, Mr. Erwin acknowledged that they play some part, but testified that the average consumer does not know what a Core77 award is and that customers buy SUPERSPACE because of "the way it works, the way it functions." Hr'g Tr. 45:9–19; *see id.* at 46:8–10. The function he described is the one the claimed structure provides: lightweight yet rigid and cost-effective panels that join from any direction "because of the rotating magnets inside," *id.* at 21:16–20, housed in corner connectors whose end openings also receive the dowels that form the panel's frame. *Id.* at 17:17–18:18, 20:21–23. That is the configuration that, after earlier designs failed, made light, sturdy, life-size panels feasible. *Id.* at 13:9–18:18. Everplay's marketing emphasizes the same mechanism: "[i]t's so easy for kids to build things because of the mechanism that we've built," without the "fiddly" assembly of rod-and-connector fort kits. *Id.* at 46:1–6; *see id.* at 10:16–21. "That's why people buy from us." *Id.* at 46:7. OMZZ offered no evidence to the contrary.

34. The same feature drives demand for the Accused Products. OMZZ advertises "Strong Magnetic Connections for Stable Structures." Dkt. 13-3 at 16. Buyers describe the Accused Products as "[a] great alternative to SUPERSPACE." Dkt. 13-4 at 2. SUPERSPACE owners can use the Accused Products as add-on panels, and have bought them for that purpose, because the accused panels use the same connector and magnet architecture, with the magnets in the same positions. Hr'g Tr. 28:12–19, 30:6–13, 32:23–33:2; Dkt. 13-4 at 4.

**E. Mr. Fletcher's Qualifications and the Level of Ordinary Skill**

35. Mr. Fletcher holds a bachelor's degree in product design from North Carolina State University and a master's degree in design from the Hong Kong Polytechnic University. Dkt. 13-

7 ¶ 10; Hr'g Tr. 57:20–25. He has more than thirty years of experience as an industrial designer and product developer, including the design of toys, infant products, and products that use magnets to hold components in place and to allow multiple configurations, and he has designed more than 150 products. Dkt. 13-7 ¶¶ 10–11, 22–25; Dkt. 13-9; Hr'g Tr. 58:1–16. He is a named inventor on U.S. design and utility patents, has taught industrial design at three universities, and is a Fellow of the Industrial Designers Society of America. Dkt. 13-7 ¶¶ 10, 15; Dkt. 13-10; Hr'g Tr. 58:17–59:2.

36. Mr. Fletcher testified that a person of ordinary skill in the art at the time of the invention would have had at least a bachelor's degree in industrial design, mechanical engineering or a related field and about five years of professional experience in consumer-products design and manufacturing, with additional education substituting for experience and vice versa. Dkt. 42-6 ¶ 26; Dkt. 13-7 ¶ 42; Hr'g Tr. 57:3–13. Only a drastic change in that definition would affect his opinions. Hr'g Tr. 57:17–19. OMZZ offered no contrary evidence. The Court adopts Mr. Fletcher's definition. The Court's conclusions would not change under any reasonable alternative definition.

37. Everplay tendered Mr. Fletcher as an expert in industrial design and consumer-product design and development, including magnetic and modular products. Hr'g Tr. 59:3–7. OMZZ did not object, and in response to the Court's question, OMZZ confirmed that it does not challenge his qualifications. *Id.* at 100:19–101:1. The Court finds Mr. Fletcher qualified to offer the opinions he gave on infringement and validity.

## F. The Accused Products Meet Every Limitation of Claim 1

### i. Mr. Fletcher's examination

38. Mr. Fletcher examined physical samples of SUPERSPACE and of the Accused Products, comparing the square panels of each; similar features are found in the other panel shapes.

Dkt. 13-7 ¶ 49; Dkt. 42-6 ¶ 52; Hr'g Tr. 59:16–20. Everplay has bought the Accused Products from Amazon several times, and the panels it has received have been consistent across purchases. Hr'g Tr. 28:3–11, 30:18–21.

39. Mr. Fletcher took the accused panels apart: he removed the stitching from the webbing, pulled the dowels from the connectors, and removed the magnets from the connectors. Dkt. 42-6 ¶ 54; Hr'g Tr. 59:21–60:5. Because the SUPERSPACE and accused parts were so similar, he marked them "S" for SUPERSPACE and "A" for accused product to keep them separate. Hr'g Tr. 60:22–61:14. He measured the connectors and magnets with calipers. Dkt. 13-7 ¶¶ 52–54; Dkt. 42-6 ¶ 56. He blackened one half of each magnet's face so that its rotation inside the connector could be seen, and mapped the magnets' polarity with a known diametric magnet. Dkt. 13-7 ¶ 55; Dkt. 42-6 ¶ 54(e); Hr'g Tr. 62:9–18. He also cross-sectioned an accused connector and a SUPERSPACE connector. Dkt. 42-6 ¶ 55. He brought the disassembled parts to the hearing. Hr'g Tr. 60:6–16, 61:20–62:7.

40. OMZZ has not contended, in its briefing, through any evidence or at the hearing, that the panels or connectors of the 20-piece and 24-piece Accused Products differ in any respect relevant to claim 1. *See* Dkt. 39; *see also* Dkt. 13-1 ¶ 17 (the products' panel shapes are "almost identical and function identically").

**ii. Element-by-element comparison**

41. **Preamble: "A system for building a play area."** Each Accused Product is a set of panels sold for building forts and play structures. OMZZ's own listing describes a "magnetic fort building kit" for "walk-in forts." Dkt. 13-3 at 16; Dkt. 13-7 ¶¶ 50–51, 63; Hr'g Tr. 63:8–12. To the extent the preamble is limiting, it is met.

42. **"Two or more panels."** Each Accused Product contains twenty or twenty-four

panels. Dkt. 13-1 ¶ 17; Dkt. 13-3 at 9, 16; Hr'g Tr. 26:23–27:5, 63:13–17. Each panel is a felt sheet stretched over a frame of wooden dowels joined at the corners by plastic connectors. Dkt. 42-6 ¶ 56; Dkt. 13-7 ¶ 63; Hr'g Tr. 59:21–60:5.

43. **"A plurality of connectors, each … defining a first recess at a first end … and a second recess at a second end."** Each accused panel has a plastic connector at each corner. Each connector has two ends, and each end defines a recess, an opening going into the connector. Dkt. 13-7 ¶ 63; Dkt. 42-6 ¶¶ 54(a)–(c), 55–56; Hr'g Tr. 63:18–64:11. The SUPERSPACE and accused connectors each measure 60 mm overall. Dkt. 42-6 ¶ 56.

44. **"A plurality of magnets … positioned in a connector … such that the magnet is able to rotate."** Each accused connector holds cylindrical magnets that are diametrically magnetized and free to rotate within the connector. Dkt. 13-7 ¶ 55; Dkt. 42-6 ¶ 54(e); Hr'g Tr. 64:13–23. Mr. Fletcher demonstrated the rotation at the hearing: as he brought two accused connectors toward each other from about an inch and a half apart, the marked magnets visibly turned inside the connectors until their attracting poles faced each other. Hr'g Tr. 64:17–65:24.

45. **"A first magnet housed in the first recess of a first connector" and "a second magnet housed in the second recess of the first connector."** Each end recess of an accused connector houses one magnet, for eight magnets per panel. Dkt. 13-7 ¶ 63; Dkt. 42-6 ¶¶ 54(c), 55, 57; Hr'g Tr. 65:25–66:15. The cross-section shows the magnet seated within the connector's end recess. Dkt. 42-6 ¶ 55.

46. **"A first dowel, a first end of which is received within the first recess of the first connector and a second end of which is received within the first recess of a second connector."** The wooden dowel along each edge of an accused panel runs from one corner connector to the next. Its ends are inserted into the end recesses of the two connectors it joins. Dkt. 13-7 ¶ 63; Dkt.

42-6 ¶¶ 54(b)–(c), 57; Hr'g Tr. 66:16–67:6. The dowel end sits in the same recess as the magnet and holds the magnet in that recess. Dkt. 13-7 ¶ 64; Dkt. 42-6 ¶¶ 55, 57. The cross-section shows the end of the dowel inside the connector, against the magnet. Dkt. 42-6 ¶ 55.

47. **"A second dowel … received within the second recess of the first connector and … within the first recess of a third connector …, wherein the first connector is coupled to the first dowel and the second dowel, the second dowel angled with respect to the first dowel."** At each corner, the connector receives one dowel in each of its two end recesses. The two dowels run along adjacent edges of the panel, at a 90-degree angle to one another, to the next connector in each direction. Dkt. 13-7 ¶ 63; Dkt. 42-6 ¶ 54(b)–(c); Hr'g Tr. 67:7–21.

48. **"Wherein … when an edge of a first panel … is brought towards an edge of a second panel … from any direction, at least one magnet … in each … panel orientates such that a magnetic connection is formed."** When an edge of one accused panel is brought toward the edge of another, the magnets nearest each other rotate to present attracting poles and the panels join, whichever way the panels are oriented. Dkt. 13-7 ¶¶ 55, 63; Hr'g Tr. 67:24–68:13. Both witnesses demonstrated this with the accused panels at the hearing. Hr'g Tr. 28:12–29:9, 68:4–13; Hr'g Ex. B. OMZZ markets this feature, promising "Strong Magnetic Connections for Stable Structures." Dkt. 13-3 at 16.

49. The Court finds that each Accused Product contains every limitation of claim 1. Dkt. 13-7 ¶ 63; Dkt. 42-6 ¶¶ 52–59; Hr'g Tr. 68:16–69:5, 81:12–13.

### iii. OMZZ offered no evidence of non-infringement

50. OMZZ offered no evidence that any limitation of claim 1 is absent from the Accused Products. It did not examine or test the products, and it offered no witness, declaration or document describing their construction. *See* Dkt. 39; Hr'g Tr. 4:24–5:1, 102:7–21. It did not cross-

examine Mr. Fletcher on infringement. Hr’g Tr. 82:9–92:24.

51. OMZZ’s opposition asserted that Everplay had not shown the magnets and dowels are positioned “in the manner claimed,” but it did not identify which limitation is missing or how the Accused Products differ from the claim. Dkt. 39 at 7; *see* Hr’g Tr. 68:23–69:2.

**G. The Asserted Prior Art**

52. OMZZ’s complaint listed ten alleged prior art references but developed only one combination against claim 1: Ornstein in view of CN 104274984 (“Wei”) and WO 2006/112679 (“Kim WO”). Compl. ¶¶ 30–31. OMZZ’s opposition adds a second combination: Ornstein in view of Alkas and Kim ’713. Dkt. 39 at 5–6. OMZZ offered no evidence on any other reference or ground. Hr’g Tr. 101:3–18, 102:7–21.

53. Ornstein discloses a modular panel assembly whose frame is made of integral frame portions, so that each corner is a single solid piece. Dkt. 13-7 ¶¶ 78–83; Dkt. 42-6 ¶ 34; Hr’g Tr. 73:3–18. Ornstein has no separate connectors with recesses and no dowels spanning from one connector to another, and its magnets are not located in connector recesses. Hr’g Tr. 73:19–74:9; Dkt. 13-22 at 8.

54. Wei discloses an adapter for a three-dimensional pipeline assembly. Dkt. 13-7 ¶¶ 85–89; Hr’g Tr. 74:10–12. Wei’s magnet is fixedly embedded in a cavity behind the floor of the adapter’s recess, cannot rotate, and attracts magnetically attractable metal rather than another rotating magnet. Dkt. 13-14 at 13–15 (¶ [0031]); Dkt. 13-7 ¶¶ 85–89; Hr’g Tr. 74:13–75:3. The recess receives the end piece of a mating pipe or a loose connecting block, not a dowel end in a recess that houses the connector’s own rotatable magnet. Dkt. 13-14 at 13–15 (¶¶ [0024]–[0025]).

55. Kim WO discloses a rod-and-ball construction toy. Its connectors are metal balls with no recesses, and its magnets sit in caps at the ends of hollow rods and attach the rods to the

balls. Dkt. 13-15 at 6–7; Dkt. 13-7 ¶¶ 90–93; Hr'g Tr. 75:4–76:7. In some embodiments a panel attaches to a ball or a rod, but the magnets do not join one panel to another. Hr'g Tr. 75:19–76:11.

56. Alkas discloses a display frame for trade shows. Dkt. 39-1, col. 1:4–7; Hr'g Tr. 76:12–15. Its connector carries male tenons that fit inside hollow frame tubes, so the frame member receives the connector, not the reverse. Dkt. 39-1, col. 3:44–58; Hr'g Tr. 76:16–21. Its magnet is a diametrically polarized cylinder carried on a separate magnet assembly inside the tube, where it rotates so that its poles self-align and adjacent display frames can couple in any orientation. Dkt. 39-1, col. 4:51–64; Dkt. 42-6 ¶¶ 37–40; Hr'g Tr. 76:22–25, 89:25–91:9. The magnet is not in the connector or in a recess of the connector. Hr'g Tr. 90:11–14, 91:10–16. Alkas has no connector with an end recess that houses a magnet and receives a dowel end. Dkt. 42-6 ¶¶ 40, 46.

57. Mr. Fletcher, who has designed trade-show exhibits, testified that a person of ordinary skill designing children's play panels would not look to trade-show display frames as analogous art because toys are safety-oriented, whereas trade-show displays are assembled and dismantled by professionals. Hr'g Tr. 89:18–24, 95:10–96:6. The Court credits that testimony.

58. Kim '713 discloses a toy block with a thumbtack-shaped fixing pin, about 4 mm long, that passes through the center of a ring-shaped magnet and holds the magnet in place as it turns. Dkt. 39-2 at 10–13; Dkt. 42-6 ¶¶ 41–45; Hr'g Tr. 77:5–20, 96:19–97:23. The pin is only a holder. It does not join one part to another, and it has no second end received in another connector; the blocks simply come together and are held by their magnets, with no connectors. Dkt. 42-6 ¶¶ 44–46; Hr'g Tr. 97:13–98:16. Asked to respond to this distinction, OMZZ's counsel argued only that the fact of rotation is sufficient. Hr'g Tr. 101:19–102:6.

**i. Differences between the prior art and claim 1**

59. No asserted reference, alone or in combination, discloses a connector that houses a

rotatable magnet in each of its two end recesses, with each recess also receiving the end of a dowel that spans to another connector. Dkt. 13-7 ¶¶ 78–94; Dkt. 42-6 ¶¶ 31–47; Hr'g Tr. 77:21–78:7, 78:13–22.

60. To reach claim 1 from OMZZ's second combination, a skilled artisan would have had to invert Alkas's joint so that the connector receives the frame member, move Alkas's magnet out of the frame tube and into a recess of the connector that also receives the frame member, which changes what holds the magnet and how it turns, and convert Kim '713's fixing pin into a member spanning two connectors. Dkt. 42-6 ¶ 46; Hr'g Tr. 78:13–79:4.

61. Mr. Fletcher testified that he saw no reason, absent hindsight, for a person of ordinary skill to combine the references in the way OMZZ proposes, or any teaching in the art that would lead to the claimed structure. Dkt. 42-6 ¶ 47; Dkt. 13-7 ¶ 94; Hr'g Tr. 78:8–12, 78:23–79:7. The Court credits that testimony. OMZZ offered no evidence of a reason to combine, of how a skilled artisan would have made the combination, or of a reasonable expectation of success. *See* Dkt. 39 at 5–6. When the Court asked what evidence OMZZ had of why a skilled artisan would view its combinations as obvious, OMZZ's counsel pointed only to the references themselves, and confirmed that OMZZ had no other evidence to rebut Mr. Fletcher's testimony. Hr'g Tr. 101:3–18.

**H. Objective Indicia**

62. SUPERSPACE embodies claim 1. Mr. Fletcher examined SUPERSPACE, including a cross-sectioned SUPERSPACE connector, compared it to claim 1, and found every limitation present. Hr'g Tr. 69:6–13, 81:14; Dkt. 42-6 ¶¶ 55, 59; Dkt. 13-7 ¶ 59. Every SUPERSPACE panel shape uses the claimed connector, recessed-magnet and dowel configuration. Hr'g Tr. 20:21–23, 21:22–22:3.

63. The praise SUPERSPACE received was directed to the claimed structure. Everplay's award-winning Core77 entry credited "a frame that would house the magnets while allowing the panels to be lightweight." Dkt. 13-2 at 19, 24. National Parenting Product Awards evaluators wrote that "there is no right or wrong way to assemble them" and that "[t]he panels are lightweight and the magnets are really strong." *Id.* at 27.

64. The features that drew that praise and that drive customer demand result from the claimed structure. Panels can be joined from any direction because the magnets housed in the connector recesses are able to rotate. Life-size panels can be light because the dowels received in those same recesses form a rigid frame. Dkt. 13-1 ¶ 8; Dkt. 13-7 ¶ 63; Hr'g Tr. 17:17–18:18, 21:9–20, 45:17–46:7.

65. The Accused Products track SUPERSPACE closely. Their square panels measure 0.5 m on each side, the same as SUPERSPACE's. Their connectors measure 60 mm overall and their magnets 10 mm in length, the same as SUPERSPACE's. Dkt. 42-6 ¶ 56; Dkt. 13-7 ¶¶ 52–54; Hr'g Tr. 69:14–18. Their magnets are positioned in exactly the same places as SUPERSPACE's. Dkt. 13-1 ¶ 17; Hr'g Tr. 28:12–19. The only measured difference, about 4 mm in the depth from the magnet to the connector face, has no effect on function, and claim 1 recites no recess dimension. Hr'g Tr. 69:18–70:8. The Accused Products are sold in 20- and 24-panel sets, against SUPERSPACE's 16- and 24-panel sets, with nearly the same distribution of panel shapes. Dkt. 13-1 ¶¶ 17–18; Hr'g Tr. 25:19–25, 26:23–27:5.

66. The two products' panels are interchangeable. Mr. Fletcher built two open cubes, each combining two SUPERSPACE square panels with two accused square panels, assembled two different ways, and the panels joined and formed a structure each time. Dkt. 42-6 ¶ 53(a) (Assemblies 1 and 2); Dkt. 13-7 ¶¶ 56–57; Hr'g Tr. 69:25–70:5. At the hearing, Mr. Erwin joined

a SUPERSPACE panel to an accused panel, and they connected in any orientation, just as two SUPERSPACE panels do. Hr'g Tr. 28:12–29:15; Hr'g Exs. A, B.

67. OMZZ offered no evidence that the praise, commercial response or similarity described above is attributable to anything other than the claimed structure. *See* Dkt. 39 at 6–7; Hr'g Tr. 101:3–18, 102:7–21.

### I. Written Description

68. The application as filed (U.S. Application No. 18/023,046) describes a dowel received in the connector's end recess with the magnet. Dkt. 42-4; Dkt. 42-6 ¶ 49. Its summary states that the magnet is "held in place in the first end of the first connector by the first dowel" and that "each housing portion … comprises a recess." Dkt. 42-4 at 3 (application p. 2). It describes an embodiment in which "a clip may not be provided and dowel 1308a may hold magnet 1300a in connector 1310." *Id.* at 29 (application p. 28). Figure 15, a cross-section "taken through a connector 1510," shows each dowel end within an end of the connector, with the magnet in the housing portion of that same end. *Id.* at 30, 56 (application p. 29 & Fig. 15); Dkt. 42-6 ¶ 49; Hr'g Tr. 79:25–81:5.

69. As originally filed, the claims recited that "the first dowel is configured to hold the first magnet in the first end of the connector" and that the magnet "can rotate in the at least one recess." Dkt. 42-4 at 34, 38 (original claims 2, 20); *see also id.* at 8, 13; Hr'g Tr. 80:25–81:5.

70. Mr. Fletcher testified that a person of ordinary skill would understand the application as filed to describe the subject matter of claim 1, including a dowel end received within the recess that houses the magnet. Dkt. 42-6 ¶¶ 48–49; Hr'g Tr. 79:25–80:9, 81:6–9. OMZZ offered no evidence of how a skilled artisan would read the application; its counsel confirmed that OMZZ relies only on the face of the documents. Hr'g Tr. 103:3–12. The Court credits Mr.

Fletcher's testimony.

**J. Everplay's Business and the Harm from Continued Infringement**

71. Everplay and OMZZ compete directly for the same customers: consumers shopping for life-size magnetic fort-building panel sets. Dkt. 18 ¶ 19; Dkt. 13-1 ¶¶ 14, 29. In an Amazon search for "superspace magnetic tiles," two of the top three results were the Accused Products. Dkt. 13-3 at 9; Dkt. 13-1 ¶ 21; Hr'g Tr. 26:5–18. Customers who learn of SUPERSPACE often shop around on Amazon, where the Accused Products appear alongside SUPERSPACE at a lower price, and many buy the cheaper product even when they understand it is a different product. Hr'g Tr. 33:8–34:2, 49:8–13.

72. SUPERSPACE is an expensive toy bought mainly as a holiday gift, and Everplay's sales are concentrated in the holiday season. Hr'g Tr. 37:16–38:4. Fourth-quarter net sales were 50.7% of Everplay's full-year U.S. net sales in 2022, 53.9% in 2023, 65.0% in 2024 and 72.1% in 2025. In 2025, November alone accounted for about 53% of Everplay's full-year U.S. net sales. Dkt. 13-1 ¶ 30; Dkt. 13-6; Hr'g Tr. 39:2–11, 42:16–43:16. These figures were prepared by Everplay's chief financial officer from its sales records, which flow from its Shopify e-commerce system into its Xero accounting system, and they reflect U.S. sales only. Hr'g Tr. 38:5–39:4, 43:17–21. OMZZ confirmed each figure on cross-examination and did not dispute them. *Id.* at 42:16–43:21.

73. Everplay places its large holiday orders with its factory in China in early-to-mid July, it pays 15% on ordering and 85% forty-five days after production, financed by loans that it must repay regardless of when the inventory sells. Hr'g Tr. 39:15–40:17; Dkt. 13-1 ¶¶ 31–32.

74. If Everplay's fourth-quarter sales were suppressed, the effect would be "disastrous." Hr'g Tr. 41:4–6. Sales fall off after the holidays, Everplay's cash would be tied up

in unsold inventory, it would incur storage costs, and it would likely have to cut marketing, let staff go and pause the other children's products it has in development. Hr'g Tr. 41:7–16.

75. Everplay has never licensed the '811 patent, and it would not license the patent to a competitor such as OMZZ. Hr'g Tr. 37:9–15.

76. The Accused Products are priced below SUPERSPACE. On September 11, 2026, Everplay's 24-panel SUPERSPACE Big Set was listed at $449, and the 24-piece Accused Product at $379.99, about 15% less. Dkt. 13-3 at 2, 16; Dkt. 13-1 ¶ 24; Hr'g Tr. 26:3–4, 27:6–13, 47:2–10. Mr. Erwin checks the Accused Products' listing every day or two. The 24-piece set has generally been listed at a discount, at about $379, rising to about $400 in recent weeks, but always below SUPERSPACE. Hr'g Tr. 27:14–19, 47:11–18; Dkt. 13-1 ¶ 24.

77. Consumers compare the two products directly and choose between them on price. One Amazon reviewer described Umoving as "[a] great alternative to SUPERSPACE and much better value." Dkt. 13-4 at 2; Hr'g Tr. 48:15–49:1. In a review dated June 26, 2026, a family that already owned "the original, Super Space tiles" explained that it bought Umoving because it was "on sale and more than half of what we paid." Dkt. 13-4 at 4; Dkt. 13-1 ¶ 25; Hr'g Tr. 49:2–7.

78. SUPERSPACE customers cannot be identified when they buy from OMZZ instead. The substitution surfaces, if at all, only in occasional public reviews. Dkt. 13-1 ¶ 25; Dkt. 13-4; Hr'g Tr. 32:18–33:2.

79. Add-on packs account for about 20% of Everplay's business. Hr'g Tr. 29:17–30:5; Dkt. 13-1 ¶ 17. Because accused panels connect to SUPERSPACE panels in the same way two SUPERSPACE panels do, a SUPERSPACE owner can buy an Accused Product as a cheaper substitute for an Everplay add-on pack. Hr'g Tr. 30:6–13.

80. OMZZ added the 24-piece set to its offerings in or around February 2026, around

when the ’811 patent issued. Dkt. 13-1 ¶ 18.

81. On September 11, 2026, Amazon displayed “100+ bought in past month” for the 20-piece Accused Product and “50+ bought in past month” for the 24-piece Accused Product. Dkt. 13-3 at 9. OMZZ offered no evidence of its actual sales volume, though it alone has that information, and its counsel could not state it at the hearing. Hr’g Tr. 106:24–107:12.

82. Everplay has built its reputation with parents and educators on product quality, safety and customer service. It maintains U.S.-based customer-service, logistics and business-to-business teams. Dkt. 13-1 ¶¶ 11–12, 28; Hr’g Tr. 32:10–17, 45:6–8. Everplay has bought and tested the Accused Products and found them made of cheaper, brittle plastic, with lower-quality webbing and stitching that frays; Mr. Erwin is concerned that customers will attribute that quality to SUPERSPACE. Hr’g Tr. 30:14–32:1.

83. Some consumers have mistaken the Accused Products for SUPERSPACE. One consumer contacted Everplay about a Umoving listing and its return policy, believing it was SUPERSPACE. Dkt. 13-5; Dkt. 13-1 ¶ 27; Hr’g Tr. 50:5–11. Mr. Erwin also testified that Everplay’s customer-service team has several times received complaints about frayed or broken panels that turned out to be Umoving panels, from customers who had mistaken them for SUPERSPACE. Hr’g Tr. 32:2–17. The Court gives this evidence modest weight.

84. OMZZ’s offices are in Hong Kong and Ningbo, China. Dkt. 26 at 2. Both of OMZZ’s Amazon seller profiles list business addresses only in Hong Kong or China. Dkt. 42-3 at 4–5, 10. OMZZ offered no evidence that it holds any assets in the United States that would be available to satisfy a judgment, and it has offered no guaranty or other assurance that a judgment would be paid. OMZZ’s counsel stated that proceeds of its Amazon sales are held in accounts with Amazon and that OMZZ does business in the United States, but there is no evidence of any account

balance or that any funds will remain in the United States, and counsel acknowledged that a judgment creditor would have to pursue post-judgment discovery to reach funds held by Amazon. Hr'g Tr. 103:13–105:2.

85. Amazon generally remits seller proceeds to sellers on a bi-weekly (14-day) basis, or more often at Amazon's option. Dkt. 42-5 (§ S-5); *see id.* (§ P-1). Funds passing through Amazon seller accounts are therefore transitory. OMZZ offered no evidence to the contrary.

**K. Everplay's Enforcement Efforts**

86. Everplay began preparing to enforce its patent rights on Amazon before the '811 patent issued. Enforcement through Amazon's Patent Evaluation Express ("APEX") program required Everplay, a foreign company not then selling on Amazon, to establish an Amazon seller account and enroll in Amazon Brand Registry. Everplay engaged an agency for that purpose in November 2025. Hr'g Tr. 34:7–22, 35:7–11.

87. The '811 patent issued on February 17, 2026, while that work was under way. Dkt. 13-8 at 2; Hr'g Tr. 34:4–6, 35:12–13. Everplay's Amazon account went live in April 2026, and Everplay then enrolled its trademark and its patent in Amazon Brand Registry, a prerequisite to an APEX submission. Hr'g Tr. 34:21–35:6, 35:14–16.

88. Everplay submitted an APEX complaint against the Accused Products on May 4, 2026. Dkt. 13-1 ¶ 19; Hr'g Tr. 35:3–6, 35:17–18. Mr. Erwin understood that the process would take about three weeks. When three weeks passed without a response, he tried to contact Amazon several ways and to escalate the complaint, but heard nothing back. Hr'g Tr. 35:19–36:1. After a couple more weeks, Everplay re-filed its APEX complaint in June. *Id.* at 36:1–6. Only then did Amazon respond, stating that an APEX procedure was already under way and that Amazon had emailed Everplay on May 7. That response led Everplay to discover that the May 7 email had gone

to a spam folder. *Id.* at 36:6–10. Everplay replied, and Amazon confirmed that the APEX procedure could proceed. *Id.* at 36:11–18.

89. Everplay signed the APEX agreement on July 2, 2026. Amazon notified OMZZ on or about July 6, initiated the evaluation on July 28, and selected a neutral evaluator on August 4, and Everplay paid the evaluator's fee on August 5. Dkt. 13-1 ¶ 19; Dkt. 1-2; Dkt. 18 ¶ 16; Hr'g Tr. 36:19–24.

90. OMZZ filed this action on August 7, 2026, and Amazon paused the APEX evaluation. Dkt. 13-1 ¶ 19; Dkt. 1; Hr'g Tr. 36:25–37:8. Everplay counterclaimed on August 31 and moved for a preliminary injunction on September 17, 2026. Dkt. 9, 12.

91. Everplay pursued relief diligently and continuously, beginning before the patent issued. Its preliminary-injunction motion was filed about seven months after issuance, after OMZZ's lawsuit halted the APEX process.

**L. The Balance of Hardships**

92. SUPERSPACE is the entirety of Everplay's business, and a suppressed holiday season would cause it serious and lasting harm. Dkt. 13-1 ¶ 29; Hr'g Tr. 40:18–41:16.

93. OMZZ offered no evidence of any hardship an injunction would cause it. Although OMZZ told the Court it would submit declarations on its sales and inventory and on the harm an injunction would cause, it submitted none. Dkt. 26 at 2; Dkt. 39. At the hearing, OMZZ's counsel asserted that OMZZ faces holiday-season pressures like Everplay's, but offered no evidence of that. Hr'g Tr. 106:5–15, 107:21–108:9.

94. The proposed injunction reaches only the two Accused Products and products not more than colorably different from them that also infringe claim 1. Everplay does not seek to enjoin OMZZ's other products. Hr'g Tr. 117:7–11. UnionMax's U-MOVING brand store on

Amazon also sells toddler beds, a play mat and a modular sofa set, none of which would be enjoined. Dkt. 42-3 at 12–14.

**M. Security**

95. OMZZ offered no evidence of its sales, margins, inventory or the cost of compliance with an injunction. Dkt. 39 at 12. At the hearing, OMZZ's counsel could not state OMZZ's sales and proposed no amount of security, asserting only that $100,000 would be too low. Hr'g Tr. 105:24–107:12.

96. The only evidence of OMZZ's sales volume in the record is Amazon's September 11, 2026 display of "100+ bought in past month" for the 20-piece Accused Product, listed at $289.99, and "50+ bought in past month" for the 24-piece Accused Product, listed at $379.99. Dkt. 13-3 at 9. Mr. Erwin, whose own Amazon listings carry the same indicators, testified that "50+" means 50 to 100 units in the past month and "100+" means 100 to 200. Hr'g Tr. 112:21–114:10. His understanding rests on Everplay's experience comparing the indicators on its own listings with its own sales, *id.* at 114:3–5, 115:5–8, and on information from Everplay's Amazon marketing agency. *Id.* at 114:6–10, 114:20–115:13. OMZZ offered nothing to the contrary.

97. At the top of each range and the listed prices, OMZZ's gross sales of the Accused Products are about $96,000 per month (100 × $379.99 + 200 × $289.99); at the bottom of each range, about $48,000. Even at the roughly $400 price at which the 24-piece set has recently been listed, Hr'g Tr. 47:13–17, the monthly total remains under $100,000. The record contains no evidence of OMZZ's margin.

**N. Credibility**

98. The Court finds Mr. Erwin credible. He testified from personal knowledge of Everplay's products, operations and records. He volunteered corrections to two paragraphs of his

declaration. Hr'g Tr. 8:11–9:9. He acknowledged the limits of his knowledge, including that he does not know which search terms OMZZ purchases, *id.* at 50:12–51:24, and that the one documented customer-service inquiry concerned a question about returns. *Id.* at 50:8–11. OMZZ confirmed his sales figures on cross-examination. *Id.* at 42:16–43:21. OMZZ's cross-examination established that Everplay has invested in marketing, that SUPERSPACE has won awards and favorable reviews, and that some buyers choose Umoving on price. *Id.* at 43:25–49:13. None of that detracts from his testimony.

99. The Court finds Mr. Fletcher credible. His opinions rest on his physical examination, disassembly, measurement and testing of the products, which he demonstrated in court, and they are consistent with the documents and the physical exhibits. Hr'g Tr. 59:16–70:8. OMZZ did not challenge his qualifications, did not cross-examine him on infringement, and offered no contrary expert. *Id.* at 82:9–92:24, 100:19–101:18. That counsel supplied the legal standards he applied is expected of a non-lawyer expert, and the standards he described are consistent with those the Court applies below. *Id.* at 62:21–63:5, 70:9–71:8, 79:8–18, 83:2–12. He is compensated at $600 per hour, and his compensation does not depend on the outcome. *Id.* at 56:2–6, 82:13–15.

100. The testimony of both witnesses is unrebutted. OMZZ called no witnesses and offered no contrary evidence. Hr'g Tr. 4:24–5:1, 101:3–18, 102:7–21, 103:3–12.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction and Authority

101. The Court has subject-matter jurisdiction over Everplay's patent-infringement counterclaim under 28 U.S.C. §§ 1331 and 1338(a). The Court may grant a preliminary injunction to prevent the violation of a patent right "on such terms as the court deems reasonable." 35 U.S.C.

§ 283; *see* Fed. R. Civ. P. 65(a). OMZZ received notice of the motion and participated in the hearing. Fed. R. Civ. P. 65(a)(1).

102. The motion was referred to this Court for a report and recommendation. Dkt. 15, 16; 28 U.S.C. § 636(b)(1)(B); N.D. Ill. L.R. 72.1. In ruling on a motion for a preliminary injunction, the Court must state the findings and conclusions that support its action. Fed. R. Civ. P. 52(a)(2).

**B. The Preliminary-Injunction Standard**

103. A party seeking a preliminary injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1398 (Fed. Cir. 2022). The movant must establish both of the first two factors. *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009).

104. Federal Circuit law governs the likelihood of success on a patent-infringement claim and the law of the regional circuit governs the remaining factors. *ABC Corp. I v. P'ship & Unincorporated Ass'ns*, 52 F.4th 934, 941 (Fed. Cir. 2022). Under Seventh Circuit law, the factors are weighed on a sliding scale: the stronger the movant's showing on the merits, the less the balance of harms need favor it. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021).

105. A preliminary injunction may rest on evidence that is less complete and procedures less formal than at trial, *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), and affidavits and declarations are admissible at this stage. *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997). The declarations and exhibits of record are properly before the Court. See ¶ 8,

supra.

### C. Everplay Is Likely to Succeed on the Merits

106. Likelihood of success has two parts: the patentee must show that "(1) it will likely prove infringement and (2) its infringement claim will likely withstand challenges to validity and enforceability." *Natera, Inc. v. NeoGenomics Labs., Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024).

#### i. Everplay is likely to prove that the Accused Products infringe claim 1

107. Whoever without authority makes, uses, offers to sell, or sells any patented invention within the United States, or imports it into the United States, during the term of the patent infringes the patent. 35 U.S.C. § 271(a). An accused product literally infringes when it practices every limitation of the claim. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). Infringement is determined by construing the claim and comparing it to the accused product. *Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*, 122 F.4th 860, 868–69 (Fed. Cir. 2024).

108. Claim terms carry the meaning they would have to a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). For purposes of the preliminary injunction hearing, neither party sought construction of any term. Findings ¶ 20. The Court applies the plain and ordinary meaning of the terms of claim 1 for purposes of this motion.

109. Based on the findings above, Everplay has shown that it will likely prove that each Accused Product practices every limitation of claim 1 and that OMZZ makes, offers to sell, sells or imports the Accused Products in the United States. *See* Dkt. 18 ¶ 44; Findings ¶¶ 38–49.

110. OMZZ offered no evidence to the contrary. It identified no limitation that the Accused Products lack, and it did not cross-examine Mr. Fletcher on infringement. Findings ¶¶

50–51. A party that merely disputes the sufficiency of the patentee's expert, and repeats conclusory statements without explaining how the accused product avoids infringement, does not create a genuine dispute. *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1089 (Fed. Cir. 1998). Where an accused infringer submits no evidence to contest infringement, a court may conclude that the patentee is likely to succeed. *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985).

111. Everplay's infringement case does not depend on OMZZ's silence. It rests on Mr. Fletcher's physical examination of the Accused Products, his demonstration of the claimed rotation and magnetic connection at the hearing, and his unrebutted testimony. Findings ¶¶ 38–49.

**ii. OMZZ has not raised a substantial question of validity**

112. A patent is presumed valid. 35 U.S.C. § 282(a); *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). At the preliminary-injunction stage, the accused infringer may defeat a showing of likely success by raising a "substantial question" of invalidity, which is a lower burden than proving invalidity at trial. *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1205 (Fed. Cir. 2017). But "the burden is on the challenger to come forward with evidence of invalidity." *Id.* (quoting *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009)). The question is whether the patentee has shown that it is more likely than not to prevail over the invalidity challenge, and "[t]here is no lower 'mere vulnerability' standard." *Natera*, 106 F.4th at 1377.

113. "[A]ttorney argument is not evidence." *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017). OMZZ offered no testimony, expert or lay, on the level of ordinary skill, the teachings of the references to a skilled artisan, a reason to combine them, an expectation of success, or how a skilled artisan would read the application as filed. Findings ¶¶ 36,

61, 70. OMZZ's counsel confirmed that its only evidence is the references themselves. Findings ¶ 61. The references are evidence of what they disclose, not of how a skilled artisan would read them or why one would combine them absent an express teaching in the reference itself.

114. **Obviousness.** Obviousness is a question of law based on underlying findings on the scope and content of the prior art, the differences between the prior art and the claim, the level of ordinary skill, and objective indicia. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). A conclusion of obviousness requires "articulated reasoning with some rational underpinning." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). The challenger must show that a skilled artisan would have been motivated to combine the references to achieve the claimed invention, with a reasonable expectation of success. *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1366 (Fed. Cir. 2017).

115. Neither of OMZZ's combinations discloses the claimed arrangement: a connector that houses a rotatable magnet in each end recess, with each recess also receiving a dowel end. Findings ¶¶ 52–59. "It is not sufficient to merely allege that the individual elements of the claimed invention were each known in the prior art." *Natera*, 106 F.4th at 1377. That magnets that rotate were known does not show that the claimed configuration was obvious, and OMZZ's position that the fact of rotation is sufficient, Hr'g Tr. 101:19–102:6, is the element-by-element approach *Natera* rejects.

116. OMZZ also offered no evidence of a reason to combine the references. "One cannot show that a patent is obvious without evidence as to why a person having ordinary skill in the art would have combined the references to arrive at the claimed invention." *Scholle Corp. v. Rapak LLC*, 35 F. Supp. 3d 1005, 1014 (N.D. Ill. 2014). Without such an explanation, the Court is "left with only hindsight bias that *KSR* warns against." *Metalcraft of Mayville, Inc. v. Toro Co.*, 848

F.3d 1358, 1367 (Fed. Cir. 2017) (affirming preliminary injunction). OMZZ's stated rationale, that a skilled artisan would be "naturally motivated" to make "a predictable combination of known elements performing their established functions," Dkt. 39 at 6, is the kind of generic statement the Federal Circuit has held "not sufficient" and "fraught with hindsight bias." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012). That Alkas comes from a different field, trade-show displays, reinforces the absence of any reason to combine it with references directed to toys. Findings ¶ 56.

117. OMZZ's burden is heavier still as to Ornstein and Alkas, each of which were before the examiner. A challenger relying on art the examiner considered bears "the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job." *Shire LLC v. Amneal Pharms., LLC*, 802 F.3d 1301, 1307 (Fed. Cir. 2015) (quoting *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008)).The examiner twice rejected the claims over Ornstein and allowed claim 1 only after it was amended to recite the recess structure that the asserted art lacks, and the examiner allowed claim 1 over Alkas. Findings ¶¶ 21–24.

118. The objective indicia confirm the conclusion. A presumption of nexus applies when the patentee shows that the objective evidence is tied to a specific product that embodies the claimed features and is coextensive with them. *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019). Embodiment and coextensiveness are distinct showings: "coextensiveness is a separate requirement." *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202, 1211 (Fed. Cir. 2023). Everplay made both. SUPERSPACE embodies claim 1. Mr. Fletcher examined SUPERSPACE, including a cross-sectioned connector, and found every limitation present. Findings ¶ 62. And SUPERSPACE is coextensive with the claim. Claim 1 recites the panel

system itself, and "[t]he inclusion of noncritical features does not defeat a finding of a presumption of nexus." *Volvo Penta*, 81 F.4th at 1210. Nexus may be presumed where the unclaimed features "amount to nothing more than additional insignificant features." *Fox Factory*, 944 F.3d at 1374. SUPERSPACE's unclaimed features, such as its panel infill, colors and shapes, are of that kind: the frame of connectors, magnets and dowels allows the infill to be any light material. Hr'g Tr. 17:24–18:2; Findings ¶ 29.

119. That the claimed combination includes individually known elements, such as rotatable magnets, does not defeat nexus. "[I]t is the claimed combination as a whole that serves as a nexus for the objective evidence." *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1330 (Fed. Cir. 2016). This case is unlike one in which the success is due to a feature already known in the prior art. *Cf. Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006). The praise and demand here are directed to the combination the examiner found missing from the prior art—magnets housed in connector recesses that also receive the frame dowels. Findings ¶¶ 33, 59, 63. That demand began before SUPERSPACE won any award: about 3,200 backers pledged more than US $1 million before a single unit shipped. Findings ¶¶ 30–31. Even without the presumption, the same evidence shows that the praise and demand are the "direct result of the unique characteristics of the claimed invention." *Fox Factory*, 944 F.3d at 1373–74 (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)). OMZZ offered no evidence to rebut the nexus. *See WBIP*, 829 F.3d at 1329 ("[A] patent challenger cannot successfully rebut the presumption with argument alone—it must present evidence."). The close copying of SUPERSPACE's dimensions and connector architecture is also probative. *Id.* at 1336 ("The fact that a competitor copied technology suggests it would not have been obvious."); Findings ¶ 65.

120. **Written description.** The written-description requirement asks whether the

application "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). It is a question of fact judged from the perspective of a person of ordinary skill. *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 127 F.4th 896, 914 (Fed. Cir. 2025). The claim need not use the same words as the application, *Ariad*, 598 F.3d at 1352; *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779 (Fed. Cir. 2002), and drawings may supply the description. *Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*, 291 F.3d 1317, 1322–23 (Fed. Cir. 2002).

121. A dowel that holds a magnet in the end of a connector is a dowel received in that end. The application as filed describes that arrangement in its summary, its detailed description, Figure 15 and its original claims, and Mr. Fletcher's unrebutted testimony establishes that a skilled artisan would so understand it. Findings ¶¶ 68–70. That the illustrated embodiments include a clip does not matter: claim 5 adds a clip to claim 1, so the clip embodiments are embodiments of claim 1. Dkt. 13-8, claim 5. OMZZ has not raised a substantial question under 35 U.S.C. § 112(a).

122. **Other grounds.** OMZZ's complaint invokes §§ 102 and 112 generally. Compl. ¶ 29. OMZZ offered no evidence or developed argument on anticipation, indefiniteness or any other ground, and none raises a substantial question on this record.

123. **The reexamination request.** A pending request for ex parte reexamination is not evidence of invalidity, and the Patent Office has not ordered reexamination. Courts have entered and affirmed preliminary injunctions notwithstanding parallel Patent Office proceedings. *See Tinnus*, 846 F.3d at 1201–02, 1208 (affirming preliminary injunction despite institution of post-grant review). Everplay has shown that it is more likely than not to prevail over OMZZ's validity challenge.

### D. Everplay Is Likely to Suffer Irreparable Harm Absent an Injunction

124. The movant must show that irreparable harm is likely, not merely possible. *Koninklijke Philips N.V. v. Thales DIS AIS USA LLC*, 39 F.4th 1377, 1380 (Fed. Cir. 2022). The harm must be "substantial and immediate." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). Lost market share to a direct competitor, price erosion, loss of goodwill and damage to reputation can establish irreparable harm. *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1154–55 (Fed. Cir. 2011).

125. **Causal nexus.** The patentee must show "some causal nexus" between the infringement and the harm, which requires "some connection between the patented feature and demand," not proof that the feature is the exclusive driver of demand. *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1364 (Fed. Cir. 2013). Where the infringing product "contains no feature relevant to consumers' purchasing decisions other than what the patent claims," the causal-nexus inquiry "may have little work to do." *Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378, 1384 n.2 (Fed. Cir. 2017).

126. The nexus is established. The patented feature need only be "one of several features that cause consumers to make their purchasing decisions." *Apple*, 735 F.3d at 1364. Here, the evidence establishes a connection between consumer demand and the particular combination of structural features recited in claim 1. The Accused Products are magnetic panel sets whose purpose is to join panels into life-size structures, and the claimed connector, magnet and dowel arrangement is what lets them join from any direction and makes life-size panels light and rigid. Findings ¶¶ 41–49, 64. Claim 1 recites a system in which connectors house rotatable magnets in their end recesses, those same recesses receive the ends of dowels forming the panel frame, and the resulting

panels connect magnetically when brought together from any direction. That combination enables lightweight yet rigid, life-size panels that children can readily assemble into play structures without concern for panel orientation. Findings ¶¶ 28–29, 33, 41–49, 64. The evidence establishes that these functional characteristics drive consumer demand. Mr. Erwin testified that customers buy SUPERSPACE because of “the way it works, the way it functions,” and explained that the claimed architecture makes that functionality possible. Findings ¶ 33. OMZZ's Accused Products employ essentially the same connector, magnet, and dowel architecture, and OMZZ expressly markets their ability to form “Strong Magnetic Connections for Stable Structures.” Findings ¶¶ 34, 44–48, 65. OMZZ markets that capability, buyers treat the Accused Products as a cheaper alternative to SUPERSPACE, and SUPERSPACE owners buy them as add-on panels because they share the claimed architecture. Findings ¶ 34. That evidence is specific to the claimed structure and to the Accused Products. It is not evidence that ease of use “in general” matters. *Cf. Apple*, 735 F.3d at 1367. Nor is this a case in which the patented feature is one component of a complex product. Claim 1 covers the panel system itself. *Cf. Genband*, 861 F.3d at 1384 n.2 (causal-nexus inquiry “may have little work to do” when the infringing product “contains no feature relevant to consumers’ purchasing decisions other than what the patent claims”). OMZZ’s argument that Everplay’s marketing, awards and reviews drive demand, Hr’g Tr. 127:11–128:16, does not break the connection. The patented feature need not be the exclusive driver of demand, *Apple*, 735 F.3d at 1364, and the praise and reviews themselves credit the claimed structure. Findings ¶¶ 33, 63. Thus, the evidence connects demand for the Accused Products to the functional advantages provided by the claimed combination as a whole, rather than to an abstract preference for magnetic toys or to the presence of rotatable magnets alone. That rotatable magnets were individually known in the prior art does not defeat this showing: the asserted patent claims their particular arrangement

within a panel system, and the evidence connects that arrangement to the functionality consumers seek. *Cf. WBIP*, 829 F.3d at 1330. Nor does OMZZ's lower price. A cheaper copy that competes for the same customers is how the harm occurs, not an alternative cause of it. The required causal nexus is established.

127. **The harm is irreparable.** Everplay and OMZZ compete head-to-head, Everplay sells a single product family, and its sales are concentrated in the holiday season now underway. Findings ¶¶ 13, 71–74. "Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013). Holiday customers diverted to the Accused Products will have bought their play sets, and there is no second 2026 holiday season in which to recover them. The lost customers, including SUPERSPACE owners who buy accused panels instead of Everplay add-on packs, cannot be identified, so the sales lost to OMZZ cannot be measured. Findings ¶ 78. Such losses are "often difficult to quantify." *Douglas Dynamics*, 717 F.3d at 1344; *see also Trebro Mfg., Inc. v. FireFly Equip., LLC*, 748 F.3d 1159, 1170 (Fed. Cir. 2014) (irreparable harm likely where patentee "is very likely to lose significant market share as well as customers"). Moreover, Everplay has never licensed the '811 patent and would not license it to a competitor. Findings ¶ 75. As in *Douglas Dynamics*, where the patentee "had never licensed the infringed patents, and intentionally chose not to, so that it could maintain market exclusivity," the injury is the loss of the exclusivity the patent confers, which a royalty cannot replace. 717 F.3d at 1345.

128. The harm also extends beyond lost sales. A small company whose cash is committed to holiday inventory, financed by loans that must be repaid, would have to cut marketing and staff and pause product development if its holiday sales were suppressed. Findings

¶¶ 73–74. Those consequences cannot be undone by a damages award years later. *See Trebro*, 748 F.3d at 1170–71 (threatened layoffs at an eighteen-employee company "further support[] the conclusion that money damages are likely inadequate"). Continued sales of a lower-priced, closely similar product also threaten Everplay's price and its standing as the originator of the product. A patentee may be unable to restore its price "as long as competition from [the infringer] remains." *Tinnus*, 846 F.3d at 1207–08. Findings ¶¶ 76–78.

129. **Money damages are inadequate.** OMZZ is based in Hong Kong and China and has no identified assets in the United States, and funds that pass through its Amazon accounts are remitted abroad on a rolling basis. Findings ¶¶ 84–85. A monetary award is not a meaningful alternative to an injunction where the accused infringer may be unable to pay it. *See Robert Bosch*, 659 F.3d at 1151, 1155–56 (accused infringer's "lack of financial wherewithal to satisfy a judgment" supported irreparable harm). OMZZ's contrary assertions about the availability of its funds are attorney argument on facts within its own control. *See id.* at 1155–56. OMZZ argued at the hearing that Everplay's harm is calculable because Everplay keeps detailed sales records. Hr'g Tr. 126:16–127:10. But that a patentee can estimate its prices, profit per unit, and lost sales "does not automatically mean money damages are adequate." *Trebro*, 748 F.3d at 1170–71.

130. *Eli Lilly & Co. v. American Cyanamid Co.*, 82 F.3d 1568, 1578–79 (Fed. Cir. 1996), on which OMZZ relies, does not alter this conclusion. That decision rested on the structure of the market at issue and on evidence that the defendants had adequate assets to satisfy a judgment. OMZZ offered no such evidence.

131. **Timing.** Everplay began preparing to enforce the '811 patent on Amazon before it issued, submitted an APEX complaint within about eleven weeks of issuance, and pursued that process until OMZZ's lawsuit halted it. It then counterclaimed and moved promptly. Findings ¶¶

86–91. Everplay's conduct does not undercut its showing of irreparable harm.

**E. The Balance of Equities Favors Everplay**

132. Under the Seventh Circuit's sliding scale, Everplay's strong showing on the merits reduces the showing it must make on the balance of harms. *Life Spine*, 8 F.4th at 539. In any event, the balance favors Everplay. Without an injunction, Everplay faces the loss of holiday sales, customers and price in its only product line during the season that produces most of its revenue. Findings ¶¶ 13, 71–78, 92.

133. OMZZ offered no evidence of hardship, despite representing that it would. Findings ¶ 93. Whatever hardship OMZZ may suffer results from stopping sales of products likely to infringe, and "[a] party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one." *Robert Bosch*, 659 F.3d at 1156; *see also Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."). On the other side of the scale, "requiring [the patentee] to compete against its own patented invention, with the resultant harms described above, places a substantial hardship on [it]." *Robert Bosch*, 659 F.3d at 1156. The injunction reaches only the Accused Products, leaving OMZZ's other product lines untouched, and any wrongful-injunction loss is secured by the bond. Findings ¶¶ 94, 97.

**F. An Injunction Would Not Disserve the Public Interest**

134. The question is whether the injunction would disserve the public interest. *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 868 (7th Cir. 1983). The public interest favors enforcing patent rights that are likely valid and infringed. *See Celsis*, 664 F.3d at 931 ("The public interest favors the enforcement of Celsis' patent rights here."). The

Accused Products are toys, not products implicating public health, and consumers will remain free to buy SUPERSPACE and other play sets that do not infringe. OMZZ's argument that the public benefits from a lower-priced alternative, Hr'g Tr. 129:3–11, is the argument the Federal Circuit rejected in *Douglas Dynamics*. Although "competition serves the public interest," "the public has a greater interest in acquiring new technology through the protections provided by the Patent Act than it has in buying 'cheaper knock-offs.'" 717 F.3d at 1346. An injunction would not disserve the public interest.

**G. Scope of the Injunction**

135. An injunction must state the reasons for its issuance, state its terms specifically, and describe in reasonable detail the acts restrained. Fed. R. Civ. P. 65(d)(1). It binds the parties, their officers, agents, servants, employees and attorneys, and other persons in active concert or participation with them who receive actual notice. Fed. R. Civ. P. 65(d)(2).

136. The injunction here will be limited to the Accused Products, identified by ASIN, name and photograph, however they are listed and through whatever channel they are sold. It reaches another product only if that product is not more than colorably different from an Accused Product and also infringes claim 1. An injunction so limited satisfies Rule 65(d). *See Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1346–47 (Fed. Cir. 2003) (affirming preliminary injunction where order was "sufficiently specific" to satisfy Rule 65(d)).

**H. Security**

137. The Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). The party to be restrained bears the burden of establishing the amount. *Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897,

911 (N.D. Ill. 2015). Because a wrongfully enjoined party's loss is its lost profit, not its gross sales, the bond should be measured by profit. *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1385 (Fed. Cir. 2006) (affirming bond set on evidence of the enjoined party's potential lost profits, lost market share, and costs of relaunch); *Lashify, Inc. v. Qingdao Network Tech. Co.*, No. 25-cv-4183 (LJL), 2025 WL 2298837, at *4 (S.D.N.Y. Aug. 8, 2025) (in patent case against foreign online sellers, declining to increase bond where sales estimate "fail[ed] to account for the cost of those sales" and so did "not provide a measure of the profits that Defendants are at risk of losing as a result of a wrongly issued injunction").

138. OMZZ, which bears the burden and alone holds its sales data, offered no evidence of its sales, margins, inventory or compliance costs and proposed no amount. Findings ¶ 95. On the evidence of record, OMZZ's gross sales of the Accused Products are at most about $96,000 per month. Findings ¶¶ 96–97. A wrongfully enjoined seller loses its profit on the sales it forgoes, which is necessarily a fraction of its gross sales. A bond of $100,000 exceeds a full month of OMZZ's gross revenue from the Accused Products even at the top of each range, so it secures OMZZ's lost profit for a substantially longer period, through the holiday season and beyond. It errs on the high side. If OMZZ comes forward with evidence of a greater loss, it may move to modify the security. *See Monster Energy*, 136 F. Supp. 3d at 911. The Court recommends that security be set at $100,000.

## IV. RECOMMENDATION

For these reasons, the Court recommends that the District Judge grant Everplay's Motion for Preliminary Injunction (Dkt. 12) and enter an order as follows:

1. Everplay's Motion for Preliminary Injunction (Dkt. 12) is GRANTED.

2. **<u>Accused Products.</u>** As used in this Order, "Accused Products" means the following

products, presently offered for sale on the Amazon.com marketplace with Counterclaim-Defendant OMZZ Trading Co., Limited as seller of record, together with any unit of the same products, however, listed, labeled, branded, or identified, and regardless of the listing, Amazon Standard Identification Number ("ASIN"), storefront, or sales channel through which it is offered:

| ASIN | Product | Exemplary Image |
|---|---|---|
| B0F1F8XFQ6 | "Umoving Deluxe Magnetic Fort Building Panels Kit" (24-piece set) |  |
| B0F1FC6SHD | "Umoving 20-Piece Magnetic Fort Building Kit" |  |

3. **<u>Acts Enjoined.</u>** Pending entry of final judgment in this action or further order of the Court, Counterclaim-Defendants; their officers, agents, servants, employees, and attorneys; and all other persons in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, see Fed. R. Civ. P. 65(d)(2), are ENJOINED from:

a) making, using, offering to sell, or selling within the United States, or importing into the United States, (i) any Accused Product, or (ii) any product that is not more than colorably different from an Accused Product and that infringes claim 1 of the '811 patent, through any sales channel,

including but not limited to the Amazon.com marketplace, any other online marketplace, any website, or retail store;

b) actively inducing any other person or entity to engage in any act prohibited by subparagraph (a);

c) knowingly assisting, aiding, or abetting any other person or entity, including any seller, distributor, importer, online marketplace, or order-fulfillment service, in engaging in any act prohibited by subparagraph (a), including by supplying Accused Products to any such person or entity for sale in the United States; and

d) creating, operating, or using any seller account, storefront, product listing, ASIN, brand name, or business entity for the purpose of engaging in any act prohibited by subparagraphs (a) through (c).

4. **Deactivation of Offers.** Within twenty-four hours after receiving notice of this Order, Counterclaim-Defendants shall deactivate remove, disable, or cause to be deactivated, removed, or disabled any offers to sell the Accused Products through Amazon.com and any other United States sales channel, including their offers associated with ASINs B0F1F8XFQ6 and B0F1FC6SHD. This period is provided solely to permit technical deactivation and does not authorize any sale or offer for sale prohibited by Paragraph 3.

5. **Notice.** Within two (2) business days of the effective date of this Order, Counterclaim-Defendants shall provide a copy of this Order to (a) their officers, agents, servants, employees, and attorneys; and (b) every person or entity acting in concert or participation with them with respect to the Accused Products, including any distributor, importer, or order-fulfillment service holding inventory of Accused Products, so that each is on notice of and bound by this Order

under Federal Rule of Civil Procedure 65(d)(2).

6. **Compliance.** Within three (3) business days of the effective date of this Order, Counterclaim-Defendants shall file a declaration under penalty of perjury (a) identifying each person and entity notified under Paragraph 5 and the date and manner of notice; (b) confirming the deactivation required by Paragraph 4; and (c) stating the number of units of Accused Products in their possession, custody, or control in the United States, including units held by any order-fulfillment service, as of the effective date of this Order.

7. **Effective Date and Security.** This Order shall take effect upon Everplay's posting of security under Federal Rule of Civil Procedure 65(c) in the amount of $100,000, by bond or by cash deposit with the Clerk of Court, and Everplay's filing of notice of that posting.

8. **Duration.** This Preliminary Injunction shall remain in effect until the entry of final judgment, further order of the Court, or dissolution or modification of the injunction pursuant to law.

9. **Enforcement.** Any violation of this Order may be addressed through proceedings for contempt of court.

* * * *

Any objection to this Report and Recommendation must be filed within five calendar days after its issuance, and any response within five calendar days after the objection is filed. Dkt. 49; *see* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to object waives the right to review by the District Judge and on appeal.

It is so recommended and ordered.

Dated: ____________________, 2026

______________________________________

**KARYN L. BASS EHLER**
United States Magistrate Judge

Respectfully submitted,

Dated: November 3, 2026

/s/Mark T. Deming
Mark T. Deming, Ill. Bar No. 6299631
POLSINELLI PC
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
(312) 819-1900
mdeming@polsinelli.com

M. Lawrence Oliverio
*(pro hac vice)*
POLSINELLI PC
One International Place, Suite 3900
Boston, MA 02110
(617) 406-0335
loliverio@polsinelli.com

Andrew Z. Weaver
*(pro hac vice)*
POLSINELLI PC
1000 Louisiana Street
Suite 6400
Houston, TX 77002
(713) 374-1600
aweaver@polsinelli.com

*Attorneys for Everplay Labs Limited.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure and Local Rule 5.9.

/s/Mark Deming