**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| OMZZ TRADING CO., LIMITED and NINGBO UNIONMAX TECHNOLOGY CO., LTD., | ) | |
| Plaintiffs, | ) | Case No. 1:26-cv-09480 |
| v. | ) | Judge Sunil R. Harjani |
| Everplay Labs Limited, | ) | Magistrate Judge Karyn L. Bass Ehler |
| Defendant. | ) | |

**PLAINTIFFS AND COUNTERCLAIM-DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OPPOSING DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to the Court's October 27, 2026 Order (Dkt. 46) and instructions at the October 30, 2026 evidentiary hearing (Dkt. 49), Plaintiffs and Counterclaim-Defendants OMZZ Trading Co., Limited ("OMZZ") and Ningbo UnionMax Technology Co., Ltd. ("UnionMax") (collectively, "Plaintiffs") respectfully submit these Proposed Findings of Fact and Conclusions of Law opposing Defendant and Counterclaim-Plaintiff Everplay Labs Limited's ("Everplay") Motion for Preliminary Injunction (Dkt. 12).

Having considered the live testimony, cross-examination concessions, exhibits of record, and the parties' submissions, the Court makes the following findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(2) and recommends that Everplay's Motion for Preliminary Injunction be DENIED, or in the alternative, that any preliminary injunction be conditioned upon Everplay posting a security bond of no less than $500,000 under Federal Rule of Civil Procedure 65(c) and narrowly tailored to the two accused products.

## I. PROCEDURAL HISTORY

1. Plaintiffs initiated this action on August 7, 2026, seeking a declaratory judgment that the claims of U.S. Patent No. 12,551,811 (the "'811 patent") are invalid. (Dkt. 1.)

2. Prior to filing suit, Plaintiffs also requested ex parte reexamination of the '811 patent before the United States Patent and Trademark Office ("USPTO") based on substantial prior art references teaching modular panel frames and rotatable magnetic connections.

3. Everplay answered and counterclaimed for patent infringement on August 31, 2026 (Dkt. 9), and moved for a preliminary injunction based solely on Claim 1 of the '811 patent on September 17, 2026 (Dkt. 12, 13).

4. Plaintiffs filed their opposition to the preliminary injunction motion on October 14, 2026 (Dkt. 39), relying on multiple prior art references, including U.S. Patent Publication No. 2016/0184727 ("Ornstein"), CN 104274984 ("Wei"), WO 2006/112679 ("Kim WO"), U.S. Patent No. 10,217,388 ("Alkas") (Dkt. 39-1), and Korean Utility Model Registration No. 20-0442713 ("Kim '713") (Dkt. 39-2), as well as statutory written-description challenges under 35 U.S.C. § 112(a).

5. On October 30, 2026, the Court held an evidentiary hearing. Everplay presented two witnesses: co-founder Anthony Erwin and industrial design expert Timothy P. Fletcher. Plaintiffs cross-examined both witnesses, eliciting key admissions regarding prior art disclosures, market demand drivers, and damages measurability.

6. At the conclusion of the October 30, 2026 hearing, recognizing that Everplay had offered no actual sales data with respect to OMZZ's products to support Everplay's proposed $100,000 bond, the Court granted Plaintiffs leave to file a verified declaration by November 3, 2026,

setting forth Plaintiffs' sales and inventory asset figures for the sole purpose of determining an appropriate bond under Rule 65(c).

## II. FINDINGS OF FACT

### A. The Parties and Products

7. Plaintiff OMZZ is a company based in Hong Kong operating the "OMZZ-US" storefront on Amazon.com, and Plaintiff UnionMax is a company based in Ningbo, China operating the "U-MOVING" storefront on Amazon.com. (Dkt. 26 at 2; Dkt. 42-3.)

8. Plaintiffs offer children's magnetic fort-building panel sets on Amazon.com under two listings: ASIN B0F1FC6SHD (a 20-piece set) and ASIN B0F1F8XFQ6 (a 24-piece Deluxe set) (collectively, the "Accused Products").

9. In addition to the Accused Products, Plaintiffs sell non-accused children's furniture and play products on Amazon.com, including toddler beds, play mats, and modular sofa sets, which Everplay does not accuse of infringement. (Dkt. 42-3 at 12–14.)

10. Defendant Everplay is a United Kingdom company founded on November 2, 2020 (correcting the erroneous November 14, 2021 formation date initially sworn to in Mr. Erwin's declaration). Everplay sells "SUPERSPACE" magnetic play panels through its website, Amazon.com, and business-to-business channels.

### B. The '811 Patent, Claim 1, and the Prior Art

11. The '811 patent issued on February 17, 2026. Notably, on cross-examination and direct clarification, Mr. Erwin admitted that paragraph 9 of his declaration was inaccurate: the underlying priority application was filed personally by Mr. Erwin and Craig Spencer before Everplay existed, and only later assigned to Everplay.

12. Claim 1 of the ’811 patent recites a play-area panel system comprising two or more panels having corner connectors with first and second end recesses, rotatable magnets housed in each recess, and frame dowels received within those recesses at an angle so that panels magnetically couple when brought together from any direction. (Dkt. 13-8, cl. 1.)

13. During prosecution, the USPTO Examiner twice rejected Claim 1 as obvious over Ornstein (non-final rejection on March 18, 2025, and final rejection on August 5, 2025). (Dkt. 13-18; Dkt. 13-19) The applicant overcame the rejections only by amending Claim 1 on August 28, 2025, to recite that the dowels and rotatable magnets are received within the end recesses of the connectors. (Dkt. 13-20)

14. As originally filed, however, U.S. Application No. 18/023,046 did not use the language added during the August 28, 2025 amendment; rather, its illustrated embodiments (such as Figure 15) relied on internal retention structures and clips (recited in dependent Claim 5) to position the magnets relative to the dowels. (Dkt. 42-4.)

15. Moreover, the mechanical components of Claim 1 are straightforward, predictable consumer-product elements well known in the prior art:

    a. Ornstein discloses modular play panels with perimeter frames housing magnets along the panel edges to connect adjacent panels into play structures. (Dkt. 13-18.)

    b. Alkas (U.S. Patent No. 10,217,388) discloses modular structural frames joined by corner connectors and tubular members utilizing cylindrical, diametrically polarized magnets that freely rotate to self-align their poles. Crucially, on cross-examination, Everplay’s expert Mr. Fletcher expressly conceded that Alkas uses a cylindrical diametrically polarized magnet that rotates inside the frame member

so its poles self-align, producing magnetic coupling of adjacent frames in any orientation.

c. Kim ’713 (Dkt. 39-2), Wei (Dkt. 13-14), and Kim WO (Dkt. 13-15) further demonstrate that housing rotatable or recessed magnets within modular toy blocks, recessed pipe adapters, and rod-and-connector construction toys was conventional in the art well before August 2020.

16. Mr. Fletcher testified that a person of ordinary skill in the art (“POSITA”) would have a bachelor’s degree in industrial design or mechanical engineering and roughly five years of experience, while conceding on cross-examination that his own 35 years of experience far exceed the POSITA level, and that he is a non-lawyer compensated at $600 per hour applying legal standards supplied by Everplay’s counsel.

17. Mr. Fletcher also admitted on cross-examination that he did not address Plaintiffs’ combination of Ornstein, Alkas, and Kim ’713 until his supplemental declaration filed on October 21, 2026. (Dkt. 42-6.)

18. For a POSITA designing modular panel frames, moving a known rotatable cylindrical magnet (as in Alkas) into the end recess of a corner connector receiving a frame dowel is a routine, predictable design choice among a finite number of mechanical housing locations.

**C. Market Demand Drivers and Absence of Causal Nexus**

19. On cross-examination, Mr. Erwin made critical admissions demonstrating that consumer demand for SUPERSPACE is driven by massive brand marketing, commercial accolades, customer reviews, and safety reputation – not just by the specific internal connector-recess-and-dowel geometry of Claim 1:

a. **Marketing Spend**: Mr. Erwin confirmed that Everplay spent more than $5 million on advertising and marketing between 2021 and 2025, following a heavily publicized Kickstarter campaign that raised over $1 million from roughly 3,200 backers.

b. **Reviews and Brand Reputation**: Mr. Erwin confirmed that SUPERSPACE maintains a 4.8-star rating across more than 1,100 customer reviews and has built a strong brand reputation for craftsmanship and child safety, agreeing on cross-examination that these factors drive consumer purchasing decisions.

c. **Design Awards**: SUPERSPACE promoted its Core77 Design Award, IDEA recognition, and U.S. Toy of the Year finalist status in its marketing.

20. With respect to Plaintiffs' Accused Products, the record establishes that consumers purchase the Accused Products primarily due to their significantly lower price point:

a. Mr. Erwin admitted on cross-examination that Everplay's 24-panel SUPERSPACE set is priced at $449, whereas Plaintiffs' 24-piece set lists at $379.99 (an approximately 15.4% discount), and that Plaintiffs' products are consistently sold at a discount relative to SUPERSPACE.

b. The customer reviews cited by Everplay itself confirm that buyers select U-MOVING because of price, describing it as "much better value" and noting it was "on sale and more than half of what we paid" for SUPERSPACE. (Dkt. 13-4 at 2, 4)

21. Everplay's expert, Mr. Fletcher, admitted on cross-examination that he conducted no consumer survey or market analysis and offers no opinion whatsoever on why consumers purchase either product.

22. Everplay's claim of "actual consumer confusion" collapsed on cross-examination: Mr. Erwin admitted that the sole documented customer inquiry in Exhibit D (dated November 7, 2025, before the '811 patent even issued) was merely a prospective shopper asking whether returns were free, not a report of product confusion. (Dkt. 13-5) Mr. Erwin also conceded that he has no knowledge of which search terms, if any, Plaintiffs purchase on Amazon.

23. Everplay presented no objective test data or evidence that Plaintiffs' Accused Products pose any safety hazard to children.

**D. Calculability of Any Alleged Harm to Everplay**

24. Everplay's sales records are tracked with mathematical precision. On cross-examination, Mr. Erwin confirmed that Everplay's Q4 revenue percentages, 50.7% in 2022, 53.9% in 2023, 65.0% in 2024, and 72.1% in 2025 (with November 2025 accounting for 53.0% of U.S. sales), were calculated directly from Everplay's Shopify e-commerce and Xero accounting systems to a tenth of a percentage point. (Dkt. 13-6)

25. Plaintiffs' Amazon sales are likewise recorded to the exact unit and cent in Amazon's transaction databases. Because both parties' historical baselines, seasonal growth rates, unit prices, and profit margins are fully documented, any alleged lost sales or reasonable royalty during the pendency of this action can be calculated with a high degree of certainty.

26. While Everplay asserted that Amazon remits seller proceeds every 14 days, Everplay offered no evidence that Plaintiffs have dissipated assets or would be unable to satisfy a monetary judgment, nor did Everplay show that standard post-judgment remedies would be ineffective.

### E. Plaintiffs' Verified Sales, Inventory Assets, and Security Calculation

27. At the hearing, Everplay proposed a $100,000 bond based entirely on guesswork derived from generic Amazon front-end badges ("100+ bought in past month" and "50+ bought in past month"), assuming Plaintiffs sold at most 150 to 300 units per month totaling under $96,000 in monthly gross sales.

28. Pursuant to the Court's leave, Plaintiffs submitted the sworn Declaration of General Manager Yuan Xia ("Xia Decl."), supported by actual Amazon Custom Transaction Reports and FBA Inventory records, which refutes Everplay's lowball estimate:

    a. <u>Actual Baseline Sales (Aug–Oct 2026)</u>: During the three non-peak months from August 1, 2026 through October 31, 2026, Plaintiffs sold 1,254 units of the Accused Products across the OMZZ-US and U-MOVING storefronts, generating $395,752.36 in gross product sales (73.31% of Plaintiffs' total revenue of $539,854.37) and approximately $65,520 USD (RMB 466,580) in net operating profit after deducting Amazon's 15% referral fee, FBA fees, manufacturing costs, ocean freight, returns, storage, and overhead. (Xia Decl. ¶¶ 4–6, Exs. A–B.)

    b. <u>Historical and Projected Q4 Holiday Sales (Nov–Dec 2026)</u>: During the November–December 2025 holiday peak, selling only a single newly launched ASIN (B0F1FC6SHD) on one storefront, Plaintiffs sold 610 units generating $194,873.91 in gross sales. (Xia Decl. ¶ 8, Ex. C.) With two active storefronts and both the 20-piece and 24-piece ASINs in Q4 2026, Plaintiffs conservatively project selling 1,500 units during November and December 2026, representing $480,000 to $525,000 in gross sales and $80,000 to $100,000 in net profits for

the two-month holiday window alone, and $160,000 to $200,000 in lost net profits over the course of a preliminary injunction. (Xia Decl. ¶¶ 9–10.)

c. U.S. FBA Inventory Assets and Recurring Storage/Liquidation Costs: As of November 2, 2026, Plaintiffs hold 1,585 units of the Accused Products committed to U.S. Amazon fulfillment – approximately 305 units on hand in FBA and approximately 1,280 units inbound to FBA on OMZZ-US, 703 units of B0F1FC6SHD, of which 3 are on hand and 700 inbound, and 806 units of B0F1F8XFQ6, of which 226 are on hand and 580 inbound; and on U-MOVING; 76 units (plus 13 reserved) of B0F1FC6SHD) – representing a retail asset value exceeding $500,000. (Xia Decl. ¶ 11, Exs. D–E.)

d. Deadweight Q4 FBA Storage Fees: Because the Accused Products are oversized, heavy kits, Amazon imposes Q4 monthly storage fees of $3.46 per unit for ASIN B0F1FC6SHD and $4.99 per unit for ASIN B0F1F8XFQ6, resulting in approximately $6,717.28 per month in deadweight storage charges on the full committed inventory once the inbound units are received if the listings are enjoined, plus unrecoverable sunk manufacturing, ocean freight, and forced inventory liquidation/removal costs because shipping heavy magnetic panels back to China is economically prohibitive. (Xia Decl. ¶¶ 13–16.)

29. Combining Plaintiffs' projected lost net profits ($160,000–$200,000), recurring Q4 FBA storage charges ($6,717.28/month), and the sunk asset value and forced liquidation/destruction losses on the 1,585 units of committed U.S. FBA and inbound inventory, Plaintiffs' quantifiable damages and costs from a wrongful injunction will exceed $500,000. (Xia Decl. ¶¶ 16–17.)

## III. CONCLUSIONS OF LAW

30. A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). A movant must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm absent relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Everplay bears the burden on each factor, and it must establish both a likelihood of success on the merits and likely irreparable harm before the Court may even reach the sliding scale; a failure on either is independently fatal. *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009); *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375–76 (Fed. Cir. 2009).

### A. Plaintiffs Have Raised a Substantial Question of Invalidity

31. The burden at the preliminary injunction stage is Everplay's, not Plaintiffs': "[t]he burden is always on the movant to show that it is likely to succeed on the merits." *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1399 (Fed. Cir. 2022). Plaintiffs need not prove invalidity by the clear-and-convincing standard that would apply at trial; they "need only show a substantial question of invalidity." *Natera, Inc. v. NeoGenomics Labs., Inc.*, 106 F.4th 1369, 1377 (Fed. Cir. 2024). Once Plaintiffs do so, "a patentee must show it will likely withstand the challenges to the validity of the patent to obtain a preliminary injunction," and "[t]he relevant inquiry is therefore whether the patentee has shown it is more likely than not to prevail over an invalidity challenge." *Id.*; *Titan Tire*, 566 F.3d at 1377–80. There is no lower standard that would let Everplay prevail on a mere showing that validity is not seriously in doubt. *Natera*, 106 F.4th at 1377. If Everplay cannot show that Plaintiffs' invalidity defense

"lacks substantial merit," the preliminary injunction should not issue. *BlephEx*, 24 F.4th at 1399.

32. Under *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007), "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." Where a problem is known and there are a finite number of identified, predictable solutions, a POSITA has good reason to pursue the known options. *Id*. at 421.

33. Here, Ornstein teaches modular play panels joined magnetically along their edges, while Alkas, as Mr. Fletcher conceded on cross-examination, teaches using a cylindrical, diametrically polarized rotatable magnet inside a modular frame assembly so that adjacent frames self-align and couple in any orientation. Combined with Kim '713 and Wei (teaching recessed magnet housings and rotational retention pins), housing a rotatable cylindrical magnet within the end recess of a corner connector that receives a frame dowel is a predictable mechanical rearrangement of known elements performing their ordinary functions. The Supreme Court has directed courts to "construe the scope of analogous art broadly," recognizing that "familiar items may have obvious uses beyond their primary purposes." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010) (quoting *KSR*, 550 U.S. at 402). Alkas is analogous art because it is "reasonably pertinent to the particular problem with which the inventor is involved" – magnetically coupling modular panels that join from any orientation by means of a rotating, self-aligning diametric magnet. *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992); *see In re Bigio*, 381 F.3d 1320, 1325–26 (Fed. Cir. 2004) (toothbrush art analogous to a hairbrush). Plaintiffs' obviousness showing does not fail for want of a retained expert. Under *KSR*, expert testimony on a motivation to combine

"may be unnecessary," the inference "may boil down to a question of common sense," and obviousness may rest on "logic, judgment, and common sense, in lieu of expert testimony" where, as here, the mechanical subject matter is easily understandable. *Wyers*, 616 F.3d at 1239–40. The asserted references are themselves evidence of what a skilled artisan would know, and documentary prior art is "perhaps the most reliable" such evidence. *Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1382–83 (Fed. Cir. 2019) (quoting *Randall Manufacturing v. Rea*, 733 F.3d 1355, 1362–63 (Fed. Cir. 2013)). The Examiner's consideration of Ornstein and Alkas does not insulate Claim 1: although prior consideration of a reference "may carry some weight," the burden to prove invalidity "does not change," *OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 705 (Fed. Cir. 2012), and because the Ornstein-Alkas-Kim '713 combination was not the stated basis for allowance, the rationale for deference to the agency "seems much diminished," *KSR*, 550 U.S. at 426.

34. Furthermore, Everplay's reliance on secondary considerations does not overcome obviousness because Everplay failed to establish that consumer praise or commercial success is coextensive with the narrow amendment that secured allowance of Claim 1 (placing the magnet and dowel end inside the same connector recess), rather than unclaimed marketing, general magnetic play-panel concepts already in Ornstein, or brand aesthetics. *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019). A presumption of nexus requires that SUPERSPACE both embody Claim 1 and be "coextensive" with it, and "coextensiveness is a separate requirement" that a product carrying significant unclaimed features – more than $5 million in marketing, a 4.8-star reputation, brand, panel infill, color, and a premium price – does not satisfy. *Volvo Penta of the Ams., LLC v. Brunswick Corp.*, 81 F.4th 1202, 1210–11 (Fed. Cir. 2023); *Fox Factory*, 944 F.3d at 1374.

Objective evidence "lacks a nexus if it exclusively relates to a feature that was known in the prior art," *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1330 (Fed. Cir. 2016) (quoting *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013)), and commercial success is probative only if it is "a direct result of the unique characteristics of the claimed invention," not of lower price, market position, business relationships, or unclaimed features, *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996). Everplay's awards, Kickstarter pledges, and sales are tied to those extraneous drivers, not to the narrow recess-and-dowel amendment that secured allowance.

35. In addition, substantial questions remain under 35 U.S.C. § 112(a) as to whether the original disclosure, which relied on separate retention clips to hold magnets in place, possessed the broad, clip-free recessed-dowel retention later amended into Claim 1 in August 2025.

**B. Everplay Failed to Establish Irreparable Harm or a Causal Nexus**

36. Irreparable harm cannot be presumed. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393–94 (2006); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011). Nor is there any presumption that money damages will be inadequate; "[s]ome evidence and reasoned analysis for that inadequacy should be proffered." *Nutrition 21 v. United States*, 930 F.2d 867, 871–72 (Fed. Cir. 1991). Everplay must prove both that it will suffer harm that cannot be compensated by money damages and a "sufficiently strong causal nexus" linking the alleged harm to the specific patented feature of Claim 1. *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("Apple II").

37. <u>No Causal Nexus</u>: Where consumer demand is driven by price, brand recognition, marketing, or general product category appeal rather than the specific patented structure, causal nexus is lacking. *Apple II*, 695 F.3d at 1375–76. Mr. Erwin's admissions on cross-

examination establish that Everplay's sales are driven by over $5 million in marketing, 1,100+ 4.8-star reviews, safety reputation, and awards, while customer reviews show buyers choose Plaintiffs' products because they are priced ~15% to 50% lower, not because the magnet sits inside a connector recess rather than an adjacent frame tube (as in Alkas). Mr. Fletcher offered no market or survey evidence to the contrary. Even under the more forgiving "some connection" formulation, "generic evidence" that a category of feature matters and "isolated, anecdotal statements" do not suffice; the patentee must show the infringing feature drives a substantial share of purchasing decisions. *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1366 (Fed. Cir. 2013) ("Apple III"). This is not a case in which the causal-nexus inquiry "may have little work to do," because that shortcut applies only where the accused product "contains no feature relevant to consumers' purchasing decisions other than what the patent claims." *Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378, 1384 & n.2 (Fed. Cir. 2017). The Accused Products compete on price, brand, build quality, and appearance, and the claimed internal connector geometry is not visible to a purchasing consumer, so where "all but an insignificant number of purchases from the infringer would have been made even without the infringing feature, the causal connection ... is missing." *Id.* at 1384.

38. Harm Is Fully Quantifiable: Because both Everplay's Shopify/Xero accounting records and Plaintiffs' Amazon transaction records capture every sale to the penny, any lost profits or reasonable royalty can be reliably calculated at trial. *See Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996); *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990). Speculative assertions regarding overseas fund transfers, unsupported by any evidence of asset dissipation, do not convert calculable commercial

competition into irreparable harm. A defendant's foreign domicile does not by itself establish that damages are inadequate. Absent evidence that Plaintiffs could not satisfy a judgment, a damages remedy remains adequate. *Eli Lilly*, 82 F.3d at 1578–79.

**C. The Balance of Equities and Public Interest Weigh Against an Injunction**

39. Enjoining Plaintiffs on the eve of Black Friday and Cyber Monday would effectively destroy Plaintiffs' primary business line and strand 1,585 units of bulky inventory in U.S. warehouses before a full determination on the merits or resolution of the pending USPTO reexamination request. Conversely, Everplay faces no restraint on its own ability to sell SUPERSPACE and retains a complete legal remedy in damages. Under the Seventh Circuit's sliding scale, the weaker the movant's showing on the merits, the more heavily the equities must favor it. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). Because Everplay has not shown a likelihood of success, it would need a strong showing on the equities, and the balance tips the other way.

40. While the public interest favors enforcing valid patents, it equally favors vigorous price competition and access to affordable consumer goods where substantial questions of patent validity remain unresolved. *See Illinois Tool Works*, 906 F.2d at 684. The interest in enjoining "cheaper knock-offs" presupposes a valid patent and a feature that drives demand, neither of which Everplay has established here. *Cf. Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013).

**D. Mandatory Security Under Rule 65(c) Must Be Set at No Less Than $500,000**

41. Under Fed. R. Civ. P. 65(c), the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." In the Seventh

Circuit, because damages recoverable for a wrongful injunction are generally capped by the amount of the bond, district courts must "err on the high side" when setting security. *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 887–88 (7th Cir. 2000); *see also Habitat Educ. Center v. U.S. Forest Serv.*, 607 F.3d 453, 456 (7th Cir. 2010). A bond set too high is not a serious error, because the enjoined party must still prove its actual loss, whereas a bond set too low inflicts irreparable injury since the damages for a wrongful injunction "cannot exceed the amount of the bond"; the Court must therefore set security reflecting the "full consequences" of the injunction and articulate the basis for the amount. *Mead Johnson*, 201 F.3d at 888; *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141–42 (7th Cir. 1994).

42. Properly compensable wrongful-injunction damages are not limited to lost net profit. They include lost profits, lost market share, and the associated costs of relaunch, as well as the unavoidable compliance costs, deadweight FBA storage fees, and sunk inventory liquidation losses caused by the restraint. *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1385 (Fed. Cir. 2006) (affirming bond based on the enjoined party's "potential lost profits, lost market share and associated costs of relaunch").

43. Everplay's proposed $100,000 bond rests on unsubstantiated front-end estimates that understate Plaintiffs' actual baseline sales ($395,752.36 over the past three non-peak months) by approximately 27%. Based on Plaintiffs' verified financial records establishing $160,000 to $200,000 in projected lost net profits, $6,717.28 per month in Q4 FBA storage charges, and unrecoverable sunk asset and liquidation losses across 1,585 units of U.S. inventory, a bond of at least $500,000 is required under Rule 65(c) and Mead Johnson. Unlike Everplay's front-end estimate, Plaintiffs' figures are drawn from actual Amazon

transaction and FBA inventory records and are stated in net profit, not gross sales, and therefore measure precisely the profit Plaintiffs stand to lose from a wrongful injunction. (Xia Decl. ¶¶ 4–17.)

**E. Narrow Scope of Any Injunction Under Rule 65(d)**

44. Should any injunction issue, Fed. R. Civ. P. 65(d) requires that it be strictly limited to the two Accused Products (20-piece magnetic fort building kit under ASIN B0F1FC6SHD and 24-piece magnetic fort building kit under ASIN B0F1F8XFQ6) and products not more than colorably different therefrom, and must expressly exclude Plaintiffs' non-accused product lines (such as toddler beds, play mats, and modular sofas). Any injunction must "explicitly proscribe only those specific acts" and may not be written to reach "any device" within the scope of the claims or "any . . . colorable imitation" of the patented system, which the Federal Circuit has held overbroad. *ABC Corp. I v. P'ship & Unincorporated Ass'ns*, 52 F.4th 934, 945–46 (Fed. Cir. 2022); *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) ("The rule requires an injunction to prohibit only those acts sought to be restrained, which in this case are infringement of the patent by the devices adjudged to infringe and infringement by devices no more than colorably different therefrom."). Whether any later product is "not more than colorably different" and still infringing must be adjudicated in a separate contempt proceeding against the adjudicated baseline, not presumed by the decree. *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011) (en banc). Nor may any injunction bind Plaintiffs' separate corporate entities or non-accused product lines, or bar the creation of seller accounts, beyond the limits of Rule 65(d)(2); a non-party's conduct may be reached only to the extent it acts in active concert with an

enjoined party. *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1394–96 (Fed. Cir. 1996).

## IV. RECOMMENDATION

For the foregoing reasons, the Court recommends that the District Judge DENY Everplay's Motion for Preliminary Injunction (Dkt. 12). In the alternative, if the Motion is granted, the Court recommends that the preliminary injunction: (1) be strictly limited in scope to the two Accused Products (ASINs B0F1FC6SHD and B0F1F8XFQ6) without affecting Plaintiffs' other product lines; and (2) take effect only upon Everplay posting a security bond of no less than $500,000 pursuant to Fed. R. Civ. P. 65(c).

Any objection to this Report and Recommendation must be filed within five calendar days after its issuance, and any response within five calendar days after the objection is filed. (Dkt. 49); see 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to object waives the right to review by the District Judge and on appeal.

It is so recommended and ordered.

Dated: ____________________

______________________________
Karyn L. Bass Ehler
United States Magistrate Judge

Dated: November 3, 2026

Respectfully submitted,

/s/Zhiwei Hua
1360 Valley Vista Dr, Suite 140,
Diamond Bar CA 91765
Bar No. 6099105
huazhiwei@concordsage.com
Phone: (216)3923236

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2026, I caused the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Zhiwei Hua