**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| OMZZ TRADING CO., LIMITED and NINGBO UNIONMAX TECHNOLOGY CO., LTD., | ) | |
| Plaintiffs/Counterclaim Defendants, | ) | Case No. 26-cv-09480 |
| vs. | ) | Magistrate Judge Karyn L. Bass Ehler |
| EVERPLAY LABS LIMITED, | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## REPORT AND RECOMMENDATION

Defendant/Counterclaim Plaintiff Everplay Labs Limited ("Everplay") Motion for Preliminary Injunction [ECF No. 12] against Plaintiffs/Counterclaim Defendants OMZZ Trading Co., Limited and Ningbo Unionmax Technology Co., Ltd. (collectively, "OMZZ") has been referred to me for resolution. [ECF Nos. 14, 15]. The Court proceeds on the Motion for Preliminary Injunction by report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B).

### I. Procedural History

OMZZ filed a lawsuit against Everplay on August 7, 2026 seeking a declaratory judgment of invalidity as to U.S. Patent No. 12,551,811 (the "'811 Patent"), which relates to a system for building a play area using panels with connectors and magnets. Complaint [ECF No. 1]. OMZZ alleges it sells "children's magnetic fort-building play panel sets on the Amazon.com marketplace under the 'Umoving' brand, including the 'Umoving Deluxe Magnetic Fort Building Panels Kit' 24-piece set, offered under Amazon Standard Identification Number ('ASIN') B0F1F8XFQ6, and the 'Umoving 20-Piece Magnetic Fort Building Kit," offered under ASIN B0F1FC6SHD" (referred to herein together as the "Accused Products"). [ECF No. 1] at ¶ 2. OMZZ alleges that

"Everplay is the assignee of the '811 patent and sells competing magnetic play-panel products under the 'Superspace' brand." *Id.* at ¶ 3. Everplay asserted the Accused Products infringe claim 1 of the '811 patent against the Accused Products' listings through the Amazon Patent Evaluation Express ("APEX") process on or about July 2, 2026. *Id.* at ¶ 4. After Everplay initiated the APEX process, OMZZ filed this declaratory judgment action seeking a declaratory judgment of invalidity. *Id.* OMZZ's Complaint did not otherwise address the infringement claim that Everplay had asserted in the APEX process. *Id.*

Everplay answered the Complaint on August 31, 2026 asserting counterclaims of infringement of the '811 patent, trademark infringement in violation of 15 U.S.C. §§ 1114(1) and 1125(a)(1)(A) and common law, and unfair competition. Defendant's Answer, Affirmative Defenses and Counterclaims to Complaint for Declaratory Judgment [ECF No. 9] ("Everplay Answer").

On September 1, 2026, OMZZ "filed an *ex parte* reexamination request challenging all twenty-four claims of the '811 patent" with the United States Patent and Trademark Office ("USPTO"). Plaintiff's Response in Opposition to Motion for Preliminary Injunction [ECF No. 39] ("Response").

Everplay filed its motion for preliminary injunction on September 17, 2026. [ECF No. 12]; *see also* Counterclaim-Plaintiff's Brief in Support of the Motion for Preliminary Injunction [ECF No. 13] ("Motion").

On September 19, 2026, OMZZ filed a motion to stay proceedings in this case pending the reexamination before the USPTO. Plaintiffs' Motion to Stay Proceedings Pending Ex Parte Reexamination of the '811 Patent [ECF No. 19] ("Motion to Stay"). The Motion to Stay was also referred to this Court. [ECF No. 21].

Everplay also filed a motion requesting an expedited briefing schedule for the Motion as well as an evidentiary hearing, [ECF No. 14], which was referred to this Court. [ECF No. 16]. Everplay requested an expedited schedule whereby briefing would be completed by October 7, 2026 with an evidentiary hearing set as soon as possible thereafter by the Court. *Id.* Alternatively, in light of OMZZ's objection that this schedule overlapped with holidays in China, Everplay proposed briefing be completed by October 19, 2026.

In OMZZ's opposition to Everplay's proposed schedule, OMZZ argued that it needed a longer briefing schedule (to be completed by October 21, 2026) to gather "evidence of their sales, their inventory, and the hardship an injunction would impose, and they must also retain and prepare an expert to respond on infringement and validity if needed. [] That evidence must come from Plaintiffs' personnel in Ningbo and Hong Kong . . ." *See* Plaintiffs' Response to Everplay's Motion to Set Expedited Briefing Schedule and Hearing [ECF No. 17] at ¶¶ 3-4. OMZZ said it needed more time "to retain an expert, respond to an expert declaration of more than fifty pages, and gather evidence from witnesses abroad. . ." *Id.* at ¶ 4. Based on OMZZ's representations, the Court granted OMZZ's requested briefing schedule and initially proposed hearing dates of November 2 or November 5. Order [ECF No. 25]. OMZZ's counsel[1] subsequently informed the Court that OMZZ would not be retaining an expert but maintained its need for the longer briefing schedule based on the need to gather evidence from China. *See* Order [ECF No. 29] ("Although OMZZ now clarifies that they will not be retaining an expert to respond to the preliminary injunction motion, the Court's previously set briefing schedule on Everplay's motion was also premised on OMZZ's representations regarding their need to 'gather evidence from witnesses abroad' over a holiday

[1] OMZZ's initial counsel, Jia Song and Mao Peng, filed a motion to withdraw on October 9, 2026, which was granted by the assigned District Judge. [ECF No. 38].

period in China during which OMZZ's offices will be closed, which OMZZ maintains to still be the case in the Joint Status Report. Accordingly, the previously set briefing schedule on Everplay's motion for preliminary injunction stands."). The Court maintained the longer briefing scheduled based on OMZZ's representations that it needed additional time to gather evidence from witnesses in China and set the hearing on Everplay's motion for preliminary injunction for October 30, 2026. [ECF No. 30].

Notwithstanding its prior representations, OMZZ did not submit any witness declarations, lay or expert, with its response brief to Everplay's Motion. *See* Response [ECF No. 39]. OMZZ attached two patent references: U.S. Patent No. 10,217,388 ("Alkas") (ECF No. 39-1) and Korean Utility Model Registration No. 20-0442713 ("Kim '713"), with an English translation (ECF No. 39-2).

The Court held an evidentiary hearing on October 30, 2026. *See* [ECF No. 49]; Transcript of Proceedings [ECF No. 50] ("Hr'g Tr."). Two Everplay witnesses testified at the hearing, both of whom also submitted declarations in support of Everplay's Motion: Anthony Erwin, Everplay's Director, and Tim P. Fletcher, Everplay's proposed expert witness on infringement and invalidity. Hr'g Tr. [ECF No. 50]; Declaration of Anthony Erwin [ECF No. 13-1] ("Erwin Decl."); Declaration of Tim P. Fletcher [ECF No. 13-7] ("Fletcher Decl."); Supplemental Declaration of Tim P. Fletcher [ECF No. 42-6] ("Fletcher Supp. Decl."). OMZZ was represented at the hearing by counsel, Ilya Zlatkin, but did not present any witnesses and no OMZZ personnel attended or participated in the hearing. Hr'g Tr. [ECF No. 50] at 4:13–5:1. At the hearing, Everplay stated that it would rely on the declarations and exhibits already filed without formally re-offering them, and the Court confirmed that those materials were before it. Hr'g Tr. [ECF No. 50] at 5:4–22. OMZZ did not object. *Id.*

The Court received two physical exhibits at the hearing: Hearing Exhibit A, two SUPERSPACE panels, and Hearing Exhibit B, two panels of the Accused Products. Hr'g Tr. [ECF No. 50] at 20:6–22:14, 27:20–28:6, 33:3–6. Mr. Fletcher displayed the disassembled panels, dowels, connectors, and magnets that he examined, and he used demonstrative slides that were provided to the Court and to OMZZ's counsel at the hearing. *Id.* at 56:22–57:1, 59:12–62:18.

On November 5, 2026, the USPTO issued a decision denying the Request for Ex Parte Reexamination of the '811 patent. *See* Everplay Labs Limited's Notice of Supplemental Authority Regarding Denial of Request for Ex Parte Reexamination of U.S. Patent No. 12,551,811 [ECF No. 55] ("Notice of Supp. Authority").

## II. Factual Background

### a. Everplay's SUPERSPACE Product[2]

Everplay Labs Limited is a company registered in the United Kingdom. It was formed on November 2, 2020. Erwin Decl. [ECF No. 13-1] at ¶ 3; Hr'g Tr. [ECF No. 50] at 8:11–16 (correcting the formation date stated in ECF No. 13-1 ¶ 3). It designs and sells SUPERSPACE, a line of life-size magnetic play panels that children use to build forts, houses, and other structures. Erwin Decl. [ECF No. 13-1] at ¶ 6; Hr'g Tr. [ECF No. 50] at 9:10–16.

SUPERSPACE sets, add-on packs, and accessories are Everplay's only products. Erwin Decl. [ECF No. 13-1] at ¶ 29; Hr'g Tr. [ECF No. 50] at 9:10–13, 40:23–41:3. Everplay sells SUPERSPACE in the United States primarily through its own website, and since 2026 also on Amazon.com, along with a small business-to-business channel serving schools, libraries, and

[2] In this Report and Recommendation, the Court relies on and adopts certain proposed findings of fact set forth in Everplay's Proposed Findings of Fact and Conclusions of Law on its Motion for Preliminary Injunction [ECF No. 51] ("Everplay's Proposed Findings") where those facts are supported by the record, including as established through witness testimony at the hearing and in the supporting declarations, and where those facts were not disputed by OMZZ or rebutted with any evidence by OMZZ.

children's museums. Hr'g Tr. [ECF No. 50] at 21:2–8; Erwin Decl. [ECF No. 13-1] at ¶ 14. Everplay is a small company: three founders and four full-time employees, three of whom are in the United States. Hr'g Tr. [ECF No. 50] at 7:4–8, 40:18–22.

Anthony Erwin is a co-founder and director of Everplay and has been with the company since its formation. Hr'g Tr. [ECF No. 50] at 6:22, 7:2–11. He runs Everplay's marketing and product development and works across all of its departments. *Id.* at 7:4–8; Erwin Decl. [ECF No. 13-1] at ¶ 4. He is a named inventor of the '811 patent. [ECF No. 13-8] at 2; *see also* Hr'g Tr. [ECF No. 50] at 8:17–9:3.

**b. OMZZ's Accused Products**

OMZZ Trading Co., Limited is based in Hong Kong, and Ningbo UnionMax Technology Co., Ltd. is based in Ningbo, China. [ECF No. 26] at 2. Each sells through its own Amazon seller account: OMZZ Trading as "OMZZ-US," and UnionMax as "U-MOVING." [ECF No. 42-3] at 2–11. *See also* Plaintiff and Counterclaim-Defendants' Proposed Findings of Fact and Conclusions of Law Opposing Defendants' Motion for Preliminary Injunction [ECF No. 53] ("OMZZ's Proposed Findings") at ¶ 7; Declaration of Yuan Xia Regarding the Preliminary Injunction Bond Amount [ECF No. 52] ("Xia Decl.") at ¶ 3.[3]

The Complaint alleges that OMZZ "design[s] and sell[s] consumer products for children under the Umoving brand, including the Accused Products — magnetic fort-building play panel sets that allow children to build walk-in forts, playhouses, tunnels, and similar structures." [ECF No. 1] at ¶ 16. "Each Accused Product consists of a set of large, lightweight felt play panels in shapes such as rectangles and trapezoids, made of felt produced from recycled plastic bottles. The

[3] Many of OMZZ's proposed findings of fact are not supported by any citations to evidence. *See generally* OMZZ's Proposed Findings [ECF No. 53]. The Court considers OMZZ's proposed facts where they are supported with citations to evidentiary support.

panels attach to one another magnetically, edge to edge. The panels are sold fully assembled and are used as supplied: a user does not assemble the panels from component parts, and the Accused Products include no clips." *Id.* at ¶ 17.

OMZZ sells "Umoving" magnetic fort-building panel sets on Amazon.com under two listings: ASIN B0F1F8XFQ6, a 24-piece "Deluxe" set, and ASIN B0F1FC6SHD, a 20-piece set (together, the "Accused Products"). Erwin Decl. [ECF No. 13-1] at ¶ 14; [ECF No. 13-3] at 9, 16; Hr'g Tr. [ECF No. 50] at 26:19–27:5. *See also* OMZZ's Proposed Findings [ECF No. 53] at ¶¶ 7-8; Xia Decl. [ECF No. 52] at ¶ 2. OMZZ's Amazon page links the two sets as options of the same product. Fletcher Decl. [ECF No. 13-7] at ¶ 48.

OMZZ lists the Accused Products for sale, sets their pricing, describes them, and controls the content of its listings. Plaintiff and Counterclaim-Defendants' Answer and Affirmative Defenses to Defendant's Counterclaims [ECF No. 18] ("OMZZ's Answer") at ¶ 44.

Everplay and OMZZ "sell competing children's magnetic play-panel products." OMZZ's Answer [ECF No. 18] at ¶ 19. The Accused Products are sold on Amazon.com in the same product subcategory as SUPERSPACE and appear alongside it in search results. Erwin Decl. [ECF No. 13-1] at ¶ 14; Hr'g Tr. [ECF No. 50] at 26:5–18.

In addition to the Accused Products, OMZZ sells non-accused children's furniture and play products on Amazon.com, including toddler beds, play mats, and modular sofa sets, which Everplay does not accuse of infringement. OMZZ's Proposed Findings [ECF No. 53] at ¶ 9 (citing [Dkt. No. 42-3] at 12–14)).

**c. The '811 Patent and its Prosecution**

The '811 patent, titled "System, Panel and Method," issued on February 17, 2026. [ECF No. 13-8] at 2; Hr'g Tr. [ECF No. 50] at 34:4–6. It names Anthony Erwin and Craig Spencer as

inventors and Everplay as assignee. [ECF No. 13-8] at 2. It claims priority to a foreign application that Mr. Erwin and Mr. Spencer filed on August 25, 2020, before Everplay was formed, and that they later assigned to Everplay. Erwin Decl. [ECF No. 13-1] at ¶ 9; Hr'g Tr. [ECF No. 50] at 8:17–9:3 (correcting Erwin Decl. [ECF No. 13-1] at ¶ 9); Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 27.

Everplay asserts only Claim 1 for purposes of this Motion. Motion [ECF No. 13] at 8; Everplay's Proposed Findings [ECF No. 51] at ¶ 19.

The application for this patent as filed (U.S. Application No. 18/023,046) contains a summary that states that the magnet is "held in place in the first end of the first connector by the first dowel" and that "each housing portion . . . comprises a recess." [ECF No. 42-4] at 3 (application p. 2). It describes an embodiment in which "a clip may not be provided and dowel 1308a may hold magnet 1300a in connector 1310." *Id.* at 29 (application p. 28). Figure 15, a cross-section "taken through a connector 1510," shows each dowel end within an end of the connector, with the magnet in the housing portion of that same end. *Id.* at 30, 56 (application p. 29 & Fig. 15). As originally filed, the claims recited that "the first dowel is configured to hold the first magnet in the first end of the connector" and that the magnet "can rotate in the at least one recess." [ECF No. 42-4] at 34, 38 (original claims 2, 20).

Claim 1 of the '811 Patent reads:

> A system for building a play area comprising:
> two or more panels, each of the two or more panels comprising:
> a plurality of connectors, each connector of the plurality of connectors defining a first recess at a first end of the connector and a second recess at a second end of the connector;
> a plurality of magnets, each magnet of the plurality of magnets positioned in a connector of the plurality of connectors such that the magnet is able to rotate, the plurality of magnets comprising:
> a first magnet housed in the first recess of a first connector of the plurality of connectors; and
> a second magnet housed in the second recess of the first connector; and
> a plurality of dowels comprising:

> a first dowel, a first end of which is received within the first recess of the first connector and a second end of which is received within the first recess of a second connector of the plurality of connectors; and
>
> a second dowel, a first end of which is received within the second recess of the first connector and a second end of which is received within the first recess of a third connector of the plurality of connectors, wherein the first connector is coupled to the first dowel and the second dowel, the second dowel angled with respect to the first dowel;
>
> wherein, for each of the two or more panels,-when an edge of a first panel of the two or more panels is brought towards an edge of a second panel of the two or more panels from any direction, at least one magnet of the plurality of magnets in each of the first panel and the second panel orientates such that a magnetic connection is formed between the first panel and the second panel.

Exhibit 1 to Complaint [ECF No. 1-1].

During prosecution, the Examiner rejected the pending claims as obvious over U.S. Patent Publication No. 2016/0184727 ("Ornstein") in a non-final rejection dated March 18, 2025, and again in a final rejection dated August 5, 2025. [ECF No. 13-18]; [ECF No. 13-19]; Hr'g Tr. [ECF No. 50] at 71:24–72:7; *see also* OMZZ Proposed Findings [ECF No. 53] at ¶ 13. After an interview, the applicant amended Claim 1 on August 28, 2025, to recite the connector structure now in the claim: connectors that each define a recess at each end, a magnet housed in each recess, and dowels whose ends are received within those recesses, with the second dowel angled with respect to the first. [ECF No. 13-20]; [ECF No. 13-21]; Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 33; Hr'g Tr. [ECF No. 50] at 72:8–14. On November 12, 2025, the Examiner allowed Claim 1, explaining that "[t]he closest prior art of record fails to make obvious a magnetized panel system comprising dowels and connectors having the structure as claimed, the connectors housing a magnet in each of two end recesses and the recesses each receiving a dowel in the manner claimed." [ECF No. 13-22] at 8; *see* Hr'g Tr. [ECF No. 50] at 72:15–73:2.

Alkas, one of the prior art references identified by OMZZ in its Response, was also before the Examiner. It appears on the Notice of References Cited issued with the Notice of Allowance

and in the Examiner's search notes, and it is listed on the face of the '811 patent, with an asterisk denoting a reference cited by the Examiner. [ECF No. 42-1] at 4; [ECF No. 13-8] at 2–3; Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 36; Hr'g Tr. [ECF No. 50] at 77:1–4, 93:14–95:6. The Examiner allowed Claim 1 over Alkas. Hr'g Tr. [ECF No. 50] at 95:4–6.

#### d. Development of SUPERSPACE product[4]

Mr. Erwin and his co-inventor set out to build a life-size, modular play system that young children could build, take apart, and rebuild themselves, as an alternative to blanket forts and to existing rod-and-connector fort kits that children found "fiddly" and frustrating. Erwin Decl. [ECF No. 13-1] at ¶ 7; Hr'g Tr. [ECF No. 50] at 9:19–11:8. They concluded that the panels had to meet three requirements at once: light enough not to hurt a child if a structure fell and for the connection to hold; stiff enough not to bend when stacked several panels high; and inexpensive enough to be sold in sets of many panels. Hr'g Tr. [ECF No. 50] at 11:19–12:16.

Meeting those requirements took many failed iterations. They tested foam, cardboard, and plastic panels and Velcro, interlocking, and magnetic connections. Hr'g Tr. [ECF No. 50] at 12:17–13:8. Magnets worked best with children, but fixed magnets attracted in one orientation and repelled in the other. *Id.* at 13:9–14:9. Rotating ball magnets connected from any direction but were too weak. *Id.* at 14:10–15:6. Diametrically magnetized cylindrical magnets, made to order because they were not then available off the shelf, rotated and were strong enough. *Id.* at 15:7–16:21. But no panel material was at once light, stiff, and affordable; injection-molded foam came closest but cost too much. *Id.* at 16:22–17:16; Erwin Decl. [ECF No. 13-1] at ¶ 8.

The solution was to move the magnets into connectors at the corners of each panel. Each

[4] As noted above, the Court adopts Everplay's Proposed Findings of Fact regarding the development and marketing of the SUPERSPACE product, as these facts were supported by Mr. Erwin's undisputed testimony at the hearing and his unrebutted declaration. The Court finds that Mr. Erwin was a credible and knowledgeable witness who supported his testimony with specific references and explanations.

connector houses two rotating magnets and has an opening at each end that receives a dowel, so that the dowels and connectors form a light, rigid frame and the panel infill need not be stiff. Hr'g Tr. [ECF No. 50] at 7:17–18:18; [ECF No. 13-1] at ¶ 8. The corner placement also produced a stronger connection between panels. Hr'g Tr. [ECF No. 50] at 18:11–20. The development took more than a year. *Id.* at 18:21–19:14; Erwin Decl. [ECF No. 13-1] at ¶ 8.

SUPERSPACE today uses essentially the same connector, recessed-magnet, and dowel configuration in every panel shape. Hr'g Tr. [ECF No. 50] at 19:23–20:5, 20:21–23, 21:22–22:3. SUPERSPACE panels join when brought together in any orientation because of the rotating magnets inside. *Id.* at 21:9–20; *see also* Hr'g Ex. A (exemplar SUPERSPACE panels).

Everplay launched the product, then called "Everplay," through a Kickstarter campaign in March and April 2021, and renamed it SUPERSPACE at the end of 2021. Hr'g Tr. [ECF No. 50] at 22:18–23:5; Erwin Decl. [ECF No. 13-1] at ¶ 9. About 3,200 backers pledged roughly £736,000, just over US $1 million, in the United States and the United Kingdom, before any units had shipped. Hr'g Tr. [ECF No. 50] at 23:6–11, 44:4–23; Exhibit 1-A to Erwin Decl. [ECF No. 13-2] at 2, 18.

Everplay spent more than $5 million on advertising and marketing from 2021 through 2025. Erwin Decl. [ECF No. 13-1] at ¶ 13; Hr'g Tr. [ECF No. 50] at 43:25–44:3.

SUPERSPACE received design awards in 2022, including a Core77 Design Award in the Sports & Recreation category and recognition in the Industrial Designers Society of America's IDEA program, and it was one of four finalists for the U.S. Toy of the Year award that year. Exhibit 1-A to Erwin Decl. [ECF No. 13-2] at 19–29, 34–43; Erwin Decl. [ECF No. 13-1] at ¶ 10; Hr'g Tr. [ECF No. 50] at 23:12–24:25.

**e. Everplay's Business and the Impact of the Accused Products**[5]

Everplay and OMZZ compete directly for consumers shopping for life-size magnetic fort-building panel sets. *See* OMZZ Answer [ECF No. 18] ¶ 19; Erwin Decl. [ECF No. 13-1] at ¶¶ 14, 29. In an Amazon search for "superspace magnetic tiles," two of the top three results were the Accused Products. Exhibit 1-B to Erwin Decl. [ECF No. 13-3] at 9; Erwin Decl. [ECF No. 13-1] at ¶ 21; Hr'g Tr. [ECF No. 50] at 26:5–18.

SUPERSPACE is an expensive toy bought mainly as a holiday gift, and Everplay's sales are concentrated in the holiday season. Hr'g Tr. [ECF No. 50] at 37:16–38:4. Fourth-quarter net sales were 50.7% of Everplay's full-year U.S. net sales in 2022, 53.9% in 2023, 65.0% in 2024 and 72.1% in 2025. In 2025, November alone accounted for about 53% of Everplay's full-year U.S. net sales. Erwin Decl. [ECF No. 13-1] at ¶ 30; Exhibit 1-E to Erwin Decl. [ECF No. 13-6]; Hr'g Tr. [ECF No. 50] at 39:2–11, 42:16–43:16. Mr. Erwin's testimony regarding Everplay's sales was based on Everplay's sales records prepared by Everplay's chief financial officer, which flow from its Shopify e-commerce system into its Xero accounting system, and they reflect U.S. sales only. Hr'g Tr. [ECF No. 50] at 38:5–39:4, 43:17–21.

Everplay places its large holiday orders with its factory in China in early-to-mid July, it pays 15% on ordering and 85% forty-five days after production, financed by loans that it must repay regardless of when the inventory sells. Hr'g Tr. [ECF No. 50] at 39:15–40:17; Erwin Decl. [ECF No. 13-1] at ¶¶ 31–32.

If Everplay's fourth-quarter sales were suppressed, the effect would be "disastrous." Hr'g Tr. [ECF No. 50] at 41:4–6. Sales fall off after the holidays, Everplay's cash would be tied up in

[5] The Court adopts Everplay's Proposed Findings of fact regarding its business and competition from OMZZ, based on the credible and unrebutted testimony of Mr. Erwin and the undisputed evidence regarding Everplay's business.

unsold inventory, it would incur storage costs, and it would likely have to cut marketing, let staff go and pause the other children's products it has in development. Hr'g Tr. [ECF No. 50] at 41:7–16.

Everplay has never licensed the '811 patent, and it would not license the patent to a competitor such as OMZZ. Hr'g Tr. [ECF No. 50] at 37:9–15.

The Accused Products are priced below SUPERSPACE. On September 11, 2026, Everplay's 24-panel SUPERSPACE Big Set was listed at $449, and the 24-piece Accused Product at $379.99, about 15% less. Exhibit 1-B to Erwin Decl. [ECF No. 13-3] at 2, 16; Erwin Decl. [ECF No. 13-1] at ¶ 24; Hr'g Tr. [ECF No. 50] at 26:3–4, 27:6–13, 47:2–10. Mr. Erwin checks the Accused Products' listing every day or two. The 24-piece set has generally been listed at a discount, at about $379, rising to about $400 in recent weeks, but always below SUPERSPACE. Hr'g Tr. [ECF No. 50] at 27:14–19, 47:11–18; Erwin Decl. [ECF No. 13-1] at ¶ 24.

Consumers compare the two products directly and choose between them on price. One Amazon reviewer described Umoving as "[a] great alternative to SUPERSPACE and much better value." ECF No. 13-4 at 2; Hr'g Tr. [ECF No. 50] at 48:15–49:1. In a review dated June 26, 2026, a family that already owned "the original, Super Space tiles" explained that it bought Umoving because it was "on sale and more than half of what we paid." Exhibit 1-C to Erwin Decl. [ECF No. 13-4] at 4; Erwin Decl. [ECF No. 13-1] at ¶ 25; Hr'g Tr. [ECF No. 50] at 49:2–7.

SUPERSPACE customers cannot be identified when they buy from OMZZ instead. The substitution surfaces, if at all, only in occasional public reviews. Erwin Decl. [ECF No. 13-1] at ¶ 25; Exhibit 1-C to Erwin Decl. [ECF No. 13-4]; Hr'g Tr. [ECF No. 50] at 32:18–33:2.

Add-on packs account for about 20% of Everplay's business. Hr'g Tr. [ECF No. 50] at 29:17–30:5; ECF No. 13-1 ¶ 17. Because accused panels connect to SUPERSPACE panels in the

same way two SUPERSPACE panels do, a SUPERSPACE owner can buy an Accused Product as a cheaper substitute for an Everplay add-on pack. Hr'g Tr. [ECF No. 50] at 30:6–13.

OMZZ added the 24-piece set to its offerings in or around February 2026, around when the '811 patent issued. Erwin Decl. [ECF No. 13-1] at ¶ 18.

OMZZ's offices are in Hong Kong and Ningbo, China. Joint Status Report [ECF No. 26] at 2. Both of OMZZ's Amazon seller profiles list business addresses only in Hong Kong or China. Exhibit 13 to Everplay Reply Brief [ECF No. 42-3] at 4–5, 10.

Amazon generally remits seller proceeds to sellers on a bi-weekly (14-day) basis, or more often at Amazon's option. Exhibit 15 to Everplay's Reply [ECF No. 42-5] at § S-5; *see id.* at § P-1.

**f. Mr. Fletcher's qualifications and the level of ordinary skill**

Mr. Fletcher testified as Everplay's witness at the hearing. [ECF NO. 50]. Mr. Fletcher holds a Bachelor's degree in product design from North Carolina State University and a Master's degree in design from the Hong Kong Polytechnic University. Fletcher Decl. [ECF No. 13-7] at ¶ 10; Hr'g Tr. [ECF No. 50] at 57:20–25. He has more than thirty years of experience as an industrial designer and product developer, including the design of toys, infant products, and products that use magnets to hold components in place and to allow multiple configurations, and he has designed more than 150 products. Fletcher Decl. [ECF No. 13-7] at ¶¶ 10–11, 22–25; Exhibit 2-B to Fletcher Decl. [ECF No. 13-9]; Hr'g Tr. [ECF No. 50] at 58:1–16. He is a named inventor on U.S. design and utility patents, has taught industrial design at three universities, and is a Fellow of the Industrial Designers Society of America. Fletcher Decl. [ECF No. 13-7] at ¶¶ 10, 15; Exhibit 2-C to Fletcher Decl. [ECF No. 13-10]; Hr'g Tr. [ECF No. 50] at 58:17–59:2.

Everplay tendered Mr. Fletcher as an expert in industrial design and consumer-product

design and development, including magnetic and modular products. Hr'g Tr. [ECF No. 50] at 59:3–7. OMZZ did not object, and in response to the Court's questioning, OMZZ confirmed that it does not challenge his qualifications. *Id.* at 100:19–101:1.

Mr. Fletcher also testified that a person of ordinary skill in the art (sometimes referred to herein as a "POSITA") at the time of the invention would have had at least a bachelor's degree in industrial design, mechanical engineering or a related field, and about five years of professional experience in consumer-products design and manufacturing, with additional education substituting for experience and vice versa. Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 26; Fletcher Decl. [ECF No. 13-7] at ¶ 42; Hr'g Tr. [ECF No. 50] at 57:3–13. OMZZ did not offer any contrary evidence or alternative definition of a POSITA in its Response, at the hearing, or in its Proposed Findings.

**i. Mr. Fletcher's examination**

Mr. Fletcher examined physical samples of SUPERSPACE and of the Accused Products, comparing the square panels of each; similar features are found in the other panel shapes. Fletcher Decl. [ECF No. 13-7] at ¶ 49; Fletcher Supp. Decl. [Dkt. 42-6] at ¶ 52; Hr'g Tr. [ECF No. 50] at 59:16–20. Mr. Fletcher took the accused panels apart: he removed the stitching from the webbing, pulled the dowels from the connectors, and removed the magnets from the connectors. Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 54; Hr'g Tr. [ECF No. 50] at 59:21–60:5. Because the SUPERSPACE and accused parts were so similar, he marked them "S" for SUPERSPACE and "A" for accused product to keep them separate. Hr'g Tr. [ECF No. 50] at 60:22–61:14. He measured the connectors and magnets with calipers. Fletcher Decl. [ECF No. 13-7] at ¶¶ 52–54; Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 56. He blackened one half of each magnet's face so that its rotation inside the connector could be seen, and mapped the magnets' polarity with a known diametric magnet. Fletcher Decl. [ECF No. 13-7] at ¶ 55; Fletcher Supp. Decl. [ECF No. 42-6] at

¶ 54(e); Hr'g Tr. [ECF No. 50] at 62:10–18. He also cross-sectioned an accused connector and a SUPERSPACE connector. Fletcher Supp Decl. [ECF No. 42-6] at ¶ 55. Mr. Fletcher displayed the disassembled parts during the hearing. Hr'g Tr. [ECF No. 50] at 60:6–16, 61:21–62:7.

Mr. Fletcher also compared the components of the Accused Products and SUPERSPACE's. The Accused Products square panels measure 0.5 m on each side, the same as SUPERSPACE's, and their connectors measure 60 mm overall and their magnets 10 mm in length, the same as SUPERSPACE's. Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 56; Fletcher Decl. [ECF No. 13-7] at ¶¶ 52–54; Hr'g Tr. [ECF No. 50] at 69:14–18. The magnets in the Accused Products are positioned in the same places as SUPERSPACE's. Erwin Decl. [ECF No. 13-1] at ¶ 17; Hr'g Tr. [ECF No. 50] at 28:12–19. Mr. Fletcher identified only one measured difference between the Accused Products and SUPERSPACE, that the Accused Products have about 4 mm in the depth from the magnet to the connector face, but concluded it has no effect on the function of the product, and noted Claim 1 does not recite any recess dimension. Hr'g Tr. [ECF No. 50] at 69:18–70:8.

Mr. Fletcher also built two open cubes, each combining two SUPERSPACE square panels with two accused square panels, assembled two different ways, and found that the panels joined and formed a structure each time. Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 53(a) (Assemblies 1 and 2); Fletcher Decl. [ECF No. 13-7] at ¶¶ 56–57; Hr'g Tr. [ECF No. 50] at 69:25–70:5. During the hearing, Mr. Erwin also joined a SUPERSPACE panel to a panel from the Accused Products, and they connected in any orientation, just as two SUPERSPACE panels do. Hr'g Tr. [ECF No. 50] at 28:12–29:15; Hr'g Exs. A, B.

## III. Analysis

For the reasons set forth below, the undersigned finds that Everplay has met its burden to show a likelihood of success on the merits as to infringement and validity, as well as the other

preliminary injunction factors, and therefore the Court recommends that Everplay's motion for a preliminary injunction be granted.

**a. Legal Standard**

"In deciding a motion for a preliminary injunction in a patent case, district courts apply Federal Circuit law instead of the law of the circuit in which they sit because the motion 'involves substantive matters unique to patent law.'" *Shenzhen Jisu Technology Co., Ltd., Plaintiff, v. The P'ship & Unincorporated Associations Identified on Schedule "A", Defendants.*, 2024 WL 4356392, at *4 (N.D. Ill. Oct. 1, 2024) (quoting *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525 (Fed. Cir. 2012)). More specifically, "'the estimated likelihood of success in establishing infringement is governed by Federal Circuit law,' while the other factors are governed by the law of the regional circuit." *See ABC Corp. I v. P'ship & Unincorporated Associations Identified on Schedule "A"*, 52 F.4th 934, 941 (Fed. Cir. 2022) (quoting *Revision Mil., Inc.*, 700 F.3d at 526 and citing *Koninklijke Philips N.V. v. Thales DIS AIS USA LLC*, 39 F.4th 1377, 1379 (Fed. Cir. 2022)).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Power Probe Grp., Inc. v. Innova Elecs. Corp.*, 2022 WL 1089910, at *2 (Fed. Cir. Apr. 12, 2022) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *ABC Corp. I*, 52 F.4th at 941 (quoting *Winter*, 555 U.S. at 20 (2008)). "The first two factors—likelihood of success on the merits and irreparable harm—are the most critical in a patent case, and a court may deny a motion for a preliminary injunction if 'a party fails to establish

*either* of the[se] two critical factors.'" *Shenzhen Jisu Technology Co., Ltd.*, 2024 WL 4356392, at *4 (quoting *Pressure Specialist, Inc. v. Next Gen Mfg. Inc.*, 469 F. Supp. 3d 863, 868 (N.D. Ill. 2020), in turn quoting *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994)).

A preliminary injunction may rest on evidence that is less complete and procedures less formal than at trial, *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), and affidavits and declarations are admissible at this stage. *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997).

**b. Likelihood of Success on the Merits**

To show likelihood of success on the merits at the preliminary injunction stage, a patentee must show "(1) it will likely prove infringement and (2) its infringement claim will likely withstand challenges to the validity and enforceability of the patents." *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024) (citing *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001)). If a patentee seeking injunctive relief meets its threshold burden, then the burden shifts to the alleged infringer. "An accused infringer can defeat a showing of likelihood of success on the merits by demonstrating a substantial question of validity or infringement." *Power Probe Grp., Inc.*, 2022 WL 1089910, at *2 (citing *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013)). A "substantial question" as to infringement or validity is raised when the accused infringer "asserts an infringement or invalidity defense that the patentee cannot prove 'lacks substantial merit.'" *Biomedical Device Consultants & Lab'ys of Colorado, LLC v. ViVitro Labs, Inc.*, 2024 WL 1318251, at *3 (Fed. Cir. Mar. 28, 2024) (quoting *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001), quoting *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364, (Fed. Cir. 1997)); *ABC Corp. I*, 52 F.4th at 942 (same).

"'Where, as here, the parties do not dispute the scope of any particular claim term [] claim construction is not necessary.' As such, the Court reads [the '811 Patent's] claims according to their 'ordinary and customary meaning[s].'" *See Shenzhen Jisu Tech. Co. v. Partnerships & Unincorporated Associations Identified on Schedule A*, 2024 WL 4356392, at *4 (N.D. Ill. Oct. 1, 2024) (citing *Plastipak Packaging, Inc. v. Premium Waters, Inc.*, 55 F.4th 1332, 1340 (Fed. Cir. 2022) and *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)). *See also* Everplay's Proposed Findings [ECF No. 51] at ¶ 20 ("The parties have not asked the Court to construe any term of claim 1. OMZZ proposed no construction in its opposition or at the hearing."). The Court therefore applies the plain and ordinary meaning of the claim terms.

**i. Everplay has met its burden to show a likelihood of success on infringement.**

Whoever without authority makes, uses, offers to sell, or sells any patented invention within the United States, or imports it into the United States, during the term of the patent infringes the patent. 35 U.S.C. § 271(a). An accused product literally infringes when it practices every limitation of the claim. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). Infringement is determined by construing the claim and comparing it to the accused product. *Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*, 122 F.4th 860, 868–69 (Fed. Cir. 2024). The moving party "'must prove that success in establishing infringement is more likely than not.'" *Jeagr Ventures, LLC v. Does 1-54*, 2022 WL 1450384, at *4–5 (N.D. Ill. May 9, 2022) (internal citations omitted).

Although OMZZ's Response included a brief section arguing Everplay had not demonstrated a likelihood of proving infringement, OMZZ's argument was premised on unsupported assertions that Mr. Fletcher's infringement analysis was "based entirely on superficial external photographs and speculative assumptions." [ECF No. 39] at 7. The Court disagrees. Mr.

Fletcher provided detailed testimony regarding his infringement analysis, which was premised his examination of physical samples of SUPERSPACE and the Accused Products. Mr. Fletcher's examination included taking apart the panels for both products, removing the dowels from the connectors and the magnets from inside the connectors, measuring the connectors and magnets with calipers, marking each magnet so that the rotation could be viewed, mapping the magnets' polarity, and cross-sectioning an accused connector and a SUPERSPACE connector.

OMZZ offered no evidence that any limitation of Claim 1 is not present in the Accused Products. OMZZ did not examine or test the products, and it offered no witness, declaration, or evidence describing their construction. *See* Response [ECF No. 39]; OMZZ Proposed Findings [ECF No. 53]; Hr'g Tr. [ECF No. 50] at 4:24–5:1, 102:7–21. While OMZZ's Response asserted that Everplay had not shown the magnets and dowels are positioned "in the manner claimed," OMZZ did not identify which limitation is missing or how the Accused Products differ from the claim. [ECF No. 39] at 7; *see* Hr'g Tr. [ECF No. 50] at 68:23–69:2. OMZZ also did not cross-examine Mr. Fletcher on infringement at the hearing. Hr'g Tr. [ECF No. 50] at 82:9–92:24. Accordingly, in the Court's view, OMZZ has essentially abandoned its argument that Everplay has not demonstrated a likelihood of success that the Accused Products infringe Claim 1 of the '811 Patent.

The Court finds Everplay's evidence and Mr. Fletcher's unrebutted testimony persuasive as to infringement and therefore adopts Everplay's Proposed Findings providing an element-by-element comparison of Claim 1 of the'811 Patent to the Accused Product, as follows:

> **Preamble: "A system for building a play area."** Each Accused Product is a set of panels sold for building forts and play structures. OMZZ's own listing describes a "magnetic fort building kit" for "walk-in forts." Exhibit 1-B to Erwin Decl. [ECF No. 13-3] at 16; Fletcher Decl. [ECF No. 13-7] at ¶¶ 50–51, 63; Hr'g Tr. [ECF No. 50] at 63:8–12. To the extent the preamble is limiting, it is met.
>
> **"Two or more panels."** Each Accused Product contains twenty or twenty-

four panels. Erwin Decl. [ECF No. 13-1] at ¶ 17; Exhibit 1-B to Erwin Decl. [ECF No. 13-3] at 9, 16; Hr'g Tr. [ECF No. 50] at 26:23–27:5, 63:13–17. Each panel is a felt sheet stretched over a frame of wooden dowels joined at the corners by plastic connectors. Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 56; Fletcher Decl. [ECF No. 13-7] at ¶ 63; Hr'g Tr. ECF No. 50] at 59:21–60:5.

**"A plurality of connectors, each … defining a first recess at a first end … and a second recess at a second end."** Each accused panel has a plastic connector at each corner. Each connector has two ends, and each end defines a recess, an opening going into the connector. Fletcher Decl. [ECF No. 13-7] at ¶ 63; Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 54(a)–(c), 55–56; Hr'g Tr. [ECF No. 50] at 63:18–64:11. The SUPERSPACE and accused connectors each measure 60 mm overall. Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 56.

**"A plurality of magnets … positioned in a connector … such that the magnet is able to rotate."** Each accused connector holds cylindrical magnets that are diametrically magnetized and free to rotate within the connector. Fletcher Decl. [ECF No. 13-7] at ¶ 55; Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 54(e); Hr'g Tr. [ECF No. 50] at 64:13–23. Mr. Fletcher demonstrated the rotation at the hearing: as he brought two accused connectors toward each other from about an inch and a half apart, the marked magnets visibly turned inside the connectors until their attracting poles faced each other. Hr'g Tr. [ECF No. 50] 64:17–65:24.

**"A first magnet housed in the first recess of a first connector" and "a second magnet housed in the second recess of the first connector."** Each end recess of an accused connector houses one magnet, for eight magnets per panel. Fletcher Decl. [ECF No. 13-7] at ¶ 63; Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 54(c), 55, 57; Hr'g Tr. [ECF No. 50] at 65:25–66:15. The cross-section shows the magnet seated within the connector's end recess. Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 55.

**"A first dowel, a first end of which is received within the first recess of the first connector and a second end of which is received within the first recess of a second connector."** The wooden dowel along each edge of an accused panel runs from one corner connector to the next. Its ends are inserted into the end recesses of the two connectors it joins. Fletcher Decl. [ECF No. 13-7] at ¶ 63; Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 54(b)–(c), 57; Hr'g Tr. [ECF No. 50] at 66:16–67:6. The dowel end sits in the same recess as the magnet and holds the magnet in that recess. Fletcher Decl. [ECF No. 13-7] at ¶ 64; Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 55, 57. The cross-section shows the end of the dowel inside the connector, against the magnet. Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 55.

**"A second dowel … received within the second recess of the first connector and … within the first recess of a third connector …, wherein the first connector is coupled to the first dowel and the second dowel, the second dowel angled with respect to the first dowel."** At each corner, the connector receives one dowel in each of its two end recesses. The two dowels run along

> adjacent edges of the panel, at a 90-degree angle to one another, to the next connector in each direction. Fletcher Decl. [ECF No. 13-7] at ¶ 63; Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 54(b)–(c); Hr'g Tr. [ECf No. 50] at 67:7–21.
>
> **"Wherein … when an edge of a first panel … is brought towards an edge of a second panel … from any direction, at least one magnet … in each … panel orientates such that a magnetic connection is formed."** When an edge of one accused panel is brought toward the edge of another, the magnets nearest each other rotate to present attracting poles and the panels join, whichever way the panels are oriented. Fletcher Decl. [ECF No. 13-7] at ¶¶ 55, 63; Hr'g Tr. [ECF No. 50] at 67:24–68:13. Both witnesses demonstrated this with the accused panels at the hearing. Hr'g Tr. [ECF No. 50] at 28:12–29:9, 68:4–13; Hr'g Ex. B (exemplar Accused Product panels). OMZZ markets this feature, promising "Strong Magnetic Connections for Stable Structures." Exhibit 1-B to Erwin Decl. [ECF No. 13-3] at 16.

Everplay Proposed Findings [ECF No. 53] at ¶¶ 41-48. *See also* Fletcher Decl. [ECF No. 13-7] at ¶ 63; Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 52–59; Hr'g Tr. [ECF No. 50] at 68:16–69:5, 81:12–13 (Fletcher's non-infringement opinion).

Based on the unrebutted analysis, expert testimony, and evidence summarized above, the Court finds that each Accused Product contains every limitation of Claim 1, and therefore concludes Everplay has met its burden to show a likelihood of success on the merits as to the Accused Products' infringement of Claim 1 of the '811 Patent. *See Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1089 (Fed. Cir. 1998); *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985).

**ii. Everplay has met its burden to show a likelihood of success on validity.**

"Each issued patent carries with it a presumption of validity under 35 U.S.C. § 282. This presumption is sufficient to establish a likelihood of success on the validity issue, absent a challenge by the accused infringer. Where the alleged infringer attacks the validity of the patent, 'the burden is on the challenger to come forward with evidence of invalidity,' which the patentee must then rebut." *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1205 (Fed. Cir. 2017)

(quoting *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376-78 (Fed. Cir. 2009)). "[T]he alleged infringer at the preliminary injunction stage does not need to prove invalidity by the 'clear and convincing' standard that will be imposed at trial on the merits." *Titan Tire*, at 1379. If challenged, the patent owner must show 'it is more likely than not to prevail over an invalidity challenge.'" *FMC Corp. v. Sharda USA, LLC*, 145 F.4th 1326, 1334 (Fed. Cir. 2025) (quoting *Natera*, 106 F.4th at 1376). "If the alleged infringer comes forward with [evidence of invalidity], the district court should then consider 'the evidence on both sides of the validity issue' to determine if the alleged infringer has raised a substantial question of validity." *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1398–99 (Fed. Cir. 2022) (quoting *Titan Tire*, 566 F.3d at 1379-80).

**1. Everplay is more likely than not to prevail over OMZZ's obviousness challenge.**

OMZZ's complaint listed ten alleged prior art references relevant to its invalidity claim but developed only one combination against Claim 1 of the '811 Patent: U.S. Patent Publication No. 2016/0184727 ("Ornstein") in view of CN 104274984 ("Wei") and WO 2006/112679 ("Kim WO") (the "Ornstein/Wei/Kim WO Combination"). Compl. [ECF No. 1] at ¶¶ 30–31. In its Response, OMZZ argues that it has raised a substantial question of invalidity based on two combinations of prior art that OMZZ says makes Claim 1 of the '811 Patent obvious: 1) the Ornstein/Wei/Kim WO Combination, and 2) a second combination raised for the first time in the Response, Ornstein in view of U.S. Patent No. 10,217,388 ("Alkas") (ECF No. 39-1) and Korean Utility Model Registration No. 20-0442713 ("Kim '713") (ECF No. 39-2) (the "Ornstein/Alkas/Kim '713 Combination"). *See* Response [ECF No. 39] at 4-6; *see also* OMZZ's Proposed Findings [ECF No. 53] at ¶ 4.[6]

[6] The reexamination request filed by Plaintiff Ningbo UnionMax Technology Co., Ltd. before the USPTO asserted the prior art of Ornstein, Kim WO, and Wei, among other references. *See* Exhibit A to Notice of Supp. Authority [ECF No. 55-1]. The USPTO denied the reexamination request, stating "the prior art of

The parties do not appear to dispute the standard for evaluating OMZZ's obviousness arguments. *See* Motion [ECF No. 13] at 10; Response [ECF No. 39] at 3. As set forth in *Natera*:

> Obviousness is a question of law based on underlying factual determinations . . *Metalcraft of Mayville*, 848 F.3d at 1366. A claim is invalid for obviousness "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, a challenger must show a reason why a skilled artisan would have made the combination. Whether a skilled artisan would have been motivated to combine references is a question of fact. *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1051 (Fed. Cir. 2016) (en banc).

*Natera*, 106 F.4th at 1376 (Fed. Cir. 2024). *See also Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007).

"To evaluate obviousness, courts consider the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the art, as well as secondary considerations like commercial success, long-felt need, and the failure of

---

Ornstein, Kim [WO], Wei, Marrin, Goodman, Aun, Haines, Glickman and Cheung, taken alone, in combination, or in new light, fail to raise [a substantial new question of patentability] with respect to independent claims 1, 17, 22 and 24. . ." *Id.* at ECF p. 15. "The Federal Circuit Court of Appeals has held that the reexamination of the validity of a patent 'may be relevant' to determining the likelihood of success" on a motion for preliminary injunction, but "cautions, however, that the USPTO 'does not appear to equate the 'substantial new question of patentability' standard for whether reexamination should take place with the 'substantial question of validity' standard by which a defendant may prevent a patentee from demonstrating a likelihood of success on the merits.'" *See Tama Plastic Indus. v. Pritchett Twine & Net Wrap, LLC*, 2012 WL 3264570, at *6 (S.D. Ind. Aug. 9, 2012) (quoting *Procter & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 847 (Fed. Cir. 2008). Here, the USPTO *rejected* Plaintiff Ningbo's request for reexamination, concluding those references did not raise a substantial new question of patentability, but, on the other hand, OMZZ also asserts additional prior art in its Response that were not part of the reexamination request (Alkas and Kim '713). Accordingly, while the Court finds it relevant that the USPTO rejected the reexamination request as to Ornstein, Kim WO, and Wei, the Court proceeds with considering OMZZ's invalidity arguments. *Cf. id.* ("Because the USPTO's decision to grant reexamination relied on a different standard than that which the Court must apply to determine Tama's likelihood of success on the merits, the Court finds that the pending reexamination weighs against, but does not preclude, Tama's likely success on the merits.").

others to arrive at the invention." *Shure, Inc. v. ClearOne, Inc.*, 2019 WL 3555098, at *15–18 (N.D. Ill. Aug. 5, 2019) (citing *KSR Int'l*, 550 U.S. at 417-18 and *Graham*, 383 U.S. at 17–18). In determining whether OMZZ's proposed combinations raise a substantial question as to the validity of the '811 Patent, "the Court must examine whether it would have occurred to a skilled artisan to combine the elements of these prior art references with one another in the first place." *Id.* (citing *ActiveNetworks, Inc. v. Verizon Comms., Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) and *KSR, Int'l*, 550 U.S. at 418). "In doing so, the Court must be careful to "guard against slipping into use of hindsight" and the "temptation to read into the prior art the teachings of the invention in issue." *Id.* (quoting *Graham*, 383 U.S. at 36 (cleaned up)). "Obviousness ... cannot be based on conclusory statements, 'instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.'" *Shenzhen Kean Silicone Prod. Co., Ltd v. Moon & Stars Online Inc.*, 2026 WL 2445410, at *6 (N.D. Ill. Aug. 20, 2026) (citing *Black & Decker Inc. v. Robert Bosch Tool Corp.*, 476 F. Supp. 2d 887, 896 (N.D. Ill. 2007), quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

As set forth above, Everplay offered Mr. Fletcher's testimony as to the level of skill of a person of ordinary skill in the art. OMZZ's only response at the hearing to this evidence was to point out during cross-examination that Mr. Fletcher testified "that his own 35 years of experience far exceed the POSITA level." OMZZ Proposed Findings [ECF No. 53] at ¶ 16. OMZZ does not, however, offer any explanation or argument about the significance of this testimony or how the Court should consider Mr. Fletcher's additional qualifications. OMZZ also does not dispute Everplay's definition of the level of ordinary skill in the art or that Mr. Fletcher met that minimum definition. *Id.* OMZZ also states that Mr. Fletcher "is a non-lawyer compensated at $600 per hour applying legal standards supplied by Everplay's counsel" but does not provide any argument or

supporting authority for why that should impact the Court's assessment of Mr. Fletcher's credibility, and OMZZ's counsel conceded at the hearing that it did not challenge Mr. Fletcher's qualifications. Hr'g Tr. [ECF No. 50] at 82:9–92:24, 100:19–101:1. Mr. Fletcher testified that his compensation does not depend on the outcome of this case. *Id.* at 56:2–6. Based on Mr. Fletcher's testimony at the hearing, as well as his supporting declarations, the Court finds that Mr. Fletcher is qualified as an expert and that his testimony was credible. The Court further adopts Everplay's unrebutted definition of a POSITA and finds that Mr. Fletcher meets the minimum standards of a POSITA. Mr. Fletcher's opinions rest on his physical examination, disassembly, measurement, and testing of the products at issue, which he demonstrated during the hearing. Hr'g Tr. [ECF No. 50] at 59:16–70:8.

In its Response, OMZZ provided no evidence about why a person of ordinary skill would have been motivated to make the identified combinations of prior art at the time of the invention. Instead, OMZZ simply recited the prior art and advanced conclusory attorney arguments. *See* Response [ECF No. 39] at 4-6 (regarding Ornstein/Wei/Kim WO combination, describing prior art in one paragraph with conclusion that "a person of ordinary skill in the art ('POSITA') seeking to construct modular, reconfigurable toy panels would have had clear reason to combine Ornstein's modular panel frame with Wei's recessed end-connector coupling structure and Kim's self-orientating rotatable magnet mechanism, raising a substantial question as to whether Claim 1 represents a patentable advance"; regarding Orstein/Alkas/Kim '713 combination, describing prior art in one paragraph with conclusion that "a POSITA seeking to build a modular, reconfigurable game panel would have been naturally motivated to combine Ornstein's modular panel frames with Alkas's rotatable, diametrically polarized magnets mounted at the ends of corner frame connectors, and further with Kim '713's arrangement in which the rotatable magnet and the fixing

pin occupy the same recess. Doing so is nothing more than a predictable combination of known elements performing their established functions.").

OMZZ also did not provide any expert evidence in support of its invalidity analysis. In its Response, however, OMZZ did not argue that the technology at issue in the '811 Patent or the prior art was so simple that no expert evidence was needed to evaluate obviousness. *See id.* ("some cases, even beyond the preliminary injunction stage, 'involve technologies and prior art that are simple enough that no expert testimony is needed,'" quoting *Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336, 1348 (Fed. Cir. 2017)). Nor did OMZZ make any such arguments at the hearing. The Court acknowledges that "[g]enerally, expert testimony is not required at the preliminary injunction stage given the lower burden and because the timing of a preliminary injunction may foreclose the possibility of developing 'a fully comprehensive presentation of [an accused infringer's] defenses'." *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1403–04 (Fed. Cir. 2022) (quoting *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 883 (Fed. Cir. 1992)). The Court does take note, however, that OMZZ initially requested a longer briefing schedule in part based on the representation that it needed an expert to rebut Everplay's expert evidence of infringement and validity but ultimately did not provide expert evidence despite the Court accommodating OMZZ's requested longer briefing schedule.

In OMZZ's Proposed Findings submitted after the hearing, OMZZ for the first time asserts that its "obviousness showing does not fail for want of a retained expert" because "the mechanical subject matter is easily understandable." [ECF No. 53] at ¶ 33. Again, this is a new argument not previously raised by OMZZ in its Response or at the hearing. OMZZ asserts "the mechanical components of Claim 1 are straightforward, predictable consumer-product elements well known in the prior art," citing simple descriptions of its identified prior art references as support for this

assertion. *Id.* at ¶ 15 ("Ornstein discloses modular play panels with perimeter frames housing magnets along the panel edges to connect adjacent panels into play structures"; "Alkas . . . discloses modular structural frames joined by corner connectors and tubular members utilizing cylindrical, diametrically polarized magnets that freely rotate to self-align their poles."; "Kim '713, Wei, and Kim WO further demonstrate that housing rotatable or recessed magnets within modular toy blocks, recessed pipe adapters, and rod-and-connector construction toys was conventional in the art well before August 2020") (internal docket citations omitted). OMZZ further argues (again, for the first time), that "[t]he asserted references are themselves evidence of what a skilled artisan would know, and documentary prior art is 'perhaps the most reliable' such evidence." *Id.* (citing *Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1382-83 (Fed. Cir. 2019)).[7]

[7] Regardless, *Airbus S.A.S.* does not stand for the proposition asserted by OMZZ. OMZZ says *Airbus S.A.S.* establishes that OMZZ's "asserted references are themselves evidence of what a skilled artisan would know" but in *Airbus S.A.S.* the Federal Circuit found error where, in considering obviousness, the Board "limited its review to the content of the four references in the asserted combination" rather than also addressing "a host of other references that the examiner had considered over the course of the examination—including some that had been the basis for rejecting other claims—as background evidence establishing what a person of ordinary skill would have known at the relevant time." *Id.*, 941 F.3d at 1383. Accordingly, the Federal Circuit faulted the Board for not considering "'documentary evidence consisting of prior art in the area'" because it "is 'perhaps the most reliable' form of evidence of what an ordinarily skilled artisan would have known." *Id.* This "critical background information [] could easily explain why an ordinarily skilled artisan would have been motivated to combine or modify the cited references to arrive at the claimed inventions." *Id.* By contrast, here, OMZZ does not identify any "critical background information" composed of a broad host of prior art references that could "explain why an ordinarily skilled artisan would have been motivated to combine or modify the cited references to arrive at the claimed inventions." Instead, OMZZ relies *only* on the narrow combination of asserted references without any explanation or identification of any such "critical background information" of other prior art that could support OMZZ's otherwise unsupported assertion that a POSITA would have been motivated to combine the asserted references to arrive at the subject matter of Claim 1. Moreover, *Airbus S.A.S.* did not involve circumstances like those present here, where Mr. Fletcher provides unrebutted testimony that a POSITA would not be motivated to combine the asserted references. Thus, *Airbus S.A.S.* does not support OMZZ's position that merely asserting a combination of prior art references is sufficient evidence, with nothing more, of a POSITA's motivation to combine those references to arrive at the claimed invention.

As an initial matter, OMZZ's arguments that the subject matter of the prior art is "easily understandable" without any need for expert evidence is untimely and raised for the first time after full briefing on Everplay's Motion and after an evidentiary hearing.

Even considering OMZZ's new argument about the purported simplicity of the technology at issue, however, the Court finds it to be conclusory and unsupported. OMZZ presents nothing but attorney argument that the subject matter of the '811 Patent and the prior art references are "easily understandable." *See Topfire Limited, et al. v. Benjamin Cook*, 2026 WL 2836761, at *13–16 (E.D. Cal. Sept. 22, 2026) ("plaintiffs merely assert that the '539 patent only involves straightforward mechanical components, but fail to provide any evidentiary basis to support their assertions that the combination of elements from the prior patents is obvious."). In the Court's view, OMZZ's prior art references, which are pulled from various distinct fields and address inventions that are embodied in a variety of very different products, combining elements of distinct models and builds, are more complex than OMZZ asserts, particularly with respect to whether these varied references would have been obvious to combine to reach the subject matter of Claim 1. *Id.* ("the '539 patent and prior art involve multiple mechanical interactions by simple machines such that the inventions claimed therein are significantly more complex and less intuitive than a standard cupholder").

In addition, some of the patents on which OMZZ relies for its obviousness challenge were "considered by the patent examiner when evaluating the patentability of the ['811 Patent] . . . The fact that the patent examiner considered [the Ornstein and Alkas patents] before issuing ['811 Patent] also suggests that there are important technical differences that a lay observer would not be able to assess without expert assistance." *Topfire Limited*, 2026 WL 2836761, at *13–16. Finally, "[a]lthough there is little guidance as to what factors to consider when determining

whether subject matter is so 'simple' as to not require expert testimony, the Federal Circuit has observed that '[a] trial judge has sole discretion to decide whether or not he needs, or even just desires, an expert's assistance to understand a patent. We will not disturb that discretionary decision except in the clearest case.'" *Id.* (quoting *Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984)). Accordingly, while the Court does not reject OMZZ's obviousness and invalidity challenges solely based on its lack of expert evidence, the Court also, in its discretion, finds Everplay's expert evidence to be relevant and helpful to this inquiry.

OMZZ also proposes a new combination of the previously identified prior art references for the first time in its Proposed Findings submitted after the hearing. *See* OMZZ's Proposed Findings [ECF No. 53] at ¶ 33 (arguing Ornstein and Alkas, "[c]ombined with Kim '713 and Wei" makes "housing a rotatable cylindrical magnet within the end recess of a corner connector that received a frame dowel [] a predictable mechanical rearrangement of known elements performing their ordinary functions."). This new combination is not timely raised, was not included in OMZZ's Response or raised at the hearing, and for these reasons, Everplay has not had any opportunity to respond to this new combination.

Even if the Court were to consider this untimely new argument, OMZZ's position that this new combination of four previously raised prior art references is "a predictable mechanical rearrangement of known elements performing their ordinary functions" is a generic statement similar to those the Federal Circuit has held "not sufficient" and "fraught with hindsight bias." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012). Indeed, although OMZZ says under *KSR Int'l*, 550 U.S. at 416, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results" and asserts "[f]or a POSITA designing modular panel frames, moving a known

rotatable cylindrical magnet (as in Alkas) into the end recess of a corner connector receiving a frame dowel is a routine, predictable design choice among a finite number of mechanical housing locations," OMZZ provides no citation or evidence to support its assertion. OMZZ's Proposed Findings [ECF No. 53] at ¶ 18.

Moreover, OMZZ fails to rebut Mr. Fletcher's testimony regarding each of the prior art references comprising the new combination of Ornstein/Alkas/Wei/Kim '713 (as well as OMZZ's previously asserted two combinations). The Court finds Mr. Fletcher's opinions persuasive, including as to why Wei is structurally and functionally different, why Alkas is not analogous art, and why Kim '713 does not teach towards the subject matter of Claim 1.

As an initial matter, Claim 1 was expressly allowed by the examiner over Ornstein. *See* Exhibit 9 to Motion [ECF No. 13-22] at 8. OMZZ also does not address key differences in Ornstein identified by Everplay, including that Ornstein discloses a modular panel assembly whose frame is made of integral frame portions, so that each corner is a single solid piece, and has no separate connectors with recesses and no dowels spanning from one connector to another, and its magnets are not located in connector recesses. Fletcher Decl. [ECF No. 13-7 ¶¶ 78–83; Fletcher Supp. Decl. [ECF No. 42-6 ¶ 34; Hr'g Tr. [ECF No. 50] at 73:3–18, 73:19–74:9.

Moreover, Mr. Fletcher persuasively testified as a person of ordinary skill in the art that a skilled artisan would not have been motivated to combine OMZZ's identified prior art and provided multiple explanations as to the structural or functional differences of OMZZ's additional prior art (Wei and Kim '713).[8] Wei discloses an adapter for a three-dimensional pipeline assembly

[8] OMZZ's Proposed Findings only briefly reference Kim WO. OMZZ's Proposed Findings [ECF No. 53] at ¶ 15 ("Kim '713, Wei, and Kim WO further demonstrate that housing rotatable or recessed magnets within modular toy blocks, recessed pipe adapters, and rod-and-connector construction toys was conventional in the art well before August 2020") (internal docket cites omitted). OMZZ does not respond to Everplay's explanations of the substantial differences in Kim WO, including that its connectors are metal balls with no recesses and its magnets sit in caps at the ends of hollow rods and attach the rods to the balls.

where Wei's magnet is fixedly embedded in a cavity behind the floor of the adapter's recess, cannot rotate, and attracts magnetically attractable metal rather than another rotating magnet. Exhibit 2-G to Fletcher Decl. [ECF No. 13-14] at 13–15 (¶ [0031]); Fletcher Decl [ECF No. 13-7] at ¶¶ 85–89; Hr'g Tr. [ECF No. 50] at 74:13–75:3. In Wei, the recess receives the end piece of a mating pipe or a loose connecting block, not a dowel end in a recess that houses the connector's own rotatable magnet, as in Claim 1. Dkt. 13-14 at 13–15 (¶¶ [0024]–[0025]). Mr. Fletcher testified that Wei's "pipeline assembly" is "structurally inconsistent with the claimed invention" in the '811 Patent and "[t]he fundamentally different method of construction and assembly teaches away from the '811 Patent, eliminating the POSITA's motivation to combine" and that the "functional attributes" of magnets in Wei "are completely different, eliminating the motivation to combine, and a POSITA would not be taught by Wei." Fletcher Decl. [ECF No. 13-7] at ¶¶ 84–89; Hr'g Tr. [ECF No. 50] at 74:10–12.

Kim '713 discloses a toy block with a thumbtack-shaped fixing pin, about 4 mm long, that passes through the center of a ring-shaped magnet and holds the magnet in place as it turns. [ECF No. 39-2] at 10–13; Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 41–45; Hr'g Tr. [ECF No. 50] at 77:5–20, 96:19–97:23. The pin is only a holder, does not join one part to another, and has no second end received in another connector. Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 44–46; Hr'g Tr. ECF No. 50] at 97:13–98:16. At the hearing, when asked to respond to this distinction, OMZZ's counsel argued that the fact of rotation is sufficient, *see* Hr'g Tr. [ECF No. 50] at 101:19–102:6, but, in the Court's view, that magnets that rotate were known in the prior art does not show that the

Exhibit 2-H to Fletcher Decl. [ECF No. 13-15] at 6–7; Fletcher Decl. [ECF No. 13-7] at ¶¶ 90–93; Hr'g Tr. [ECF No. 50] at 75:4–76:7. In addition, while in some embodiments in Kim WO, a panel attaches to a ball or a rod, the magnets do not join one panel to another. Hr'g Tr. [ECF No. 50] at 75:19–76:11. Beyond a cursory description of Kim WO as a "rod-and-connector construction toy[]," OMZZ does not explain how Kim WO would teach towards the invention in Claim 1 and OMZZ does not appear to rely on Kim WO in its obviousness analysis in its Proposed Findings. [ECF No. 53] at ¶ 33.

configuration in Claim 1 was obvious. Mr. Fletcher opined that "[a] person of ordinary skill in the art implementing the teachings of Kim '713 would have made the magnets with a pin inserted through their middle. This would not lead a person of ordinary skill in the art to arrive at the claimed subject matter." Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 43. While OMZZ cites authority that analogous art should be construed broadly, OMZZ does not provide any explanation or contrary testimony or evidence as to why these prior art references should be considered analogous. OMZZ's Proposed Findings [ECF No. 53] at ¶ 33.

Alkas discloses a display frame for trade shows. Exhibit A to Response [ECF No. 39-1] at col. 1:4–7; Hr'g Tr. [ECF No. 50] at 76:12–15. Its connector carries male tenons that fit inside hollow frame tubes, so the frame member receives the connector, not the reverse. Exhibit A to Response [ECF No. 39-1] at col. 3:44–58; Hr'g Tr. [ECF No. 50] at 76:16–21. Its magnet is a diametrically polarized cylinder carried on a separate magnet assembly inside the tube, where it rotates so that its poles self-align and adjacent display frames can couple in any orientation. Exhibit A to Response [ECF No. 39-1] at col. 4:51–64; Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 37–40; Hr'g Tr. [ECF No. 50] at 76:22–25, 89:25–91:9. The magnet is not in the connector or in a recess of the connector. Hr'g Tr. [ECF No. 50] at 90:11–14, 91:10–16. Alkas has no connector with an end recess that houses a magnet and receives a dowel end. Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 40, 46.

OMZZ notes that on cross-examination, Mr. Fletcher "conceded that Alkas uses a cylindrical diametrically polarized magnet that rotates inside the frame member so its poles self-align, producing magnetic coupling of adjacent frames in any orientation" and asserts that "Alkas is analogous art because it is 'reasonable pertinent to the particular problem with which the inventor is involved' – magnetically coupling modular panels that join from any orientation by

means of a rotating, self-aligning diametric magnet." OMZZ's Proposed Findings [ECF No. 53] at ¶ 15. But OMZZ does not respond to Mr. Fletcher's explanations as to why Alkas is not analogous art. Mr. Fletcher, who has designed trade-show exhibits, testified that a person of ordinary skill designing children's play panels would not look to trade-show display frames as analogous art because toys are safety-oriented for children's use and play, whereas trade-show displays are assembled and dismantled by professionals and not meant for play. Hr'g Tr. [ECF No. 50] at 89:18–24, 95:10–96:6; Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 38 ("[t]he description of Alkas on the fact of the patent is DISPLAY SYSTEM. It is my opinion that a POSITA would not look to display systems, like those used in trade shows, to teach the, about children's play environments" and "[i]t is my opinion that Alkas is not analogous art" because "[t]he panels mentioned in Alkas are for the purpose of holding graphics in place and not for play. While felt is sometimes used on display panels, their purpose is to fill a hole in a section where graphics have not been added."). Although Alkas addressed a way to magnetically connect panels from any orientation, the Court finds the context of Alkas, trade show displays rather than childrens' toys, to be a relevant distinction that calls into question the extent to which Alkas would have been viewed as analogous art by a person of ordinary skill in the art.

Moreover, OMZZ acknowledges that the Examiner allowed Claim 1 over Alkas, which is cited on the face of the '811 Patent, and that "[t]he Examiner's consideration of Ornstein and Alkas . . . may carry some weight." OMZZ's Proposed Findings [ECF No. 53] at ¶ 33. OMZZ argues "because the Ornstein/Alkas/Kim '713 combination was not the stated basis for allowance, the rationale for any deference to the agency 'seems much diminished." *Id.* Although the Court does not rely on deference to the Examiner as the sole basis for rejecting OMZZ's proposed combination adding Kim '713 to Ornstein and Alkas, the fact that the Examiner allowed Claim 1 over Ornstein

while also expressly considering Alkas is still relevant. A challenger relying on art an examiner considered bears "the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job." *Shire LLC v. Amneal Pharms., LLC*, 802 F.3d 1301, 1307 (Fed. Cir. 2015) (quoting *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008)). In the Court's view, OMZZ fails to articulate why the addition of Kim '713 to two other prior art references over which the Examiner allowed the '811 Patent raises a substantial question of invalidity. OMZZ does not rebut Mr. Fletcher's explanations as to the differences in Kim '713 and why Kim '713's teaching of "a pin inserted through the middle of a magnet in order to allow the magnet to rotate around the pin . . . would not lead a person of ordinary skill in the art to arrive at the claimed subject matter" because a POSITA "implementing the teachings of Kim '713 would have made the magnets with a pin inserted through their middle. This would not lead a person of ordinary skill in the art to arrive at the claimed subject matter." Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 41-45.

While OMZZ "need not have presented expert testimony, it needed to provide something on which the district court could base a finding that there is a substantial question of validity." *BlephEx*, 24 F.4th at 1403–04. "It is not enough for [OMZZ] to merely demonstrate that elements of the claimed invention were independently known in the prior art. Often, every element of a claimed invention can be found in the prior art." *Metalcraft of Mayville,* 848 F.3d at 1367. OMZZ's attorney argument "provides no explanation or reasoning for concluding that one of skill in the art would have combined these particular references to produce the claimed invention. Without any explanation as to how or why the references would be combined to arrive at the claimed invention, we are left with only hindsight bias that *KSR* warns against." *Id.* (citing *KSR*, 550 U.S. at 421, and concluding "the district court did not abuse its discretion in rejecting Toro's obviousness defense

and determining that Toro did not raise a substantial question of validity"). OMZZ identifies Ornstein (over which the Examiner expressly allowed Claim 1 of the '811 Patent) and Alkas (which the Examiner also expressly considered and which is listed on the face of the patent) in combination with other prior art (Kim '713, and, as addressed above, in its Proposed Findings, adding Wei to the combination for the first time) but "has not explained the reason or motivation a person of ordinary skill in the art at the time of the invention would have possessed and therefore would have combined" this prior art to reach the invention. *See 9878866 Canada Inc. v. Intake Breathing Tech., LLC*, 2026 WL 1133144, at *13 (D.D.C. Apr. 27, 2026) (finding "plaintiff has not shown that the validity of the defendant's patent is vulnerable, either to an indefiniteness challenge or an obviousness challenge" where "besides highlighting the Macken patent—which the Patent Office already decided did not teach the defendant's patent—and including the Riach Application, the plaintiff has not explained the reason or motivation a person of ordinary skill in the art at the time of the invention would have possessed and therefore would have combined these two prior arts") (citing *BlephEx, LLC*, 24 F.4th at 1403); *Yukon Packaging, LLC v. Jones Sustainable Packaging, LLC*, 2026 WL 1270614, at *7 (W.D.N.C. May 8, 2026) (defendant did not raise a substantial question as to validity where it offered "a single paragraph of conclusory argument on why a person of ordinary skill in the art would have been motivated to combine the prior art" and "relies on general statements, like: '[a] POSITA would have further recognized that the teachings of these references would all be useful . . . .' without further support"); *CryoLife, Inc. v. C.R. Bard, Inc.*, 2015 WL 1093543, at *3 (D. Del. Mar. 10, 2015) (finding party seeking preliminary injunction had shown a likelihood of success over the invalidity arguments "that certain prior art anticipates or, in combination, renders the asserted claims obvious" made "without expert testimony or declarations" and supported with "the barest of attorney argument").

The Court credits Mr. Fletcher's testimony regarding how a person of ordinary skill in the art would have viewed OMZZ's identified prior art and proposed combinations. Mr. Fletcher testified that he saw no reason, absent hindsight, for a person of ordinary skill to combine the references in the way OMZZ proposes, or any teaching in the art that would lead to the claimed structure. Fletcher Decl. [ECF No. 13-7] at ¶ 94 (as to Ornstein/Wei/Kim WO combination); Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 43-47 (as to Ornstein/Alkas/Kim '713 combination); Hr'g Tr. [ECF No. 50] at 78:8–12, 78:23–79:7. No asserted reference, alone or in combination, discloses a connector that houses a rotatable magnet in each of its two end recesses, with each recess also receiving the end of a dowel that spans to another connector. Fletcher Decl. [ECF No. 13-7] at ¶¶ 78–94; Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 31–47; Hr'g Tr. [ECF No. 50] at 77:21–78:7, 78:13–22. Mr. Fletcher supported his opinions with a chart demonstrating the significant changes a POSITA would have had to make to the teachings of each of these three prior art references in order to arrive at the subject matter of Claim 1 of the '811 Patent, including inverting Alkas's joint so that the connector receives the frame member, moving Alkas's magnet out of the frame tube and into a recess of the connector that also receives the frame member, which changes what holds the magnet and how it turns, and converting Kim '713's fixing pin into a member spanning two connectors. Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 46; Hr'g Tr. [ECF No. 50] at 78:13–79:4. The Court finds Mr. Fletcher's testimony persuasive and concludes it supports Everplay's argument that a POSITA would not have been motivated to combine the prior art in the combinations proposed by OMZZ to arrive at the subject matter of Claim 1.

Finally, Everplay provided evidence of objective indicia of nonobviousness that confirms the Court's conclusion, including commercial success, industry praise, and copying. *See Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202, 1211–12 (Fed. Cir. 2023). "For

objective evidence of secondary considerations to be relevant, there must be a nexus between the merits of the claimed invention and the objective evidence. [] A showing of nexus can be made in two ways: (1) via a presumption of nexus, or (2) via a showing that the evidence is a direct result of the unique characteristics of the claimed invention." *Id.* at 1210 (Fed. Cir. 2023) (internal citations omitted). A presumption of nexus applies when the patentee shows that the objective evidence is tied to a specific product that embodies the claimed features and is coextensive with them. *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019). Embodiment and coextensiveness are distinct showings: "coextensiveness is a separate requirement." *Volvo Penta of the Americas*, 81 F.4th at 1211. Th Court finds that a presumption of nexus is warranted here.

There is no dispute that SUPERSPACE embodies Claim 1, as Mr. Fletcher examined SUPERSPACE, including a cross-sectioned connector, and found every limitation present. Hr'g Tr. [ECF No. 50] at 69:6–13, 81:14; Fletcher Supp. Decl. [ECF No. 42-6] at ¶¶ 55, 59; Fletcher Decl. [ECF No. 13-7] at ¶ 59. Every SUPERSPACE panel shape uses the claimed connector, recessed-magnet and dowel configuration. Hr'g Tr. [ECF No. 50] at 20:21–23, 21:22–22:3.

OMZZ argues Everplay did not establish that SUPERSPACE's "consumer praise or commercial success is coextensive with the narrow amendment that secured allowance of Claim 1 (placing the magnet and dowel end inside the same connector recess), rather than marketing, general magnetic play-panel concepts already in Ornstein, or brand aesthetics." OMZZ Proposed Findings [ECF No. 53] at ¶ 34 (citing *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019). The Court disagrees. Claim 1 recites the panel system used in SUPERSPACE, and SUPERSPACE's frame of connectors, magnets, and dowels allows the infill to be any light material. Hr'g Tr. [ECF No. 50] at 17:24–18:2. The praise SUPERSPACE received was directed to this claimed structure. Everplay's award-winning Core77 entry credited "a frame that would

house the magnets while allowing the panels to be lightweight." Exhibit 1-A to Erwin Decl. [ECF No. 13-2] at 19, 24. National Parenting Product Awards evaluators wrote that "there is no right or wrong way to assemble them" and that "[t]he panels are lightweight and the magnets are really strong." *Id.* at 27. The features that drew that praise and that drive customer demand result from the claimed structure. The panels can be joined from any direction because the magnets in the connector recesses are able to rotate to connect and the large panels can be light because the dowels received in those recesses form a rigid frame. Erwin Decl. [ECF No. 13-1] at ¶ 8; Fletcher Decl. [ECF No. 13-7] at ¶ 63; Hr'g Tr. [ECF No. 50] at 17:17–18:18, 21:9–20, 45:17–46:7. OMZZ offered no evidence that the praise and commercial response described above is attributable to anything other than the claimed structure. *See* Response [ECF No. 39] at 6–7; *see also* Hr'g Tr. [ECF No. 50] at 102:7–21.

Moreover, "[t]he inclusion of noncritical features does not defeat a finding of a presumption of nexus." *Volvo Penta*, 81 F.4th at 1210. Nexus may be presumed where the unclaimed features, such as SUPERSPACE's panel infill, colors, and shapes, "amount to nothing more than additional insignificant features." *Fox Factory*, 944 F.3d at 1374. OMZZ points to Everplay's marketing spend of more than $5 million and its "4.8-star reputation," but does not explain how these are unclaimed features relevant to the nexus analysis. *See Fox Factory*, 944 F.3d at 1374. To the contrary, the Court finds Everplay's evidence does establish a nexus between the claimed features of SUPERSPACE and its awards and commercial success. *Cf. In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996) (mere evidence of sales is insufficient and "the applicant must submit some factual evidence that demonstrates the nexus between the sales and the claimed invention").

OMZZ also argues that objective evidence "lacks a nexus if it exclusively relates to a feature that was known in the prior art," *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1330 (Fed. Cir. 2016). OMZZ Proposed Findings [ECF No. 53] at ¶ 34. But OMZZ does not identify or explain what feature it contends was known in the prior art that provided the basis for SUPERSPACE's commercial success. Moreover, assuming that OMZZ is referring to individually known elements that were identified in the references included in its proposed combinations, such as rotatable magnets, that is not sufficient to defeat Everplay's showing of nexus. "[I]t is the claimed combination as a whole that serves as a nexus for the objective evidence." *See WBIP*, 829 F.3d at 1330. The praise and demand for SUPERSPACE are directed to the combination the examiner found missing from the prior art—magnets housed in connector recesses that also receive the frame dowels—that allowed Everplay to create a lightweight product using panels that can be joined from any direction.

Finally, even without the presumption, this same evidence shows that the praise and demand for SUPERSPACE are the "direct result of the unique characteristics of the claimed invention." *Fox Factory*, 944 F.3d at 1373–74 (quoting *In re Huang*, 100 F.3d at 140). In addition, the evidence also reflects the Accused Products' close copying of SUPERSPACE's dimensions and connector architecture, which is also probative of nonobviousness. *Id.* at 1336 ("The fact that a competitor copied technology suggests it would not have been obvious."). As discussed above, Mr. Fletcher confirmed the measurements of the Accused Products' components are almost identical to SUPERSPACE's, including the length of the square panels, and the length of the connectors and magnets. In addition, Mr. Fletcher opined that the magnets in the Accused Products are positioned in the same places as SUPERSPACE's. Mr. Fletcher also found that the two products' panels are completely interchangeable.

For all these reasons, the Court finds Everplay's evidence of objective indicia supports the conclusion that Everplay has shown a likelihood of success over OMZZ's obviousness challenge. *See Spectrum Brands, Inc. v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Assocs. Identified in Schedule A*, 2024 WL 4449945, at *4 n.7 (N.D. Ill. Oct. 9, 2024) ("the Court would not deny the preliminary injunction motion on obviousness grounds" where "[t]he responding defendants provide 'no explanation or reasoning for concluding that one of skill in the art would have combined [the cited] references to produce the claimed invention,' offering only a brief, conclusory statement to that effect" and where "the plaintiffs have produced secondary evidence of non-obviousness (including commercial success, 'awards and accolades,' and purported copying of the '129 patent) to which the responding defendants have not replied.") (internal citations omitted).

**2. Everplay is more likely than not to prevail over OMZZ's lack of written description challenge.**

OMZZ also argues "Claim 1 is vulnerable under 35 U.S.C. § 112(a) for lack of written description support." Response [ECF No. 39] at 6. The written-description requirement asks whether the application "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). It is a question of fact judged from the perspective of a person of ordinary skill. *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 127 F.4th 896, 914 (Fed. Cir. 2025).

In its Response, OMZZ argued the application did not disclose "a first dowel, a first end of which is received within the first recess of the first connector" because "[w]hile the specification mentions an alternative arrangement operating without clips, it states only that the dowel holds the magnet in the end of the connector; it nowhere states or describes that an end of a dowel is received

within a recess of the connector alongside the magnet." [ECF No. 39] at 6. Everplay, however, identified several ways in which the application describes a dowel received in the connector's end recess with the magnet, including the application's summary, its detailed description, the drawing in Figure 15, and its original claims. *See* Everplay's Proposed Findings [ECF NO. 51] at ¶¶ 68-69 (citing [ECF No. 42-4]). A claim need not use the same words as used in the application, *Ariad*, 598 F.3d at 1352; *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779 (Fed. Cir. 2002), and drawings may supply the description. *Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*, 291 F.3d 1317, 1322–23 (Fed. Cir. 2002).

In OMZZ's Proposed Findings, it now describes the argument a bit differently, stating the original application "did not use the language added during the August 28, 2025 amendment; rather, its illustrated embodiments (such as Figure 15) relied on internal retention structures and clips (recited in dependent Claim 5) to position the magnets relative to the dowels." OMZZ's Proposed Findings [ECF No. 53] at ¶ 14. OMZZ contends "substantial questions remain under 35 U.S.C. § 112(a) as to whether the original disclosure, which relied on separate retention clips to hold magnets in place, possessed the broad, clip-free recessed-dowel retention later amended into Claim 1 in August 2025." OMZZ's Proposed Findings [ECF No. 53] at ¶ 35.

As an initial matter, the Court views OMZZ's argument in its Proposed Findings, which centers on whether the application disclosed what OMZZ now describes as "the broad, clip-free recessed-dowel retention" in Claim 1, to be different than the argument made in the Response. In its Response, OMZZ acknowledged "that the specification mentions an alternative arrangement operating without clips," [ECF No. 39] at 6, and OMZZ does not explain why this would not be sufficient to disclose a "clip-free recessed-dowel retention." Even considering OMZZ's new argument that the application required clips to hold the magnets in place, Everplay identifies that

the application describes an embodiment in which "a clip may not be provided and dowel 1308a may hold magnet 1300a in connector 1310." [ECF No. 42-4] at 29 (application p. 28). Everplay further explains "[t]hat the illustrated embodiments include a clip does not matter: claim 5 adds a clip to claim 1, so the clip embodiments are embodiments of claim 1." Everplay's Proposed Findings [ECF NO. 51] at ¶ 121 (citing [ECF No. 13-8] at claim 5).

Finally, Mr. Fletcher's unrebutted testimony establishes that a skilled artisan would have understood the application to disclose the claimed subject matter in Claim 1. Fletcher Supp. Decl. [ECF No. 42-6] at ¶ 49; Hr'g Tr. [ECF No. 50] at 79:25–81:9. OMZZ offers no evidence of how a skilled artisan would read the application and OMZZ's counsel confirmed at the hearing that OMZZ relied solely on the face of the documents. Hr'g Tr. [ECF No. 50] at 103:3-12.

Accordingly, the Court finds that OMZZ has not raised a substantial question as to the validity of Claim 1 under 35 U.S.C. § 112(a).

**c. Everplay is likely to suffer irreparable harm absent an injunction.**

A party seeking a preliminary injunction must show harm that is likely, not speculative. *Koninklijke Philips N.V. v. Thales DIS AIS USA LLC*, 39 F.4th 1377, 1380 (Fed. Cir. 2022). It must be "substantial and immediate." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)). To show irreparable harm, it is necessary to show that the infringement caused harm in the first place. *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 641 (Fed. Cir. 2015) ("a finding that the competitor's infringing features drive consumer demand for its products satisfies the causal nexus inquiry"). Price erosion, lost market share from a direct competitor, loss of goodwill, damage to reputation, and loss of business opportunities support a finding that remedies at law are inadequate. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011); *Celsis in Vitro, Inc. v. CellzDirect, Inc.*,

664 F.3d 922, 930 (Fed. Cir. 2012).

**1. Causal Nexus:**

The patentee must show "some causal nexus" between the infringement and the harm, which requires "some connection between the patented feature and demand," not proof that the feature is the exclusive driver of demand. *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1364 (Fed. Cir. 2013). Where the infringing product "contains no feature relevant to consumers' purchasing decisions other than what the patent claims," the causal-nexus inquiry "may have little work to do." *Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378, 1384 n.2 (Fed. Cir. 2017).

The Court finds the evidence establishes a connection between consumer demand and the particular combination of structural features recited in Claim 1. Although OMZZ contends that on cross-examination, Mr. Erwin admitted that "consumer demand for SUPERSPACE is driven by massive brand marketing, commercial accolades, customer reviews, and safety reputation – not *just by* the specific internal connector-recess-and-dowel geometry of Claim 1" OMZZ Proposed Findings [ECF No. 53] at ¶ ¶ 19, 37 (emphasis added), the law does not require that the patented feature be the sole reason for consumer demand. The patented feature need only be "one of several features that cause consumers to make their purchasing decisions." *Apple*, 735 F.3d at 1364. Nor is this a case in which the patented feature is merely one component of a highly complex product containing a multitude of other features. Claim 1 covers the panel system itself. *See Genband*, 861 F.3d at 1384 n.2.

During cross-examination, Mr. Erwin acknowledged that awards and reviews play some part in why customers choose SUPERSPACE but also testified that the average consumer likely does not know what a Core77 award is and that customers buy SUPERSPACE because of "the

way it works, the way it functions." Hr'g Tr. [ECF No. 50] at 45:9–20; 46:8–10. Mr. Erwin described that function as the lightweight yet rigid and cost-effective panels that join from any direction "because of the rotating magnets inside," *id.* at 21:16–20, housed in corner connectors whose end openings also receive the dowels that form the panel's frame. *Id.* at 17:17–18:18, 20:21–23. As Mr. Erwin explained, this is the same configuration, after earlier design attempts had failed, that made light, sturdy, life-size panels feasible. *Id.* at 13:9–18:18. As discussed above, market praise and awards also credits this claimed structure and resulting functionality. Similarly, while OMZZ points to the amount of Everplay's advertising spend, Everplay's marketing also emphasizes "[i]t's so easy for kids to build things because of the mechanism that we've built," without the "fiddly" assembly of rod-and-connector fort kits. *Id.* at 46:1–6; *see id.* at 10:16–21. Mr. Erwin explained "[a]n important aspect of the SUPERSPACE user experience is that children can bring panels together from different directions without having to match a particular orientation. Everplay emphasizes the ease and versatility of the connection in its product development and marketing because it allows children to build, take apart, and reconfigure structures themselves." Erwin Decl. [ECF No. 13-1] at ¶ 6.

OMZZ's Accused Products employ essentially the same connector, magnet, and dowel configuration, and OMZZ also expressly markets their ability to form "Strong Magnetic Connections for Stable Structures." Exhibit 1-B to Erwin Decl. [ECF No. 13-3] at 16. Buyers describe the Accused Products as "[a] great alternative to SUPERSPACE." Exhibit 1-C to Erwin Decl. [ECF No. 13-4] at 2. Moreover, SUPERSPACE owners can use the Accused Products as add-on panels, and have bought them for that purpose, because the accused panels are interchangeable given that they use the same connector and magnet architecture, with the magnets in the same positions. Hr'g Tr. [ECF No. 50] at 28:12–19, 30:6–13, 32:23–33:2; Exhibit 1-C to

Erwin Decl. [ECF No. 13-4] at 4. Thus, the evidence establishes that these functional characteristics drive consumer demand. Moreover, while OMZZ points to price as a driver of consumer demand, the Court is persuaded by Everplay's argument that "[a] cheaper copy that competes for the same customers is how the harm occurs, not an alternative cause of it." Everplay Proposed Fundings [ECF No. 51] at ¶ 126. OMZZ provides no authority that causal nexus is defeated where consumers purchase an infringing product in part because it is priced lower than the product with the patented feature, where the demand for the product in the first instance is driven by the patented feature.

### 2. Everplay's Harm from Sales of the Accused Products is Likely to be Irreparable

"Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013). As discussed above, the Court credits Everplay's unrebutted evidence regarding its business and the impact of the Accused Products. Everplay and OMZZ compete head-to-head for the life-size children's magnetic play panel products, Everplay sells a single product family, and Everplay's sales are concentrated in the fourth quarter holiday season. Holiday customers diverted to the Accused Products will have already bought their play sets, and Everplay will not be able to recover those lost sales during this holiday season. Current SUPERSPACE owners who buy the accused panels instead of Everplay's add-on packs also cannot be easily identified, so those lost sales cannot be easily measured. Such losses are "often difficult to quantify." *Douglas Dynamics*, 717 F.3d at 1344; *see also Trebro Mfg., Inc. v. FireFly Equip., LLC*, 748 F.3d 1159, 1170 (Fed. Cir. 2014) (irreparable harm likely where patentee "is very likely to lose significant market share as well as customers"); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664

F.3d 922, 930 (Fed. Cir. 2012) (finding district court did not err in finding irreparable harm absent a preliminary injunction where "[t]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door or to identify the specific persons who do not reorder because of the existence of the infringer."); *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1170–71 (Fed. Cir. 2014) ("the record shows that a loss of market share and customers is a loss that Trebro is not likely to recover."). Moreover, where the patentee "had never licensed the infringed patents, and intentionally chose not to, so that it could maintain market exclusivity," the injury is the loss of the exclusivity the patent confers, which a royalty cannot replace. *Douglas Dynamics*, 717 F.3d at 1345. Here, as in *Douglas Dynamics*, Everplay has never licensed the '811 patent and would not license it to a competitor.

Mr. Erwin testified that the effect of losing substantial holiday sales would be disastrous. Everplay is a small company whose cash is committed to holiday inventory, financed by loans that must be repaid, and would have to cut marketing and staff and pause product development if its holiday sales were suppressed. Such consequences cannot be undone by a damages award years later. *See Trebro*, 748 F.3d at 1170–71 (threatened layoffs at an eighteen-employee company "further support[] the conclusion that money damages are likely inadequate"). Continued sales of a lower-priced, closely similar product also threaten Everplay's price and its standing as the originator of the product. A patentee may be unable to restore its price "as long as competition from [the infringer] remains." *Tinnus*, 846 F.3d at 1207–08 (Amazon review showing customer preference for "off-brand" product "establishes persisting harm to Tinnus's reputation and tarnishes its status as the innovator in this market").

### 3. Money damages are inadequate including where the ability of the infringer to satisfy any damages award is not established.

OMZZ is based in Hong Kong and China and has not presented any evidence of assets that are consistently maintained in the United States. Everplay argued that funds passing through Amazon accounts, such as those held by OMZZ, are likely to be remitted abroad on a rolling basis. OMZZ did not present any evidence to counter that understanding of Amazon accounts or to otherwise demonstrate that OMZZ would have sufficient assets to satisfy a damages award. A monetary award is not a meaningful alternative to an injunction where the accused infringer may be unable to pay it. *See Robert Bosch*, 659 F.3d at 1151, 1155–56 (accused infringer's "lack of financial wherewithal to satisfy a judgment" supported irreparable harm; "the questionable financial condition of both Pylon and its parent company reinforces the inadequacy of a remedy at law. A district court should assess whether a damage remedy is a meaningful one in light of the financial condition of the infringer before the alternative of money damages can be deemed adequate."). *See also Foodcomm Int'l v. Barry*, 328 F.3d 300, 304–05 (7th Cir. 2003) (considering that defendants "have no significant assets in the United States" in finding irreparable harm).

OMZZ argued at the hearing that Everplay's harm is calculable because Everplay keeps detailed sales records, Hr'g Tr. [ECF No. 50] at 126:16–127:10, and OMZZ asserted in its Proposed Findings [ECF No. 53] at ¶ 38 that its "Amazon records capture every sale to the penny." But *Eli Lilly & Co. v. American Cyanamid Co.*, 82 F.3d 1568, 1578–79 (Fed. Cir. 1996), on which OMZZ relies, was based on evidence that the defendants had adequate assets to satisfy a judgment. OMZZ offered no evidence that it holds assets in the United States that would be available to satisfy a damages award. At the hearing, OMZZ's counsel asserted (without supporting evidence) that proceeds of OMZZ's Amazon sales are held in accounts with Amazon and that OMZZ does business in the United States, but there is no evidence about the amount of any account balance or

whether those funds will remain in the United States, and counsel acknowledged that a judgment creditor would have to pursue post-judgment discovery to reach funds held by Amazon. Hr'g Tr. [ECF No. 50] at 103:13–105:2. Accordingly, the Court is not persuaded that OMZZ would have assets available in this country to satisfy any damages award.

*****

For all the above reasons, the Court concludes that Everplay is likely to suffer irreparable harm absent an injunction.

**d. The balance of equities and whether an injunction would disserve the public interest.**

The Court weighs the harm of denying relief against the harm of granting it, "using a sliding scale—the greater the movant's likelihood of success on the merits, the less the harms need be in its favor." *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023); *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). Under the Seventh Circuit's sliding scale, Everplay's strong showing on the merits, including the essentially undisputed evidence of infringement and copying, reduces the showing it must make on the balance of harms. *Life Spine*, 8 F.4th at 539. The balance also favors Everplay. Without an injunction, Everplay faces the loss of holiday sales, customers and price in its only product line during the season that produces most of its revenue. OMZZ offered no evidence of hardship, despite representing that it would and insisting on a longer briefing schedule to do so.[9] Any hardship to OMZZ would also result from stopping

[9] At the hearing, the Court allowed OMZZ to submit a declaration in support of its argument that Everplay's proposed security of $100,000 would be inadequate. The Court made clear that this declaration should be limited solely to the issue of the amount of security, as OMZZ had not provided any evidence of any financial harm to OMZZ's business from any injunction and indeed, OMZZ had not submitted any supporting declarations with its Response and did not present any witnesses at the hearing. In its Proposed Findings, OMZZ now argues that "[e]njoining Plaintiffs on the eve of Black Friday and Cyber Monday would effectively destroy Plaintiffs' primary business line and strand 1,585 units of bulky inventory in U.S. warehouses . . ." relying on evidence in the newly submitted declaration. [ECF No. 53] at ¶ 39; Xia Decl. [ECF No. 52]. The Court strikes this reference and does not consider OMZZ's belated evidence of hardship.

sales of products likely to infringe. *See Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."); *Robert Bosch*, 659 F.3d at 1156 ("[a] party cannot escape an injunction simply because . . . its primary product is an infringing one"); *Dongguan Saien Chuangke Technology Co. Ltd. v. Shenzhen Huamingjun Rubber Co. Ltd., & Internet Stores 1-45 Identified in Schedule A*, 2024 WL 7168766, at *3 (N.D. Ill. Nov. 18, 2024) ("The plaintiff is correct that courts should not reward infringing conduct by allowing the continued sale of the accused products. This does not change just because the defendants filed a declaratory judgment shortly after the asserted patents issued."). Moreover, the injunction reaches only the Accused Products and OMZZ does not dispute that it has other product lines. On the other side of the scale, "requiring [the patentee] to compete against its own patented invention, with the resultant harms described above, places a substantial hardship on [it]." *Robert Bosch*, 659 F.3d at 1156.

The final question is whether the injunction would disserve the public interest. *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 868 (7th Cir. 1983). The public interest favors enforcing patent rights that are likely valid and infringed. *See Celsis*, 664 F.3d at 931 ("The public interest favors the enforcement of Celsis' patent rights here."); *Cozy Comfort Co. LLC v. Individuals, Corps. Ltd. Liab. Companies, Partnerships, & Unincorporated Associations Identified on Schedule A to Complaint*, 2024 WL 2722625, at *7 (N.D. Ill. May 28, 2024) ("The public interest is served by enforcing the rights of persons who have been issued patents by the United States government," quoting *John Mezzalingua Assocs., Inc. v. Arris Int'l, Inc.*, 298 F. Supp. 2d 813, 822 (N.D. Ill. 2003)). OMZZ's argument that the public benefits from a lower-priced alternative is the argument the Federal Circuit rejected in *Douglas Dynamics*. *See*

Hr'g Tr. [ECF No. 50] at 129:3–11. Although "competition serves the public interest," "the public has a greater interest in acquiring new technology through the protections provided by the Patent Act than it has in buying 'cheaper knock-offs.'" *Douglas Dynamics*, 717 F.3d at 1346; *see also Shure*, 2019 WL 3555098, at *25 ("Any harms from loss of competition should be offset by the benefits of the injunction to the public: the point of granting a period of exclusivity over patented technology is to reward innovation and investment in research. The public benefits when this system works, and suffers when patents are infringed, so it is in the public interest—in the long run—to protect valid patents.") (citing *Douglas*, 717 F.3d at 1346). Moreover, OMZZ's argument as to an interest in vigorous price competition is premised on the assertion that "substantial questions of patent validity remain unresolved." OMZZ's Proposed Findings [ECF No. 53] at ¶ 40. Here, by contrast, the Court has concluded there is not such a substantial question (and, as the Court discussed above, the USPTO also denied the reexamination request). *See Dongguan Saien Chuangke Technology*, 2024 WL 7168766, at *3 ("The Court agrees with the plaintiff that the public interest favors the enforcement of patent rights. The defendants rely on their invalidity arguments to undercut this notion, which has no effect here given the Court's treatment of those invalidity arguments above.").

The Court concludes the balance of equities favors entry of an injunction and that an injunction would not disserve the public interest.

## IV. Scope of the Injunction

An injunction must state the reasons for its issuance, state its terms specifically, and describe in reasonable detail the acts restrained. Fed. R. Civ. P. 65(d)(1). It binds the parties, their officers, agents, servants, employees, and attorneys, and other persons in active concert or participation with them who receive actual notice. Fed. R. Civ. P. 65(d)(2).

On the one hand, there arguably does not appear to be a dispute that the injunction should be limited to the Accused Products, identified by ASIN, name and photograph, however they are listed and through whatever channel they are sold, as well as that the injunction "reaches another product only if that product is not more than colorably different from an Accused Product and also infringes claim 1." *See* Everplay Proposed Findings [ECF No. 51] at ¶ 136; OMZZ Proposed Findings [ECF No. 53] at ¶ 44 ("Fed. R. Civ. P. 65(d) requires that [the injunction] be strictly limited to the two Accused Products (20-piece magnetic fort building kit under ASIN B0F1FC6SHD and 24-piece magnetic fort building kit under ASIN B0F1F8XFQ6) *and products not more than colorably different therefrom*, and must expressly exclude Plaintiffs' non-accused product lines (such as toddler beds, play mats, and modular sofas).") (emphasis added).

On the other hand, OMZZ also argues the injunction cannot extend to include products that are "not more than colorably different" as OMZZ contends the determination of "[w]hether any later product is 'not more than colorably different' and still infringing must be adjudicated in a separate contempt proceeding against the adjudicated baseline, not presumed by the decree." OMZZ Proposed Findings [ECF No. 53] at ¶ 44. OMZZ cites *ABC Corp. I v. P'ship & Unincorporated Ass'ns*, 52 F.4th 934, 945–46 (Fed. Cir. 2022) and *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004), but *ABC Corp. I* endorsed substantially similar language to that proposed by Everplay here: "[t]he preliminary injunction must be limited to those products actually found likely to infringe and those 'not more than colorably different.'" *Id.*, 52 F.4th at 946 ("Under *International Rectifier*, preliminary injunctions that 'simply prohibit[ ] future infringement of a patent' are overbroad."). Moreover, while OMZZ is correct that a subsequent contempt proceeding would be necessary to determine whether a redesigned product violates the injunction under the two-step test articulated by the Federal Circuit in *TiVo Inc. v. EchoStar Corp.*,

646 F.3d 869 (Fed. Cir. 2011) (en banc) including because the first step of that test analyzes whether the new product "is not more than colorably different from the product found to infringe," *Shure*, 2020 WL 5214647, at *9, that does not appear to bar the injunction language proposed by Everplay (and perhaps, based on OMZZ's initial statement referenced above, OMZZ also does not dispute including the "not more than colorably different" language). In the Court's view, including Everplay's proposed language that the injunction encompass "(i) any Accused Product, or (ii) any product that is not more than colorably different from an Accused Product and that infringes claim 1 of the '811 patent" is sufficiently specific so as to satisfy the requirements of Rule 65(d). *See Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1346–47 (Fed. Cir. 2003) (affirming preliminary injunction where order was "sufficiently specific" to satisfy Rule 65(d)).[10]

## V. Security

The Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). The party to be restrained bears the burden of establishing the amount. *Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897, 911 (N.D. Ill. 2015). Because a wrongfully enjoined party's loss is its lost profit, not its gross sales, the bond should be measured by profit. *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1385 (Fed. Cir. 2006) (affirming bond set on evidence of the enjoined party's potential lost profits, lost market share, and costs of relaunch). "When setting the amount of security, district courts should

[10] OMZZ also says the injunction "[m]ay not . . . bind Plaintiffs' separate corporate entities or non-accused product lines, or bar the creation of seller accounts, beyond the limits of Rule 65(d)(2); a non-party's conduct may be reached only to the extent it acts in active concert with an enjoined party." OMZZ Proposed Findings [ECF No. 53] at ¶ 44. OMZZ does not argue that Everplay's proposed injunction language (binding "Counterclaim-Defendants; their officers, agents, servants, employees, and attorneys; and all other persons in active concert or participation with any of them who receive actual notice of this Order… ," Everplay's Proposed Findings [ECF No. 51] at IV) exceeds these limitations.

err on the high side" because setting security too low could result in "irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *See Mead Johnson & Co. v. Abbott Lab'ys*, 201 F.3d 883, 888 (7th Cir.), *opinion amended on denial of reh'g*, 209 F.3d 1032 (7th Cir. 2000). "The amount of a bond is a determination that rests within the sound discretion of a trial court." *Sanofi-Synthelabo*, 470 F.3d at 1385.[11]

OMZZ offered no evidence of its sales, margins, inventory, or compliance costs before or at the hearing, and it proposed no specific amount of security. Response [ECF No. 39] at 12; Hr'g Tr. [ECF No. 50] at 105:24–107:12. At the conclusion of the hearing, the Court raised concerns about exercising its discretion to set the amount of security without any such evidence and therefore allowed OMZZ to subsequently file a declaration regarding the amount of OMZZ's sales of the Accused Products, but strictly limited this submission to solely the issue of the amount of security for any preliminary injunction. The Court further confirmed, in response to a question raised by OMZZ's counsel, that any such declaration should not address any harm to OMZZ that would result if a preliminary injunction were issued because OMZZ had failed to timely submit such evidence in its Response or during the hearing. Hr'g Tr. [ECF No. 50] at 110:14–25, 111:25–112:14.

OMZZ provided a declaration from its general manager, Yuan Xia, in support of OMZZ's argument that security should be set at $500,000. *See* Xia Decl. [ECF No. 52]. Everplay filed a

---

[11] Although OMZZ argues the potential damages for a wrongfully issued injunction can include more than just lost profits, referencing "lost market share, and the associated costs of relaunch," OMZZ's Proposed Findings [ECF No. 53] at ¶ 42 (citing *Sanofi-Synthelabo*, 470 F.3d at 1385), OMZZ does not provide any evidence to support a calculation of its lost market share or the costs of a relaunch. Accordingly, OMZZ has not met its burden to include any such costs in the amount of security for any injunction. Nor does OMZZ provide any authority supporting its assertion that the amount of security should also include "the unavoidable compliance costs, deadweight FBA storage fees, and sunk inventory liquidation losses caused by the restraint"; *Sanofi-Synthelabo*, 470 F.3d at 1385, the only case cited for this proposition by OMZZ, does not provide such support.

response disputing the reasons set forth in the Xia Declaration for why security should be set at $500,000 and instead argued "[t]he Court should set security at $100,000, which secures OMZZ's sworn holiday-season profit" or "[i]f the Court chooses to secure OMZZ's projected profit for the full life of the injunction, security should not exceed $200,000, the top of OMZZ's own sworn figure." *See* Everplay Labs Limited's Response to the Declaration of Yuan Xia Regarding Preliminary Injunction Bond Amount (Dkt. 52) [ECF No. 54] ("Everplay Bond Response") at 2.

The Xia Declaration states that from August 1 through October 31, 2026, which OMZZ describes as "non-peak months," OMZZ sold 1,254 units of the Accused Products for about $65,520 in net profit after Amazon's referral and fulfillment fees, manufacturing costs, ocean freight, returns, storage and overhead, reflecting a net margin of about 16.6% or about $52 per unit. [ECF No. 52] at ¶¶ 5–6. Everplay points out that the Xia Declaration does not list advertising or Amazon's deal and coupon fees among the costs deducted, *id.* ¶ 6, so OMZZ's calculation may be an overstatement of net profits. Everplay Bond Response [ECF No. 54] at 3.

OMZZ also projects that it would sell about 1,500 units in November and December 2026, for $80,000 to $100,000 in net profit, and that an injunction remaining in place through the holiday season and pending the resolution of this litigation would cost it $160,000 to $200,000 in net profit. Xia Decl. [ECF No. 52] at ¶¶ 9–10. As Everplay notes, OMZZ also states that it has registered the Accused Products for Amazon's Black Friday and Cyber Monday promotional events, *id.* at ¶ 10, but OMZZ projects revenue from the holiday sales of $320 to $350 per unit, which would be based on sales prices of more than the $315.59 per unit OMZZ realized from August through October. *Id.* at ¶¶ 5, 9; Everplay Bond Response [ECF No. 54] at 4. OMZZ does not explain why its projected holiday sale or deal prices would exceed the non-peak pricing, and the Court agrees with Everplay that such sale or deal pricing would be expected to be at a discounted, rather than a

premium, price.

Finally, OMZZ argues that the security should be increased beyond the amount of its estimated lost net profits throughout the duration of an injunction ($160,000-$200,000) to $500,000, which OMZZ says also reflects "stranded holiday inventory, sunk manufacturing costs, and storage/destruction losses." Xia Decl. [ECF No. 52] at ¶¶ 11-15. OMZZ does not provide a clear explanation of how it calculates its purported losses as reaching $500,000. OMZZ points to 1,585 units of Accused Products that are in Amazon inventory or in inbound transit but also acknowledges 1,280 of those units are "inbound" without any further information regarding when the units shipped, where the units currently are, or whether it is possible to halt or redirect those shipments. *Id.* OMZZ identifies storage costs of $6,717.28 per month for these units, but again, does not account for the 1280 units that are not yet in storage and therefore would not appear to be presently accruing such costs. *Id.* OMZZ then says that it would be "economically prohibitive to ship oversized magnetic panels back to China" and asserts that an injunction would therefore "force" OMZZ to pay the high Amazon storage costs or liquidate or destroy the inventory, but OMZZ provides no factual information to support these assertions, including how much the shipping costs would be to return the product to China or to ship the product to another country where its sales would not be enjoined. The Court, therefore, is persuaded by Everplay's arguments that OMZZ has not supported its claim that security for the injunction should be set at $500,000. Everplay Bond Response [ECF No. 54] at 5-6. Moreover, as noted above, OMZZ chose not to submit any evidence about its sales or the amount of security for any injunction in the briefing or at the hearing. In that respect, OMZZ's inability to respond to Everplay's criticisms is of OMZZ's own making.

OMZZ's sworn figures put its lost profit at $80,000 to $100,000 through the holiday season

and $160,000 to $200,000 for an injunction lasting through this litigation and the reexamination. The Court does not understand why the security should be limited to only OMZZ's estimated lost profits for the holiday season if the injunction is expected to last beyond that point. Accordingly, the Court views the $200,000 as an appropriate amount for security. For the reasons stated above, OMZZ's calculation does not clarify whether it includes deductions for advertising and promotional costs, or whether it accounts for promotional discounts and thus even this estimate likely overstates OMZZ's estimated lost profits. *See Lashify, Inc. v. Qingdao Network Tech. Co.*, No. 25-cv-4183 (LJL), 2025 WL 2298837, at *4 (S.D.N.Y. Aug. 8, 2025) (in patent case against foreign online sellers, declining to increase bond where sales estimate "fail[ed] to account for the cost of those sales" and so did "not provide a measure of the profits that Defendants are at risk of losing as a result of a wrongly issued injunction"). In the Court's discretion, it finds that a bond of $200,000 would err on the high side of securing OMZZ's projected net profit for the full duration of the injunction. *See Mead Johnson*, 201 F.3d at 888. Moreover, either party may seek to modify the security if circumstances change. *See Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1142 (7th Cir. 1994). For all the above reasons, the Court recommends that security be set at $200,000.

Therefore, for the reasons discussed in this Report and Recommendation, and in accordance with 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b)(1), the undersigned respectfully recommends that Everplay's motion for preliminary injunction be granted. The following is the recommended language for an order entering a preliminary injunction:

> 1. **Accused Products.** As used in this Order, "Accused Products" means the following products, presently offered for sale on the Amazon.com marketplace with Counterclaim-Defendant OMZZ Trading Co., Limited as seller

of record, together with any unit of the same products, however, listed, labeled, branded, or identified, and regardless of the listing, Amazon Standard Identification Number ("ASIN"), storefront, or sales channel through which it is offered:

| ASIN | Product | Exemplary Image |
|---|---|---|
| B0F1F8XFQ6 | "Umoving Deluxe Magnetic Fort Building Panels Kit" (24-piece set) |  |
| B0F1FC6SHD | "Umoving 20-Piece Magnetic Fort Building Kit" |  |

2. **<u>Acts Enjoined.</u>** Pending entry of final judgment in this action or further order of the Court, Counterclaim-Defendants; their officers, agents, servants, employees, and attorneys; and all other persons in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, *see* Fed. R. Civ. P. 65(d)(2), are ENJOINED from:

a) making, using, offering to sell, or selling within the United States, or importing into the United States, (i) any Accused Product, or (ii) any product that is not more than colorably different from an Accused Product and that infringes Claim

1 of the ’811 patent, through any sales channel, including but not limited to the Amazon.com marketplace, any other online marketplace, any website, or retail store;

b) actively inducing any other person or entity to engage in any act prohibited by subparagraph (a);

c) knowingly assisting, aiding, or abetting any other person or entity, including any seller, distributor, importer, online marketplace, or order-fulfillment service, in engaging in any act prohibited by subparagraph (a), including by supplying Accused Products to any such person or entity for sale in the United States; and

d) creating, operating, or using any seller account, storefront, product listing, ASIN, brand name, or business entity for the purpose of engaging in any act prohibited by subparagraphs (a) through (c).

3. **Deactivation of Offers.** Within twenty-four hours after receiving notice of this Order, Counterclaim-Defendants shall deactivate, remove, disable, or cause to be deactivated, removed, or disabled any offers to sell the Accused Products through Amazon.com and any other United States sales channel, including their offers associated with ASINs B0F1F8XFQ6 and B0F1FC6SHD. This period is provided solely to permit technical deactivation and does not authorize any sale or offer for sale prohibited by Paragraph 3.

4. **Notice.** Within two (2) business days of the effective date of this

Order, Counterclaim-Defendants shall provide a copy of this Order to (a) their officers, agents, servants, employees, and attorneys; and (b) every person or entity acting in concert or participation with them with respect to the Accused Products, including any distributor, importer, or order-fulfillment service holding inventory of Accused Products, so that each is on notice of and bound by this Order under Federal Rule of Civil Procedure 65(d)(2).

5. **Compliance.** Within three (3) business days of the effective date of this Order, Counterclaim-Defendants shall file a declaration under penalty of perjury (a) identifying each person and entity notified under Paragraph 5 and the date and manner of notice; (b) confirming the deactivation required by Paragraph 4; and (c) stating the number of units of Accused Products in their possession, custody, or control in the United States, including units held by any order-fulfillment service, as of the effective date of this Order.

6. **Effective Date and Security.** This Order shall take effect upon Everplay's posting of security under Federal Rule of Civil Procedure 65(c) in the amount of $200,000, by bond or by cash deposit with the Clerk of Court, and Everplay's filing of notice of that posting.

7. **Duration.** This Preliminary Injunction shall remain in effect until the entry of final judgment, further order of the Court, or dissolution or modification of the injunction pursuant to law.

8. **Enforcement.** Any violation of this Order may be addressed through proceedings for contempt of court.

In addition, pursuant to the Court's Order setting an expedited schedule for any objections to this Report and Recommendation [ECF No. 49], the parties are advised that any objections to this Report and Recommendation must be served and filed in writing within 5 calendar days after service of a copy of this Report and Recommendation and the response to any such objections must be served and filed in writing within 5 calendar days after any objections are filed. *See also* 28 U.S.C § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(2). Failure to file a timely objection will constitute a waiver of objections on appeal. *See Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 760 (7th Cir. 2009); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

It is so ordered.

Karyn L. Bass Ehler
United States Magistrate Judge

Dated: November 10, 2026